RECEIVED IN
COURT OF CRIMINAL APPEALS

September 16, 2016

ABEL ACOSTA, CLERK

AP-77,047
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/16/2016 9:28:49 AM
Accepted 9/16/2016 10:28:08 AM
ABEL ACOSTA
CLERK

*ORAL ARGUMENT IS REQUESTED*

**No. AP-77,047**

**IN THE
COURT OF CRIMINAL APPEALS
OF TEXAS**

FILED IN
COURT OF CRIMINAL APPEALS

September 27, 2016

ABEL ACOSTA, CLERK

---

**KENNETH WAYNE THOMAS,
APPELLANT
V.
THE STATE OF TEXAS,
APPELLEE**

---

*On appeal from the 194th Judicial District Court of Dallas County, Texas
In Cause No. F86-85539*

---

**STATE'S BRIEF**

---

| | *Counsel of Record:* |
|---|---|
| **Susan Hawk** | **Christine Womble** |
| *Criminal District Attorney* | *Assistant District Attorney* |
| **Messina Madson** | State Bar No. 24035991 |
| *First Assistant* | Frank Crowley Courts Building |
| *Criminal District Attorney* | 133 N. Riverfront Blvd., LB-19 |
| Dallas County, Texas | Dallas, Texas 75207-4399 |
| | (214) 653-3625 |
| | (214) 653-3643 *fax* |
| | CWomble@dallascounty.org |

*Attorneys for the State of Texas*

# TABLE OF CONTENTS

Index of Authorities ................................................................ vii-xviii

Statement Regarding Oral Argument ................................................... 1

Statement of the Case ............................................................... 1

Statement of Facts ............................................................... 1-44

Summary of the Argument ........................................................ 44-49

Argument.......................................................................... 49

State's Response to Issue Nos. 1-7:................................................ 49

   **THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S BATSON CHALLENGES.**

State's Response to Issue Nos. 9-23:.............................................. 78

   **THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S CHALLENGES FOR CAUSE.**

State's Response to Issue Nos. 24-30:............................................ 140

   **THE TRIAL COURT DID NOT ERR IN GRANTING THE STATE'S CHALLENGES FOR CAUSE.**

State's Response to Issue No. 31:................................................ 168

   **THE SUPREME COURT'S DECISION IN HALL V. FLORIDA DID NOT INVALIDATE THIS COURT'S DECISION IN EX PARTE BRISENO.**

State's Response to Issue Nos. 32-34:.................................................. 178

> **THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S MOTION TO QUASH, HIS MOTION TO RE-QUESTION JURORS, AND HIS MOTION TO LIMIT THE STATE'S VOIR DIRE.**

State's Response to Issue Nos. 35-36:.................................................. 187

> **APPELLANT WAS NOT DEPRIVED OF A LAWFULLY CONSTITUTED JURY.**

State's Response to Issue No. 37:....................................................... 188

> **THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S MOTION TO DISQUALIFY THE DISTRICT ATTORNEY'S OFFICE.**

State's Response to Issue No. 38:....................................................... 195

> **THE TRIAL COURT PROPERLY OVERRULED APPELLANT'S MOTION FOR MISTRIAL DURING APPELLANT'S COMPETENCY TRIAL.**

State's Response to Issue No. 39:....................................................... 202

> **APPELLANT'S CLAIM THAT THE TRIAL COURT ERRED IN OVERRULING HIS OBJECTION DURING THE COMPETENCY TRIAL IS NOT PROPERLY BEFORE THE COURT.**

State's Response to Issue Nos. 40-41:.................................................. 205

> **THE EVIDENCE WAS SUFFICIENT TO PROVE APPELLANT'S COMPETENCY TO STAND TRIAL.**

State's Response to Issue No. 42:...........................................................227

    **THE TRIAL COURT PROPERLY OVERRULED APPELLANT'S OBJECTION TO DR. PRICE'S TESTIMONY THAT APPELLANT EXHIBITS TRAITS CONSISTENT WITH ANTI-SOCIAL PERSONALITY DISORDER.**

State's Response to Issue No. 43:...........................................................238

    **DR. PRICE DID NOT TESTIFY BEFORE THE JURY REGARDING APPELLANT'S REMORSE.**

State's Response to Issue No. 44:...........................................................240

    **THE TRIAL COURT DID NOT ERR IN ADMITTING A SILHOUETTE OF A KNIFE AS A DEMONSTRATIVE AID.**

State's Response to Issue No. 45:...........................................................247

    **THE TRIAL COURT PROPERLY ADMITTED THE AUTOPSY PHOTOGRAPHS. ALTERNATIVELY, ANY ERROR IS HARMLESS.**

State's Response to Issue No. 46:...........................................................254

    **THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S OBJECTION TO THE TESTIMONY OF JAMES BELT, SR.**

State's Response to Issue Nos. 47-48:.....................................................261

    **APPELLANT IS NOT INTELLECTUALLY DISABLED.**

State's Response to Issue No. 49:.........................................................278

**THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE JURY'S FINDING THAT APPELLANT IS A FUTURE DANGER.**

State's Response to Issue No. 50:.........................................................282

**THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUESTED JURY INSTRUCTION.**

State's Response to Issue No. 51:.........................................................287

**THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST THAT THE JURY BE ALLOWED TO ENTER A NON-UNANIMOUS VERDICT REGARDING THE INTELLECTUAL DISABILITY SPECIAL ISSUE.**

State's Response to Issue No. 52:.........................................................291

**THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST FOR AN ACCOMPLICE WITNESS INSTRUCTION.**

State's Response to Issue No. 53:.........................................................293

**THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST FOR AN ANTI-PARTIES INSTRUCTION IN THE CHARGE.**

State's Response to Issue No. 54:.........................................................295

**THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST FOR A SECOND COMPETENCY HEARING.**

State's Response to Issue No. 55:.........................................................304

**APPELLANT'S CLAIM THAT THE EVIDENCE IS INSUFFICIENT TO SUPPORT HIS CONVICTION FOR CAPITAL MURDER PRESENTS NOTHING FOR THIS COURT'S REVIEW.**

State's Response to Issue Nos. 56-67:......................................................305

**THE TRIAL COURT PROPERLY DENIED APPELLANT'S CHALLENGES TO THE DEATH PENALTY STATUTE.**

Prayer ......................................................................................310

Certificate of Compliance.................................................................311

Certificate of Service .......................................................................311

# INDEX OF AUTHORITIES

## Cases

*Adanandus v. State,*
866 S.W.2d 210 (Tex. Crim. App. 1993)..........................................56-57

*Almanza v. State,*
686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g) ......................286

*Apprendi v. New Jersey,*
530 U.S. 466 (2000) ........................................................................307

*Atkins v. Virginia,*
536 U.S. 304 (2002) ........................................................................170

*Baker v. State,*
177 S.W.3d 113 (Tex. App.—Houston [1st Dist.] 2005, no pet.) .......243

*Barber v. State,*
757 S.W.2d 359 (Tex. Crim. App. 1988)....................................200, 201

*Barnes v. State,*
876 S.W.2d 316 (Tex. Crim. App. 1994)..........................................106

*Batson v. Kentucky,*
476 U.S.79 (1986) ..................................................................... passim

*Belyeu v. State,*
791 S.W.2d 66 (Tex. Crim. App. 1989) ............................................294

*Bodde v. State,*
568 S.W.2d 344 (Tex. Crim. App. 1978)....................................183, 186

*Bone v. State,*
77 S.W.3d 828 (Tex. Crim. App. 2002) ..............................................66

*Brandon v. State,*
599 S.W.2d 567 (Tex. Crim. App. 1979)...................................................... 199

*Broadnax v. State,*
No. AP-76,207, 2011 Tex. Crim. App. Unpub. LEXIS 920 (Tex. Crim. App. Dec. 14, 2011) (not designated for publication) .....................67-68

*Butcher v. State,*
454 S.W.3d 13 (Tex. Crim. App. 2015) ...................................... 217, 225

*Callaway v. State,*
594 S.W.2d 440 (Tex. Crim. App. 1980)...................................... 199, 200

*Chambers v. State,*
866 S.W.2d 9 (Tex. Crim. App. 1993) ................................................53

*Cherry v. State,*
959 So. 2d 702 (Fla. 2007) (per curiam)............................................173

*Clark v. State,*
929 S.W.2d 5 (Tex. Crim. App. 1996) ..............................................146

*Coble v. State,*
330 S.W.3d 253 (Tex. Crim. App. 2010)............................................205

*Colburn v. State,*
966 S.W.2d 511 (Tex. Crim. App. 1998)...................................... 80, 145

*Coleman v. State,*
246 S.W.3d 76 (Tex. Crim. App. 2008) ..............................................191

*Cordova v. State,*
733 S.W.2d 175 (Tex. Crim. App. 1987).................................... 122, 127

*Devoe v. State,*
354 S.W.3d 457 (Tex. Crim. App. 2011)...................................279, 281

*Easley v. State,*
424 S.W.3d 535 (Tex. Crim. App. 2014)............................................183

*Easton v. State,*
920 S.W.2d 747 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd).....304

*Escamilla v. State,*
143 S.W.3d 814 (Tex. Crim. App. 2004).............................. 81, 249, 309

*Estrada v. State,*
313 S.W.3d 274 (Tex. Crim. App. 2010)............................................257

*Ex parte Briseno,*
135 S.W.3d 1 (Tex. Crim. App. 2004) ......................................... passim

*Ex parte Cathey,*
451 S.W.3d 1 (Tex. Crim. App. 2014) .........174, 176, 264, 272, 276, 277

*Ex parte Hagans,*
558 S.W.2d 457 (Tex. Crim. App. 1977)............................................199

*Ex parte Hearn,*
310 S.W.3d 424 (Tex. Crim. App. 2010).................................... 175, 264

*Ex parte Lizcano,*
No. WR-68,348-03, 2015 Tex. Crim. App. Unpub. LEXIS 331 (Tex. Crim. App. Apr. 15, 2015) (Alcala, J., dissenting) (not designated for publication)...................................................................................176

*Ex parte Moore,*
470 S.W.3d 481 (Tex. Crim. App. 2015), *cert. granted in part,* 136 S. Ct. 2407 (2016) .............................................. 174, 175, 178, 263, 264

*Ex parte Sosa,*
364 S.W.3d 889 (Tex. Crim. App. 2012)............................................178

*Ex parte Tennard,*
960 S.W.2d 57 (Tex. Crim. App. 1997) .............................................266

*Ex parte Thomas*,
  No. AP-76,405, 2010 Tex. Crim. App. Unpub. LEXIS 452 (Tex. Crim.
  App. Aug. 25, 2010) (not designated for publication).........................305

*Ex parte Woods*,
  296 S.W.3d 587 (Tex. Crim. App. 2009)............................................175

*Feldman* v. State,
  71 S.W.3d 738 (Tex. Crim. App. 2002) ............................ 79, 80, 96, 137

*Furman v. Georgia,*
  408 U.S. 238 (1972) ..........................................................................308

*Gallo v. State,*
  239 S.W.3d 757 (Tex. Crim. App. 2007)............................................290

*Garcia v. State,*
  887 S.W.2d 862 (Tex. Crim. App. 1994) 183-84, 193, 232, 240, 292, 294

*Gardner v. State,*
  306 S.W.3d 274 (Tex. Crim. App. 2009)................. 80, 96, 115, 136, 137

*Gonzales v. State,*
  353 S.W.3d 826 (Tex. Crim. App. 2011)............................ 104, 139, 141

*Good v. State,*
  723 S.W.2d 734 (Tex. Crim. App. 1986)..............................................99

*Goodman v. State,*
  701 S.W.2d 850 (Tex. Crim. App. 1985)....................................199-200

*Goodwin v. State,*
  799 S.W.2d 719 (Tex. Crim. App. 1990)..................................... 149, 152

*Granados v. State,*
  85 S.W.3d 217 (Tex. Crim. App. 2002) ............................. 146, 160, 165

*Gray v. State,*
    233 S.W.3d 295 (Tex. Crim. App. 2007)............................................188

*Griffith v. State,*
    983 S.W.2d 282 (Tex. Crim. App. 1998)......................................235-36

*Guevara v. State,*
    97 S.W.3d 579 (Tex. Crim. App. 2003) ....................................203, 245

*Hall v. Florida,*
    134 S. Ct. 1986 (2014) ............................................................... passim

*Hawkins v. State,*
    135 S.W.3d 72 (Tex. Crim. App. 2004) ............................................198

*Hernandez v. New York,*
    500 U.S. 352 (1991) ...................................................................53, 64

*Hernandez v. State,*
    757 S.W.2d 744 (Tex. Crim. App. 1988)...........................................200

*Howard v. State,*
    153 S.W.3d 382 (Tex. Crim. App. 2004)...........................................239

*Hunter v. State,*
    243 S.W.3d 664 (Tex. Crim. App. 2007)...........................................289

*In re Allen,*
    462 S.W.3d 47 (Tex. Crim. App. 2015) ............................................174

*Johnson v. State,*
    68 S.W.3d 644 (Tex. Crim. App. 2002) ..............................................56

*Johnson v. State,*
    429 S.W.3d 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ..........302

*Jones v. State,*
    982 S.W.2d 386 (Tex. Crim. App. 1998)..................................... passim

*Kelly v. State,*
824 S.W.2d 568 (Tex. Crim. App. 1992)..........................................232

*King v. State,*
29 S.W.3d 556 (Tex. Crim. App. 2000) ................. 149, 152, 154, 156-59

*King v. State,*
953 S.W.2d 266 (Tex. Crim. App. 1997)..........................................279

*Ladd v. State,*
3 S.W.3d 547 (Tex. Crim. App. 1999) ... 106, 139, 167-68, 198, 253, 278

*Landers v. State,*
256 S.W.3d 295 (Tex. Crim. App. 2008)..................................... 194, 195

*Martinez v. State,*
327 S.W.3d 727 (Tex. Crim. App. 2010)......................................278-79

*Martinez v. State,*
899 S.W.2d 655 (Tex. Crim. App. 1994)..........................................294

*Martinez v. State,*
924 S.W.2d 693 (Tex. Crim. App. 1996)..........................................279

*Mathis v. State,*
67 S.W.3d 918 (Tex. Crim. App. 2002) ..............................................55

*Matlock v. State,*
392 S.W.3d 662 (Tex. Crim. App. 2013)..................................... 217, 218

*Mendoza v. State,*
552 S.W.2d 444 (Tex. Crim. App. 1977)..................................... 182, 185

*Meraz v. State,*
785 S.W.2d 146 (Tex. Crim. App. 1990)..........................................218

*Miller-El v. Dretke,*
545 U.S. 231 (2005) ............................................................59, 65, 77

*Montgomery v. State,*
  810 S.W.2d 372 (Tex. Crim. App. 1990)............................................231

*Morris v. State,*
  301 S.W.3d 281 (Tex. Crim. App. 2009)............................................225

*Mosley v. State,*
  983 S.W.2d 249 (Tex. Crim. App. 1998)...........................................256-59

*Murphy v. Florida,*
  421 U.S. 794 (1975) ..................................................................116

*Neal v. State,*
  256 S.W.3d 264 (Tex. Crim. App. 2008)................................261-64, 277

*Nenno v. State,*
  970 S.W.2d 549 (Tex. Crim. App. 1998)............................................232

*Nieto v. State,*
  365 S.W.3d 673 (Tex. Crim. App. 2012)...........................................57-58

*Owens v. State,*
  473 S.W.3d 812 (Tex. Crim. App. 2015)............................................199

*Payne v. Tennessee,*
  501 U.S. 808 (1991) ..................................................................257

*Powell v. State,*
  898 S.W.2d 821 (Tex. Crim. App. 1994)............................................236

*Purkett v. Elem,*
  514 U.S. 765 (1995) ...................................................................54

*Rachal v. State,*
  917 S.W.2d 799 (Tex. Crim. App. 1996)............................................145

*Reed v. Quarterman,*
  555 F.3d 364 (5th Cir. 2009) .....................................................50, 64

*Romero v. State,*
    800 S.W.2d 539 (Tex. Crim. App. 1990)............................................230

*Ross v. State,*
    133 S.W.3d 618 (Tex. Crim. App. 2004)............................................300

*Sadler v. State,*
    977 S.W.2d 140 (Tex. Crim. App. 1998)............................................ 141

*Salazar v. State,*
    90 S.W.3d 330 (Tex. Crim. App. 2002) ............................................257

*Saldano v. State,*
    232 S.W.3d 77 (Tex. Crim. App. 2007) ....... 80-81, 83, 90, 139, 305, 309

*Sanders v. State,*
    832 S.W.2d 719 (Tex. App.—Austin 1992, no pet.) ................... 304, 305

*Santellan v. State,*
    939 S.W.2d 155 (Tex. Crim. App. 1997)............................................252

*Scarborough v. State,*
    54 S.W.3d 419 (Tex. App.—Waco 2001, pet. ref'd) ...........................193

*Shuffield v. State,*
    189 S.W.3d 782 (Tex. Crim. App. 2006)............................................231

*Simmons v. State,*
    622 S.W.2d 111 (Tex. Crim. App. 1981)................................... 243, 245

*Solomon v. State,*
    49 S.W.3d 356 (Tex. Crim. App. 2001) ............................................237

*State ex rel. Eidson v. Edwards,*
    793 S.W.2d 1 (Tex. Crim. App. 1990) ...................................... 191, 192

*State ex. rel. Hill v. Pirtle,*
    887 S.W.2d 921 (Tex. Crim. App. 1994)................................... 191, 194

*Tamez v. State,*
27 S.W.3d 668 (Tex. App.—Waco 2000, pet. ref'd) ............................ 183

*Threadgill v. State,*
146 S.W.3d 654 (Tex. Crim. App. 2004)....................................... passim

*Torres v. State,*
116 S.W.3d 208 (Tex. App.—El Paso 2003, no pet.) .................. 243, 244

*Turner v. State,*
422 S.W.3d 676 (Tex. Crim. App. 2013).................................... 199, 299

*United States v. Figueroa,*
618 F.2d 934 (2nd Cir. 1980)..............................................................231

*Vollbaum v. State,*
833 S.W.2d 652 (Tex.App.—Waco 1992, pet. ref'd) ...........................243

*Walder v. State,*
85 S.W.3d 824 (Tex. App.—Waco 2002, no pet.)................................235

*Waldo v. State,*
746 S.W.2d 750 (Tex. Crim. App. 1988)............................................201

*Walters v. State,*
247 S.W.3d 204 (Tex. Crim. App. 2007)............................................237

*Watkins v. State,*
245 S.W.3d 444 (Tex. Crim. App. 2008).................................... passim

*Weatherred v. State,*
15 S.W.3d 540 (Tex. Crim. App. 2000) .............. 185, 230, 246, 253, 286

*Williams v. State,*
191 S.W.3d 242 (Tex. App.—Austin 2006, no pet.) ...........................225

*Williams v. State,*
270 S.W.3d 112 (Tex. Crim. App. 2008)................................... 171, 290

*Witherspoon v. Illinois,*
391 U.S. 510 (1968) ..................................................................... 145

*Wood v. State,*
18 S.W.3d 642 (Tex. Crim. App. 2000) ............................................ 198

*Woodward v. Epps,*
580 F.3d 318 (5th Cir. 2009) ........................................................61-62

*Young v. State,*
826 S.W.2d 141 (Tex. Crim. App. 1991)............................................. 64

*Zamora v. State,*
411 S.W.3d 504 (Tex. Crim. App. 2013)............................................293

## Constitutional Provisions

Tex. Const. art. I...................................................................................306

U.S. Const. amend. VIII ............................................................... 170, 306

U.S. Const. amend. XIV ...................................................................306

## Statutes

Tex. Code Crim. Proc. Ann. art. 35.16(a)(9) (West 2006) ....................... 79

Tex. Code Crim. Proc. Ann. art. 35.16(b) (West 2006) ....................140-41

Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (West 2006)........................ 79

Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007)...................... 284, 285

Tex. Code Crim. Proc. Ann. art. 37.0711, §3(b)(2)(West Supp. 2015)...94, 278

Tex. Code Crim. Proc. Ann. art. 37.0711, §3(c) (West Supp. 2015)......278

Tex. Code Crim. Proc. Ann. art. 37.0711, §3(e) (West Supp. 2015).......94, 306-08

Tex. Code Crim. Proc. Ann. art. 37.0711, §3(f) (West Supp. 2015) .306-08

Tex. Code Crim. Proc. Ann. art. 37.0711, §3(j) (West Supp. 2015) ..........1

Tex. Code Crim. Proc. Ann. art. 38.08 (West 2005)...............................99

Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005)............................292

Tex. Code Crim. Proc. Ann. art. 46B.003(a) (West 2006).... 204, 216, 220, 298-99, 301

Tex. Code Crim. Proc. Ann. art. 46B.003(b) (West 2006)..... 216, 217, 298

Tex. Code Crim. Proc. Ann art. 46B.024(1) (West Supp. 2015) ...........217

Tex. Health & Safety Code Ann. §591.003(1) (West Supp. 2015) ........266

Tex. Health & Safety Code Ann. §591.003(7-a) (West Supp. 2015)....170, 263

Tex. Health & Safety Code Ann. §591.003(20) (West Supp. 2015) ......264

Tex. Loc. Gov't Code Ann. §87.013 (West 2008) ...................................191

Tex. Loc. Gov't Code Ann. §87.018(a) (West 2008).............................191

Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2015).........................93

**Rules**

Tex. R. App. P. 33.1(a)................................................................. passim

Tex. R. App. P. 38.1(i)....................................................................... passim

Tex. R. App. P. 44.2(b)........................................ 237, 238, 247, 254, 260

Tex. R. Civ. P. 292 .........................................................................290

Tex. R. Evid. 103 ................................................................... 237, 260

Tex. R. Evid. 401 ..........................................................................203

Tex. R. Evid. 403................................................................ 231, 245, 257

Tex. R. Evid. 702 .................................................................230-31, 232

Tex. R. Evid. 705(b) ........................................................................233

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

The State of Texas submits this brief in response to the brief of Appellant, Kenneth Wayne Thomas.

## STATEMENT REGARDING ORAL ARGUMENT

The State requests the opportunity to present oral argument if the Court grants Appellant's request to argue.

## STATEMENT OF THE CASE

This is an automatic appeal from a sentence of death. *See* Tex. Code Crim. Proc. Ann. art. 37.0711, § 3(j) (West Supp. 2015). The trial court sentenced Appellant to death on July 23, 2014 for the capital murder of Mildred Finch. (CR:88-89; RR70:84-85).[1] Appellant filed his brief on direct appeal on June 22, 2015. He filed an amended brief on August 24, 2016. Appellant presents sixty-seven allegations of reversible error.

## STATEMENT OF FACTS

On or about March 16, 1986, Kenneth Wayne Thomas (hereinafter, "Appellant"), broke into the home of Fred and Mildred

---

[1] The State will refer to the Clerk's Record filed on December 23, 2014 as "CR," the Clerk's Record filed on October 27, 2015 as "CR2," the Clerk's Record filed on November 30, 2015 as "CR3," the Clerk's Record filed on March 3, 2016 as "CR4," and the Sealed Clerk's Record as "CR-S."

1

Finch. Fred and Mildred were home at the time of the burglary and Appellant stabbed and killed them both.

### *Fred and Mildred*

At the time of their death, Fred and Mildred Finch had been married for many years. (RR68:221). Fred and Mildred were both in their mid-60s and they shared a small house on Rose Lane, the home that they purchased in the 1950s. (RR60:31; RR68:223-25; SX34A). Mildred, a smart and strong-willed woman with a master's degree in math and science, was a Professor of Mathematics at El Centro College. (RR68:224; SX2). Fred, a World War II veteran and former Tuskegee airman, was a Harvard-educated lawyer who had worked to integrate schools and hotels in Dallas. (RR68:221-22; SX1). Fred and Mildred had one child, a daughter named Molly. (RR68:221). Molly married James Belt, Jr. (RR68:220-21). Molly and James gave Fred and Mildred two grandchildren, James III and Melanie. (RR68:226).

On Sunday, March 16, 1986, the Belt family attended the 8:00 a.m. services at their church. (RR68:227). Afterward, Molly planned to take Mildred to the mall. (RR68:227). James stayed behind at the church to attend Sunday school. (RR68:227). He would get a ride

home with a friend later. (RR68:227). While James was waiting for his ride, he was notified that he had a phone call. (RR68:227). It was Melanie. (RR68:226, 228). Melanie said that James needed to come to Rose Lane immediately. (RR68:228).

When James arrived, Molly, Melanie, and James III were in front of the house. (RR68:228). A police officer was there. (RR68:228). James went to the back door and asked whether the officer had been inside the house. (RR68:228). The officer had not. (RR68:228). James noticed that the back door was open and Fred's car was in the driveway. (RR68:228). At that point, James knew something was wrong so he went inside the house. (RR68:228). James described the scene:

> I guess I was on my knees or crawling or something, and I crawled through the kitchen. When I got midway through the kitchen, at the end of the kitchen, I saw [Mildred]. Oh, God. She was laying on the floor, and blood was everywhere. Blood was everywhere: On the floor, on the wall, on the ceiling. It was everywhere. When I touched her, she was cold. I felt her pulse. She was dead.
>
> I went into the bedroom. [Fred] was dead. Bed was just covered with blood. Blood was on the floor, it was on the wall, it was on the ceiling. It was everywhere.

. . .

> In the living room, there was clothes piled up everywhere. In the bedroom, the drawers had been pulled out. There were clothes and things on the floor. I could tell that the house had just been ramshacked (sic).

(RR68:228-29). Fred and Mildred appeared to have been stabbed multiple times. (RR60:34).

Mildred's body was found lying in the hallway, up against the wall. (RR60:40, 65-66, 72-75; RR63:11; SX48-53). Detective Gallagher testified:

> There was blood everywhere. There was blood on the walls. There were smears on the baseboards. She was wrapped in some sheets and some blankets, and you could still see multiple stab wounds all over her. It was a mess.

(RR60:40; SX50, 51). Several feet from her body was "a bloody palm print or fingerprint on the hallway wall." (RR60:43).

Fred's body was found in the bedroom, lying on the floor about five feet from Mildred. (RR60:40-41, 76; RR63:11; SX42-47). That scene was described as follows:

> Mr. Finch suffered multiple stab wounds. He was almost in a kneeling-type position on the floor, with his head down on the floor. There were blankets and everything. Disarray. It was blood everywhere in there. He had pajamas on, but his

4

pajamas were down around his ankles or his calves. So his bare buttocks was very obvious to me, as I peered down the hallway.

(RR60:41). There was blood on the bed, the walls, and the floor. (RR60:41; RR63:12). There was blood "up and down the hallway, from the baseboard almost to the ceiling." (RR60:63).

James tried to determine whether anything had been stolen from the house. (RR68:230). He saw "a gap in the closet." (RR68:230). A number of Fred's suits were gone as were his shirts, hats and caps. (RR68:230). Fred's gold and silver Rolex was also gone. (RR68:231-32).

Dr. Edward McDonough performed an autopsy on Mildred. (RR61:46-47; SX71-83). Mildred "had extensive sharp-force trauma over almost all the surfaces of her body. Particularly, above the waist." (RR61:54). The total number of sharp-force wounds was "probably more than 90." (RR61:54).

Mildred suffered multiple injuries to the head. Dr. McDonough described the following: a stab-wound to the right side of her chin; a v-shaped cut to her scalp; a superficial stab wound above her right eyebrow; a three-inch cut on the back of her scalp; and, two stab wounds to her right-back shoulder. (RR61:63-65; SX75-76, 79-80). Mildred's

other wounds were grouped based on their location:  the head; right-chest; abdomen; and back.  (RR61:66; SX82).  There were 20 individual stab wounds to Mildred's abdomen.  (RR61:67; SX82).  Most were superficial, however, some entered the abdominal cavity.  (RR61:67).  There were 17 wounds to Mildred's back, some of which penetrated her right chest cavity.  (RR61:68-69).  There were "about 35 individual wounds of various widths and depths" to the right side of Mildred's body, from her armpit down to her thigh.  (RR61:69; SX70A, 83).  "There's a lot of wounds that are even confluent, where they're so close together they actually blend together."  (RR61:71).  There were stab wounds to the left side of Mildred's body.  (RR61:71; SX71).  There were four or five stab wounds to the back of her left upper arm.  (RR61:71; SX81).  There were wounds to her right hand.  (RR61:72; SX73).  There was a "through and through stab wound of the wrist" on her left arm.  (RR61:72-74; SX74).  Dr. McDonough estimated the depth of the stab wounds as five to six inches deep.  (RR61:68).  She had defensive wounds on her hands, wrists, and forearms.  (RR61:66).

Many of the stab wounds affected Mildred's organs.  There was a stab wound to her right lung; her left lung; eleven stab wounds to the

liver; her aorta was transected. (RR61:75). Mildred also suffered a "fairly-significant blunt-force trauma, which consisted of a fracture of the right humerus." (RR61:67; SX82). Almost every one of her ribs was fractured, some in two places. (RR61:67-68). Mildred's cause of death was "multiple stab wounds of the torso." (RR61:74).

Dr. Gilliland performed an autopsy on Fred.[2] (RR61:47-48, 51-52; SX57-70, 70A). Dr. Gilliland documented 21 sharp-force injuries on Fred. (RR61:58). Fred had a stab wound to the right side of his head that was about an inch long. (RR61:79, 80; SX58, 65). He suffered five stab wounds to the left side of his trunk, injuring his left upper lung, heart, abdomen, liver, stomach and pancreas. (RR61:79-81; SX58, 62). The approximate depth of these wounds is "up to six inches[.]" (RR61:80). He suffered ten blunt and sharp-force wounds to his back. (RR61:80, 82; SX67, 59). These injuries caused damage to Fred's left lung and spleen as well as a fracture of the 11th rib. (RR61:80; SX67). He suffered stab wounds to his arms. (RR61:81; SX64). The medical examiner also "noted there were several cuts between the buttocks."

---

[2] Dr. McDonough was present and observed Fred's autopsy. (RR61:47-48).

7

(RR61:83; SX61). Fred's cause of death was "multiple stab wounds." (RR61:83).

All of Mildred's and Fred's wounds are consistent with a single-edged knife. (RR61:58, 61). All of the wounds could have been inflicted by a single knife. (RR61:61, 88).

### *Physical Evidence of the Crime*

The Finch home appeared to have been burglarized. (RR60:37, 43). The point-of-entry appeared to be a window. A couple of the window sills on the front of the house appeared to have been recently damaged and there were two open windows. (RR60:36, 55-57, 148-50; RR63:13; SX35, 37, 107-08). The window in the front of the house was open, but blocked on the inside by a heavy piece of furniture. (RR60:147, 149, 188; RR63:13; SX108, 110). A bent window screen in the yard appeared to fit this window. (RR60:36, 56, 144, 182; SX35-37).

A window on the side of the house was also open. (RR60:149, 187; SX36-37). There was an air conditioning window unit sitting in the grass nearby. (RR60:36, 145, 150; SX36-37). The cord for the unit stretched from the unit though the open window to the outlet where it was still plugged in inside. (RR60:36, 145, 148; SX36-37, 107, 109). On

the inside of the house, the curtains were pulled away, consistent with someone coming through the side window from the outside to the inside. (RR60:150-51; SX109-10).

The home appeared to have been ransacked. (RR63:12). In the living room, a stereo, and a cardboard box were stacked up by the front door. (RR60:39, 179). The box appeared to have been "stacked up for a purpose." (RR60:204). Inside the box were some suits and a raincoat. (RR60:107, 109, 179, 204; SX111). The black raincoat appeared to have blood on it. (RR60:180, 204).

In the kitchen, there was a bloody rag on the floor near the refrigerator. (RR60:37; RR63:12; SX41). There was blood on the handle of the refrigerator. (RR60:38). On the kitchen table, there was a Saturday-edition of the Sunday March 16th newspaper.[3] (RR60:37-38, 109-10; RR61:197; SX112, 114, 116). The newspaper had blood on it. (RR60:37-38, 109-10; SX112, 114, 116). The blood appeared to be an outline of a knife. (RR60:110, 125; SX116). "It looks like there was

---

[3] The Dallas Times Herald newspaper on the table was a "Sunday noon dog edition[.]" (RR61:197; SX114). This version of the Sunday paper was part of an edition that would have gone to press in the morning of Saturday, March 15, 1986. (RR61:197; SX114). It would have been available for sale at various over-the-counter locations throughout the county "around 8:30, 9:00 o'clock Saturday morning." (RR61:197-98).

9

blood on a knife tip and it was wiped off on the newspaper." (RR60:178, 209; SX112-16).

Police walked around the scene trying to find the murder weapon. (RR60:118, 197). It was never recovered. (RR60:127-28).

### *The Investigation*

On March 18th, the Crime Stoppers Unit received a tip from Kathy Johnson. (RR60:83, 85, 122). Kathy knew about the stolen property and the type of weapon. (RR60:85). She provided Appellant's name. (RR60:86). Kathy met with police later in the day and provided Appellant's brother's name, Lonnie Thomas, and advised that Lonnie knew of the stolen property as well. (RR60:87, 122).

Detectives James Gallagher and Phillip Jones went to 4323 Electra to speak with Lonnie. (RR60:87; RR63:22). Lonnie wasn't home, but they spoke with his mother, Shirley Baldwin, and his other brother, Billy Thomas. (RR63:22). Shirley told Jones that Appellant admitted to the murders. (RR63:63). Jones requested and was granted consent to enter the house. (RR63:23). Inside, Jones found a three-piece black suit, an umbrella, and black-and-white shoes. (RR63:23). He did not find a bloody knife or bloody clothing. (RR63:24).

10

Later that day, Billy called Jones to let him know that Lonnie had returned home. (RR63:26). Jones and Gallagher went back to the house on Electra. (RR63:26). Lonnie agreed to accompany them back to the station. (RR60:87; RR63:26). Jones testified:

> What Lonnie told me, en route from 4323 Electra to the office, was that when Kenneth woke him up, he had been stacking property in the house; that he asked him to come out and help move some of the stuff. He walked outside and he said, at that point, that the property had been taken out of the back of a yellow car.

(RR63:54).

At the station, Lonnie provided a written statement implicating Appellant.[4] (RR60:88, 90, 124; RR63:30). Lonnie told police that he saw Appellant in possession of a bloody weapon. (RR60:127). Detectives were on their way to return Lonnie back to Electra when they learned that Lonnie had recently disposed of some of the Finch's property at a "makeshift dump" on the 4000 block of Hancock Street. (RR60:91-95; RR63:31; SX34D, 87-88, 94, 100). Lonnie had not mentioned Hancock in his statement. (RR63:30). The detectives drove to the dump site where they recovered several hat boxes, black trash

---

[4] Lonnie claimed to be home in bed with his girlfriend, Delores Easter. (RR60:93, 131).

11

bags containing clothing, and Fred's brown briefcase. (RR60:95-97; RR63:31; SX87-88, 94-99).

Lonnie was transported back to the station where he gave a voluntary statement and was arrested. (RR60:98-99; RR63:32-33). This time, Lonnie said that Kathy Johnson helped him dump the property. (RR63:32). He claimed that he did not call the police because he "was afraid that he would be charged or considered a suspect in the case." (RR63:49)

Late that night, Appellant was arrested at the house on Electra, which is about four blocks from the Finch home. (RR60:49, 53, 103; RR63:35-36; SX34B, 225). Appellant was wearing Fred's Rolex watch. (RR60:106; RR63:36-37; SX219-21).

### The Hancock Dumpsite

At the Hancock dumpsite, police located a great deal of Fred's property, including suitcases, clothing, suits, men's hats, and hat boxes. (RR61:97-99, 104-10; SX5-14, 18-21, 23, 86-88, 94-101, 207). Hats and hat boxes were found under a white sheet. (RR61:100, 102, 104-10; SX87, 95). A brown hat box was found on top of a couch. (RR61:101; SX87, 98). Two black garbage bags containing clothing were found

near the couch. (RR61:101-03; SX88, 95, 97). There was also a brown satchel containing men's dress shirts and a loaded Enfield .38-caliber revolver in a holster. (RR61:97-98, 103-05, 123; SX84, 85, 87,[5] 97, 99, 207).

Among the items collected from the dumpsite were: a men's three-piece suit (SX23); a grey and red flannel suit (SX25); a grey plaid suit containing the label "Fred James Finch, Jr" and dated December 10, 1982 (SX27); a grey suit containing the label "Custom Tailored for Fred Finch" (SX26); a yellow shirt (SX8); a light colored shirt (SX7); a blue and red plaid shirt (SX12); a blue striped shirt (SX11); a white and blue shirt (SX9); a gray shirt (SX10); a light-colored plaid shirt (SX6); a blue patterned shirt (SX13); a blue shirt with a white collar (SX5); a multi-colored shirt (SX28); a silver patterned shirt (SX17); two Dobbs hats (SX19-20); a flannel newsies hat (SX23); a brown fur hat (SX101); a blue hat (SX21); a tweed hat (SX18); a straw hat; (SX14); a pair of brown gloves (SX93); three pairs of black gloves (SX102-04); a blue striped scarf (SX29); a brown suede jacket (SX16).[6] (RR61:105-20).

---

[5] The gun and holster were released following Appellant's 1987 trial. (RR61:116; SX87).

[6] The property from the Hancock dumpsite that was introduced into evidence represents about one-third of the property collected from that site. (RR61:124).

Bernard Blackmon[7] testified that he worked for the Leonard Custom Tailoring Company in Cincinnati and the Ripley Shirt Company in Dallas, selling tailored suits and tailored shirts. (RR61:190). Blackmon sold Fred custom suits. (RR61:193). He identified State's Exhibit 26 as a custom-made suit that he sold Fred. (RR61:193; SX26). He also ordered custom-tailored shirts for Fred as well. (RR61:194-95; SX10-3, 17). The cuffs of these shirts are monogramed with Fred's initials, FJF. (RR61:195).

### *Forensic Evidence*

Appellant's fingerprints were found on the inside portion of the window sill, on the inside of the window screen, and on the air conditioning unit. (RR60:215-16, 252-57; SX117-24). The bloody palm and fingerprint found near Mildred's body also belonged to Appellant. (RR60:111-14, 171-76, 217, 232-257; SX125-26, 202). Police had no information suggesting that Appellant knew the Finches or had any reason to be at their home. (RR60:113-14). Lonnie's fingerprints did not match those recovered from the Rose Lane address. (RR60:131).

---

[7] Bernard Blackmon was deceased at the time of the 2014 trial. The transcript of his prior testimony was read into the record. (RR61:188).

Appellant's fingerprints were found on the Knox hat box recovered from the Hancock Street dumpsite. (RR60:221, 260; SX134, 202).

In 1986, Carolyn VanWinkle performed serological testing on the following items: the black raincoat (SX111); some pillowcases; black and white shoes; a bedsheet and mattress pad; Mildred's clothes; and the sheets from around Mildred's body. (RR61:15, 18-19, 21). The raincoat tested positive for blood. (RR61:22; SX111). It was Fred's and Mildred's blood. (RR61:22, 26; SX111). Further testing of the samples from the raincoat did not reveal the presence of any foreign blood. (RR61:28-29). A presumptive test performed on the black-and-white shoes was positive for blood. (RR61:35-38; SX30). The gold bedsheet and white mattress pad collected with Mildred's body both "had a large quantity of blood and blood soaked into it." (RR61:38-39). Samples of the blood corresponded to the Finches. (RR61:39).

A pink and green pillowcase that was received with Fred's body by the medical examiner was also tested. (RR61:30-31). "[T]here was semen identified on the pillowcase." (RR61:31). "[S]permatozoa were identified on that stain." (RR61:33-34). A screening test performed on

the anal swab collected during Fred's autopsy was positive for the presence of semen. (RR61:32-33, 43). The semen was Fred's. (RR61:43).

Certain items of evidence were subjected to testing "for handler DNA or any epithelial cells that may have come off when somebody was carrying them or maybe wearing them." (RR61:128, 132-33; SX208-09). Mildred's pajama shirt contained human blood. (RR61:137). There were three available cuttings from the shirt, but only one sample yielded a genetic profile. (RR61:158; SX210). A sample of blood from Mildred's pajama shirt yielded a partial DNA profile, which was identified as Mildred's own blood. (RR61:153-55). There were four available cuttings from Mildred's pajama pants. (RR61:159; SX210). One sample yielded a partial profile that matched Mildred. (RR61:159; SX210). There were six available cuttings from the bedsheet from the Finch home. (RR61:160; SX210). One sample yielded a full genetic profile, which was that of Mildred. (RR61:161-62; SX210). Several partial genetic profiles from the sheet were also a match to Mildred. (RR61:162-63; SX210). Testing of a hair curler yielded a partial profile matched to Mildred. (RR61:163; SX210). Testing of a hair curler clip yielded a partial profile matched to Mildred. (RR61:163; SX210).

Three stains from the raincoat did not yield any DNA. (RR61:164; SX210). One stain from the raincoat, however, matched Mildred's DNA. (RR61:164-65; SX210). The cutting from a pillowcase matched Fred's DNA profile. (RR61:171-72; SX217).

Angela Fitzwater tested the anal swab from Fred's rape kit. (RR61:169; SX218). Both the epithelial cell fraction and the sperm cell fraction matched Fred's DNA profile. (RR61:170, 173-74; SX218). DNA testing from Fred's right-hand fingernail clippings was also a match to Fred. (RR61:170; SX218).

### *The Thomas Family*

In March of 1986, Appellant, his mother (Shirley Thomas), his brother (Lonnie Thomas), his sister (Shirley), and Lonnie's girlfriend (Delores Easter) shared a home at 4323 Electra. (RR62:11-13, 28, 30, 73, 81, 118-19). Lonnie and Easter occupied one of the bedrooms in the house.

On Saturday, March 15, 1986, Lonnie watched wrestling on television, after which he and Easter went to bed. (RR62:74). Early the following morning, Appellant woke him up, "bringing in some clothing and bags and boxes." (RR62:74). He had "a suitcase, with a

17

pistol in it. He had boxes with hats and clothes, and he had [sic] Rolex watch on. (RR62:14). Appellant wanted Lonnie to help him bring everything inside. (RR62:32, 75-76). Appellant put the property on the living room couch, on the porch and in the back room. (RR62:31). Included among the property were long-sleeve shirts with initials embroidered on them. (RR62:15-17). The initials did not correspond with Appellant's name. (RR62:15). Appellant claimed that he got the property as payment for helping a lady "move something out of her garage." (RR62:76).

At one point, Appellant went into the bathroom. (RR62:76). When Appellant came out, Lonnie saw a shirt lying in the bathtub. (RR62:77). The shirt was covered in blood on the right side from the wrist to the elbow. (RR62:76-77). Lonnie also saw a bloody knife in the bedroom. (RR62:78-79). It was a long hunting-type knife. (RR62:78). It was about six inches long and had a "cream-colored speck with brown" handle. (RR62:78). Appellant claimed that he had stabbed a dog. (RR62:13-14, 78).

Appellant showed Lonnie "an old model .38 Breakdown front side" firearm. (RR62:79). The gun was in a briefcase. (RR62:80). Appellant

was wearing "a gold-band watch." (RR62:80-81; SX221). After he showed Lonnie the property, Appellant "basically kind of just sat down and fell asleep." (RR62:82). When Lonnie woke up the following morning, Appellant was gone. (RR62:83). The bloody shirt and knife were also gone. (RR62:83).

That day, Appellant's other brother, Billy,[8] went to the house on Electra at about noon. (RR62:143). He wanted his mother to pay him for babysitting his nieces and nephew. (RR62:142-43). At the house, Billy noticed some big boxes in the bedroom where Lonnie and Kenneth slept. (RR62:144, 177, 200). He did not see how the boxes got there. (RR62:177, 200).

On Monday, Appellant met up with his cousin Thomas Penagraph. (RR62:42, 43). Appellant went over to Thomas's house, then Appellant, Thomas, and Thomas's girlfriend Brenda Jackson all went to the house on Electra. (RR62:43-44). There, Appellant changed into a black suit. (RR62:45, 50; SX24). He showed Thomas "[t]he suede brown jacket. A couple of hats . . . [and] some suits[.]" (RR62:44-45; SX16, 18-19). Appellant was wearing a watch that was big and looked expensive.

---

[8] Billy Thomas was deceased at the time of the 2014 trial. The transcript of his prior testimony was read into the record. (RR62:140).

(RR62:45; SX219-21). Thomas had not seen Appellant with that watch or that property before. (RR62:45-46, 52, 68). Appellant gave Thomas one of the jackets and one of the hats. (RR62:46; SX16, 19).

On Tuesday, Lonnie heard on the radio that a lawyer and his wife had been killed "in the South Dallas area, close to where I lived." (RR62:85). That day, Lonnie moved the property from Electra to his cousin Bobby Roy's house. (RR62:86, 101). Billy had told Lonnie of a call that he had received from Kathy, "to get the stuff out of my mom's house because my brother had killed some people." (RR62:87). Later, Billy called and told Lonnie to get rid of the property because the police were looking for him. (RR62:87). Lonnie put everything in a sheet and trash bags and he and Kathy took the property to Hancock. (RR62:88-89; SX87-88). Afterward, he went back to the house on Electra. (RR62:90).

The police came and picked Lonnie up and took him to the station where he gave a statement. (RR62:91, 132-35; SX223). In this statement Lonnie told Detective Gallagher that he saw Appellant with the property on Sunday morning. (RR62:92-93). He told them about the bloody shirt. (RR62:93). He did not say anything about the knife

20

or the gun or about dumping the property on Hancock. (RR62:93, 128-29). The police were taking Lonnie home when they learned that someone had seen Lonnie dumping the property. (RR62:93, 122-23). Lonnie realized that he had to be honest. (RR62:123, 125). On Hancock, he pointed out the property that he and Kathy had dumped. (RR62:94). Lonnie was placed under arrest for murder.[9] (RR62:94, 96). He gave a second statement. (RR62:95; SX224). In this statement, he told police about the bloody knife, the bloody shirt, the pistol, and how the property moved from Electra to Hancock. (RR62:95, 135; SX224).

After Lonnie's arrest, Billy started receiving calls from Appellant. (RR62:156-57). During one call, Appellant said he was coming to the house to get his clothes. (RR62:158, 187). Appellant also said "[t]hat he was going to kill us." (RR62:159). During another call, Appellant said "[t]hat he was going to kill us all if he didn't get what he wanted." (RR62:160). He wanted "[h]is money and clothes." (RR62:161). The threat to kill was directed at Billy and their mother. (RR62:163). Billy called the police. (RR62:188). He was told to call back if Appellant went to the house. (RR62:188).

---

[9] After Lonnie testified at the trial in 1987, his case was "dismissed for insufficient evidence." (RR62:97, 137).

That night, Appellant returned to the Electra house. (RR62:164-65). Appellant and Billy discussed Lonnie and money.[10] (RR62:164-65, 205, 207, 216-17). Appellant wanted Billy to give him $8,000. (RR62:165, 193). Appellant went to the back room, came back, pointed a gun at Billy's head and then pulled the trigger.[11] (RR62:166, 193-94, 205). He pulled the trigger six times. (RR62:166, 194). Billy told Appellant that the police had called. (RR62:167). Appellant said that "he didn't know what the police were looking for him for unless they had some money to give him." (RR62:167). If Billy didn't give Appellant his money or clothes, Appellant was going to kill the family. (RR62:167-68). Appellant was upset. (RR62:170).

Lonnie's father, Lonnie Burrell,[12] went to the house on Electra that night. (RR62:225). When he arrived, Appellant was walking out. (RR62:226). Appellant asked where Lonnie was. (RR62:226). Burrell said Lonnie was probably in jail for something that Appellant did.

---

[10] On direct examination, Billy testified that the encounter with Appellant and the gun occurred on Tuesday night. On cross-examination, he testified that the encounter occurred on Monday night. (RR62:197, 205, 207, 209-14). His memory was refreshed with his prior testimony wherein he testified that the encounter took place on Tuesday. (RR62:209-15). He eventually testified that "maybe I had the days mixed up." (RR62:211).

[11] Billy had not previously seen a gun at the house on Electra. (RR62:200-01).

[12] Lonnie Burrell was deceased at the time of the 2014 trial. The transcript of his prior testimony was read into the record. (RR62:220).

(RR62:226-27). Appellant told Burrell that Lonnie did not know anything. (RR62:227). He said that Lonnie was not with him "during the time." (RR62:227). Later that evening, coverage of the murders appeared on the news. (RR62:228). Appellant's mother asked Appellant whether he killed them and Appellant said yes. (RR62:164, 169-70, 217-18, 228). He said that "the dead can't talk and he wasn't through yet." (RR62:164). Appellant said that he was not finished killing yet. (RR62:229).

Appellant was arrested later that night. (RR62:172, 229).

### *Appellant's Criminal History*

The State presented evidence of Appellant's criminal history and bad behavior while in prison:

On February 18, 1979, an 18-year-old Marvin Lindwood went to his friend Vicki Calhoun's house for drinks. (RR63:68-69, 88). Lindwood and Vicki were sitting around having a good time when Appellant came over. (RR63:69). Vicki invited him in. (RR63:69). For the first couple of hours, everything went well but then Appellant tried to attack Vicki. (RR63:70). In the kitchen "he had her in there up against the sink. He was trying to pull her clothes off of her."

23

(RR63:70). Lindwood told Appellant to leave Vicki alone. (RR63:70, 79). He and Appellant started fighting. (RR63:70, 79, 90). "He hit me. I hit him." (RR63:70). At some point, Appellant left. (RR63:71). Lindwood stayed with Vicki to continue drinking and listening to music. (RR63:71). Later, Lindwood heard someone calling his name outside. (RR63:71). It was Appellant. (RR63:71).

"When [Lindwood] went to the door, [Appellant] was standing up out there acting like he wanted to apologize and all that there." (RR63:71). He told Lindwood that he knew he was wrong and asked Lindwood to apologize to Vicki for him. (RR63:71). He said he would not return. (RR63:71). Appellant got up as if he were going to walk off. (RR63:71, 87). Lindwood turned to go inside. (RR63:71, 87, 90). The last thing he remembered was reaching for the screen door. (RR63:71-73, 90). "That's when [Appellant] stabbed [him] in the head with that screwdriver." (RR63:72). When Lindwood woke up, he was in the hospital and nearly a month had passed. (RR63:74).

The screwdriver penetrated Lindwood's brain. (RR63:75). Lindwood suffered irreversible, permanent brain damage. (RR63:84). The stabbing caused permanent damage to the left side of his body.

(RR63:74-75). Lindwood suffered a loss of mobility to his left side. (RR63:74).

That same day, Billy, who was living with Appellant, Lonnie, their sister, and their mother, gave Appellant money to buy beer. (RR63:111). Appellant did not come back with any beer. (RR63:111, 116-17). Instead, Appellant returned late. (RR63:111). Then, they got into a fight during which Appellant cut Billy.[13] (RR63:112). Appellant also cut Billy's friend, who happened to be at the house during the fight. (RR63:112-13). After the fight with Billy, Appellant went next-door, to his ex-girlfriend Joyce Brown's house. (RR63:101-02). When Brown refused to let him inside, Appellant broke her window. (RR63:102-03).

Appellant was tried for the offense against Lindwood. He was convicted of aggravated assault with a deadly weapon and was sentenced to ten years' confinement in the institutional division of the Texas Department of Criminal Justice. (RR60:223, 264-65; SX205).

In January of 1983, Michael Ferguson was arrested and jailed for murder. (RR63:136). He was assigned to a cell with Appellant. (RR63:137-38). Initially, Appellant was "playing the nice-guy role."

---

[13] On direct examination, Billy testified that he was cut on his forehead. (RR63:112). On cross, Billy admitted that it could have been on his chest. (RR63:115).

25

(RR63:138). Appellant was religious and read scripture. (RR63:138). Once Ferguson let his guard down, however, Appellant became aggressive. (RR63:138-39). Appellant "started coming on to me sexually, of course. Extortion. Wanted to know if I had money and whatnot." (RR63:138-39). Appellant was "[d]emanding." (RR63:139). He was a "predator." (RR63:142). Ferguson was transferred out of Appellant's tank. (RR63:140-41).

On June 13, 1983, Steven McCarroll was in the Dallas County Jail, incarcerated on a charge of aggravated robbery. (RR63:150). McCarroll was assigned to Appellant's tank. (RR63:150). That day, McCarroll saw Appellant "raping another inmate." (RR63:151). McCarroll was sleeping on the bunk on one side of the cell. (RR63:152-53). Appellant was on the bunk on the other side with "the sheet up over the top of the bunk." (RR63:152). The sheet fell down and McCarroll saw Appellant on top of the other inmate. (RR63:152). The inmate was screaming. (RR63:153).

The following day, when McCarroll got out of the shower Appellant approached him "want[ing] me to suck his dick." (RR63:154). McCarroll "tried to get away from him. Ended up with a broke nose and

two black eyes." (RR63:154). "So he was going to try to force me to suck his dick." (RR63:154).

On August 25, 1983, then-17-year-old Larry Dean Turner was incarcerated at the Dallas County Jail on an aggravated robbery charge. (RR63:163, 165, 173). Appellant befriended Turner. (RR63:168). At first, Appellant "got [Turner] to wash his clothes for him." (RR63:167). Then, he tried to get Turner to be "[h]is kid." (RR63:167). "All the big peoples [sic] up there. You had younger people on the tank with them at that time." (RR63:168). Appellant wanted Turner to "[r]ide with him: Be his bitch." (RR63:168). Turner explained that meant that Turner was supposed to be Appellant's "woman. Kid. Where I do sexual stuff for him, and stuff like that there." (RR63:168). Additionally, "If he told me to have sex with people, I have to have sex with people." (RR63:169).

Over the course of the four and a half years Appellant was incarcerated at the Dallas County Jail, he was moved multiple times. (RR63:181-82). Among the reasons for his moves were: placing in administrative custody; assaultive towards other inmates; causing

trouble in tank; fighting; making sexual threats; unable to get along with others; and to keep down trouble. (RR63:182; SX228).

Appellant was released from prison on June 1, 1984. (RR63:187; SX226). He was required to report to his parole officer, Linda Nelson, on a monthly basis but he failed to do so. (RR63:186, 188). Appellant was "unstable with his residence" and he "did not maintain stable employment." (RR63:192-93). While on parole, Appellant tried to stab his mother. (RR63:189). He had a parole violation hearing after which he was ordered to go to a halfway house for six months.[14] (RR63:189). Appellant absconded from the halfway house. (RR63:190).

Records relating to Appellant's disciplinary incidents in prison were also admitted. (RR65:36; SX245). While in prison, Appellant engaged in the following conduct: he created a disturbance by flooding his cell (twice); he used indecent or vulgar language; he threw his tray out of his cell; he threatened an officer, telling him, "If you put me on that list again, I will do something to your ass"; Appellant refused to obey an order (multiple times); he got into a fistfight with another

_____

[14] At the hearing, Appellant's mother denied that Appellant had assaulted her; she testified that she wanted him arrested for a few days and she knew she would have to tell the police something serious. (RR63:196-97). The assault against Appellant's mother was reduced to a Class C misdemeanor. (RR63:196).

28

inmate; he threw two glasses of water at an officer, striking him on the face and chest; he was found in possession of contraband (multiple times); and, he threatened an officer, telling him, "I'm going to burn your ass." (RR65:37-40; SX245).

### *Appellant's Case*

Appellant's cousin, Anthony Penagraph, testified that he and Appellant grew up "over there in Frazier Court." (RR65:43). It was difficult there because in that area "you go to the store, you go to school, you had to fight. And Kenneth was not the type of person that was a fighting person." (RR65:44). Anthony testified that Appellant was picked on and had to be rescued a couple of times. (RR65:47). If Appellant had to defend himself, however, he would. (RR65:56).

Appellant's mother worked a lot. (RR66:78). According to several of Appellant's cousins, Shirley treated Appellant differently than her other children. (RR65:51; RR66:80, 129). "[W]hen it came to Kenneth . . . she didn't do too much for him. Just to get by." (RR65:51). Appellant did not have a father figure growing up. (RR66:77).

According to Anthony, Appellant "was a little slow[.]" (RR65:49). Appellant made it through school but "they would help you get through

29

those grades." (RR65:49). His grades were "low." (RR65:49). Appellant's cousin Cynthia Penagraph Rice also believed that Appellant was slower than others. (RR66:130). She testified that:

> We always thought that. Because sometimes it will take him, like, quite a minute to kind of catch on. He would say, "What you say?" You know, he was slow.

(RR66:131).

When he was 15, Appellant received a head injury at Fair Park. (RR65:52; RR66:19). "It was a guy jumped on him out there and hit him in the head with some object. And he been acting different ever since." (RR65:52). After Appellant's head injury, Appellant "kind of drifted away a little bit." (RR66:84). He was "[m]ore quiet." (RR66:85). After his head injury, "he seem [sic] to get a little slower." (RR66:132).

Appellant's cousin Bobby testified that Appellant never did any drugs around him. (RR66:90). He had seen him drink beer, however. (RR66:90).

Rice was surprised when she learned that Appellant was arrested for the Finch murders. (RR66:135). She testified that Appellant is "not that type." (RR66:135). She did not think that Appellant could have committed the offense by himself. (RR66:135).

Rodney Turner is Appellant's half-brother.[15] (RR66:96). Growing up, Turner had only brief interaction with Appellant. (RR66:96). In 1990, however, he and Appellant reconnected by writing letters when they were both in prison. (RR66:97). The men encouraged each other through their letters. (RR66:97). Appellant would include in his letters citations to scripture for Turner to look up in the Bible. (RR66:106). When Turner was let out on parole, he visited Appellant in the Dallas County Jail. (RR66:101-02). During their twice-weekly visits, the men discussed religion. (RR66:102). Appellant is able to discuss the Bible, scriptures, "you know - - just helpful things." (RR66:102). Turner brought Appellant's mother to visit him a couple of times. (RR66:103). She appeared supportive of him during the visits, but "when she got in the car, was something totally different." (RR66:103).

Several detention officers who have supervised Appellant in the Dallas County Jail since he was transferred from prison in October 2010 testified that Appellant does not cause problems in the jail. (RR67:19-21, 23-24, 41, 50; RR68:22, 25-26, 28). Van Similine testified

---

[15] At the time of his testimony, Turner was incarcerated as the result of a parole violation on charges of aggravated sexual assault and burglary of a habitation. (RR66:97-98). Turner admitted that he has ten felony convictions and is a registered sex offender. (RR66:106).

that Appellant "stays to himself.  Don't [sic] cause no [sic] problems."  (RR67:41).  In his cell, Appellant is "[e]ither reading or sleeping."  (RR67:41).  Appellant reads "novels off the law library cart."  (RR67:45).  During Appellant's recreation time, he goes to the gym and walks or plays basketball.  (RR67:42).  Curfey Anderson described Appellant as "[i]nstitutionalized."  (RR67:24).

Defense expert, James Aiken, a prison consultant, reviewed the records detailing Appellant's confinement history.  (RR67:67, 74).  According to Aiken, since he has been incarcerated, Appellant has been on a "predictable scale."  (RR67:83).  Appellant has "gone from disruptive behavior, down, down, down, to compliant behavior[.]"  (RR67:83).  Aiken opined that Appellant "can be adequately managed for an extended period of time, without causing unusual risk to staff, inmates or the general public."  (RR67:97).  If he is placed in general population, "[h]is vulnerability level will be high.  His adjustment level would be excellent."  (RR67:97).

### *Appellant's Psychological Experts*

Dr. Jim Hom, a neuropsychologist, evaluated Appellant' brain functioning in 1987.  (RR65:82, 91).  Dr. Hom administered the

Halstead-Reitan Neuropsychological Test Battery. (RR65:88). On the WAIS-II,[16] a "measure of intelligence," Dr. Hom determined that Appellant's reading level is at a fourth grade level,[17] his spelling below a third grade level, and math below a third grade level. (RR65:110, 115). Appellant scored a verbal IQ of 73, a performance IQ of 85, and a full-scale IQ of 77. (RR65:118). In his report, Dr. Hom noted that, with regard to Appellant's low scores, "it is likely that these performances represent poor education experience." (RR65:123; DX7).

Appellant performed well on the Tactual Performance Test, "a test of psychomotor problem solving, incidental memory learning." (RR65:132). "This is a very challenging test." (RR65:133). Appellant performed well on the Trail Making Test, Part A, a "test of attention and concentration[.]" (RR65:134). Appellant demonstrated no problems on tests of vision, hearing, touch, and sensation. (RR65:135). Appellant's ability for "inscription" using his left hand was "quite strong" despite a history of being stabbed on his left arm. (RR65:135; DX7).

---

[16] The current version of this test is the WAIS-IV. (RR65:111).
[17] Given Appellant's reading level, the results of two tests were considered invalid: the Minnesota Multiphasic Personality Inventory (MMPI) and the Cornel Health Index. (RR65:89-90).

Dr. Hom testified that Appellant's "test results are consistent with someone who has what I believe is a significant head injury of one sort or another." (RR65:102-03). He assessed Appellant's intelligence in the "low 70 range" and his academic abilities at the third and fourth grade, level. (RR65:103). He opined that Appellant has "significant problems in reasoning and thinking," and difficulty in sequencing, concentrating, language and function. (RR65:103-04). He described Appellant's verbal memory as "moderately to severely impaired." (RR65:105). He also showed "mild motor and sensory difficulties." (RR65:107). Dr. Hom conceded that during testing Appellant was, at times, nonchalant and "[r]eluctant to perform." (RR65:120, 125, 128; DX7).

Dr. Antoinette McGarrahan, a psychologist specializing in forensic psychology and neuropsychology, performed a neuropsychological evaluation of Appellant in 2012. (RR66:15-16). Dr. McGarrahan administered 30 to 35 tests over the course of two days. (RR66:21). Dr. McGarrahan measured Appellant's full-scale IQ at 71. (RR66:23). She placed this score in "what we used to call 'mildly mentally retarded' range to borderline functioning[.]" (RR66:23). She noted that the interval of Appellant's IQ is "essentially plus or minus five points,' thus

placing his true score somewhere in the range of 66-76. (RR66:29-30). She observed "significant deficits in [Appellant's] academic skills" and mild to moderate memory impairment. (RR66:23). Based on the results of her evaluation, Dr. McGarrahan concluded that Appellant is intellectually disabled.[18] (RR66:24).

During the evaluation, Dr. McGarrahan learned that Appellant was raised in "the projects" and that his family was poor. (RR66:18). Dr. McGarrahan also pointed out the fact that Appellant's mother smoked and drank alcohol while she was pregnant with Appellant. (RR66:26). And, Appellant was born with the umbilical cord wrapped around his neck while his mother was in a car on the way to the hospital. (RR66:26). He was never placed in special education but he did not learn to drive; he had problem making change; he had difficulty using a phone book. (RR66:18, 25). He had "very few jobs over his life." (RR66:18). Appellant was a loner and had difficulty getting along with others. (RR66:25). He does not have "a psychiatric history." (RR66:19).

---

[18] Intellectual disability was previously referred to as mental retardation. At trial, the terms were used interchangeably.

Dr. McGarrahan testified that, consistent with Dr. Hom's findings, in both sets of testing, the primary areas in which Appellant demonstrated impairment are reasoning, logical thinking, planning, and problem solving. (RR66:33).

On cross-examination, Dr. McGarrahan testified that the history Appellant gave her "wasn't quite accurate." (RR66:36). Appellant told Dr. McGarrahan that "he had a wonderful childhood; that there were no problems; that he had great relationships with his family members; that he did okay in school." (RR66:36). Dr. McGarrahan conceded that Appellant is capable of lying to avoid criminal responsibility. (RR66:53). She acknowledged that when Appellant was interviewed by a reporter, he said that on the day of the murders he went to church with his girlfriend in the morning and then had supper at his father's house. (RR66:52-53). He also told the reporter that there was no proof that he committed the murders because the police did not have a weapon. (RR66:52).

Psychiatrist Dr. Jaye Crowder became involved in Appellant's case in 1987.[19] (RR66:140-42). Back then, Dr. Crowder performed a mental status exam, conducted background interviews, and reviewed Appellant's medical records. (RR66:142). Dr. Crowder was concerned that Appellant had suffered a traumatic brain injury so he referred him to Dr. Hom for testing. (RR66:142). Dr. Hom's testing confirmed the presence of central nervous system damage. (RR66:144). According to Dr. Crowder, Appellant saw difficulty with abstract reasoning. (RR66:145). "So, in other words, it was more difficult for him to assess the likely consequences of particular behavior." (RR66:145). Additionally, "you have typically some impulsiveness and irritability that goes with this so that people can overreact in an aggressive way[.]" (RR66:145).

Dr. Crowder examined Appellant on January 24, 2013 and again on July 3, 2014. (RR66:146, 153). Appellant remembered him from their 1987 interaction. (RR66:149-50). In the 2013 exam, Dr. Crowder spent about an hour with Appellant and performed a basic psychiatric

---

[19] Dr. Crowder testified to his memory of his 1987 examination. (RR66:151). He no longer has his notes from that time. (RR66:151). He no longer had the notes from the interview he conducted with Appellant's mother and uncle. (RR66:152). Other than the mother and uncle, Dr. Crowder could not recall who he interviewed. (RR66:152).

interview and a Montreal Cognitive Assessment. (RR66:146, 150). He concluded that Appellant suffered from "major cognitive disorder due to traumatic brain damage and intellectual disability." (RR66:148). Regarding Appellant's adaptive functioning, Dr. Crowder opined that Appellant has difficulty in interaction, trouble with employment, and did not perform well academically. (RR66:157-58). In Dr. Crowder's opinion, the probability of Appellant being a future danger is low. (RR66:149). He admitted, however, that an absolute prediction of future danger cannot be made. (RR66:162). And, he conceded that he testified at Appellant's prior trial that Appellant "is certainly a danger if he's not treated and not put in a structured setting." (RR66:164). Dr. Crowder also conceded his prior testimony that Appellant's alibi – that he was with his girlfriend between midnight and six in the morning – was easily refutable and not very believable. (RR66:169).

### *The State's Case-in-Rebuttal*

Melodye Nelson, a 25-year veteran of TDCJ, testified as an expert on the prison system in Texas. (RR68:144). She is the senior warden of two correctional facilities located in the Gatesville area. (RR68:144). She has previously served as a major at a high-security male prison

facility. (RR68:146). "Our majors are what we consider our chiefs of security. They are the highest-ranking security supervisors that we have." (RR68:146). Nelson testified generally about the types of facilities, number of inmates and guards statewide, and how inmates are classified within the system. (RR68:144-45).

Inmates in TDCJ are classified "in a custody level that is suitable for the safety and security of the institution." (RR68:151). Among the factors considered are the inmate's history of incarceration and prior jail conduct, the length of his sentence, and the inmate's behavior and attitude. (RR68:152). General Population 1, or "G1," includes those inmates who are considered "minimum custody." (RR68:153). A G1 may be a trustee, which allows him to live and work outside of the facility's perimeter fences. (RR68:153). General Population 2, or "G2," is the largest percentage of the general inmate population. (RR68:153). A G2 may live and work in a dormitory. (RR68:153). A G2 is allowed to work anywhere inside the secure perimeter. (RR68:163).

General Population 3, or "G3," includes inmates serving 50 years or more. (RR68:153). G3s may live in dormitories. (RR68:157). They are allowed to work, so long as they do not "have access to multiple

areas of the facility." (RR68:158). General Population 4, or "G4," includes those inmates who have multiple disciplinary infractions. (RR68:153). G4s are "housed in cell blocks, two-man cells." (RR68:182). They have fewer work opportunities. (RR68:182). General Population 5, or "G5," are those inmates who are "chronic-rule violators[.]" (RR68:153). G5s live on cell blocks and are not allowed contact visits. (RR68:182). Their ability to purchase from the commissary is reduced. (RR68:183). Finally, administrative segregation is "a classification outside of general population." (RR68:154). These offenders are "housed singularly . . . [and they] recreate individually[.]" (RR68:154).

An inmate coming into TDCJ with a life sentence is classified as a G3 upon arrival. (RR68:155). A capital murderer with a life sentence will be initially classified and housed with all other G3s. (RR68:157). A G3 will change classification to a G2 after ten years of incarceration if he has never taken a hostage or escaped a secure correctional facility. (RR68:162).

Nelson testified that, on average, there are about 15,000 assaults in prison each year. (RR68:165). This figure includes inmate-on-

inmate assaults as well as inmate-on-staff assaults. (RR68:165). In prison, murders occur as well. (RR68:166). There have been murders of inmates, guards, and civilian contractors. (RR68:166).

Dr. Richard Hughes, an educational psychologist, testified that students in the Dallas Independent School District (DISD) are routinely administered achievement tests and intelligence tests. (RR68:190). Dr. Hughes reviewed records of Appellant's scores on the California Test of Mental Maturity and the Iowa Test of Educational Development. (RR68:190, 192-93; SX246-247). Both tests have an average score of 100 with a standard deviation of 15. (RR68:192). Because these tests are group-administered, they are less reliable than an individualized testing experience. (RR68:208).

Appellant was administered the California Test of Mental Maturity when he was in second grade in May of 1973. (RR68:200). The California Test of Mental Maturity is "a group-administered measure of intelligence." (RR68:198). Appellant scored a 78 language IQ, a 92 non-language IQ, and an 82 total IQ. (RR68:198).

Appellant was administered the Iowa test in September of 1975. (RR68:207). This test includes sections on reading, language arts,

math, social studies, science, the use of sources,[20] and a composite. (RR68:195). On the reading portion, his score of 91 falls within the average range. (RR68:196). On the language arts section, he scored a 78, which falls within the borderline range. (RR68:196). Math was Appellant's highest score; he scored a 97-98, which is just below the average score of 100. (RR68:197). On the social studies portion, Appellant scored an 89-90, which is "one foot in the low-average range. The other in the average range." (RR68:197). On the science portion, Appellant scored an 83. (RR68:197). On the use of sources portion, he scored a 93. (RR68:197). On the composite portion, he scored at the 88-89 level. (RR68:197).

Dr. Hughes also reviewed Appellant's grades. Dr. Hughes noted that "[g]rades are not good reflections of intellectual capacity." (RR68:201). Indeed, grades measure only "a student's ability or

---

[20] Dr. Hughes described the Use of Sources portion as follows:

> The Use of Sources is a sub-test designed to see how a student can utilize sources to pursue answers to problems.

> For example, multiple-choice questions might be posed that says in order to find the capital of the state of Texas, you would look in A, a dictionary; B, an encyclopedia; C, D, and choices like that, to see if they can select the correct source to obtain information that they are pursuing.

(RR68:195).

willingness to comply, whether they bring their homework assignment in on time or whether they push through an extra-credit project or whether they complete their class work assignment." (RR68:201). Grades do not measure cognitive functioning. (RR68:201). Elementary school children are evaluated using a numerical system, giving grades of one through four. (RR68:199-200). A one is assigned for "rapid progress," a two for "satisfactory progress," a three for "acceptable progress," and a four for "little or no progress." (RR68:200). In junior high and high school, students are given grades of A through F. (RR68:199).

In his elementary years, Appellant received a number of 3s and 4s. (RR68:203). In sixth grade, Appellant received Bs, Cs, and Ds. (RR68:204). In seventh grade he received Ds and Fs. (RR68:203). In eighth grade he received all Fs. (RR68:203). When Appellant started attending Metro North in tenth grade, he received Bs and Cs. (RR68:203). Appellant was moved to Metro North after his head injury at Fair Park. (RR68:210). Metro North is "an alternative regular-education program that was on a special class placement for handicapped students." (RR68:204).

Appellant's grades stand in contrast to his test scores, which reflect an ability to do well in school. (RR68:201-02). Had Appellant applied himself in school, his grades would have been better. (RR68:202). There is no evidence in Appellant's DISD records that he was ever placed in a special education program. (RR68:207). "The records from Dallas ISD indicate his education was all offered within the general education program." (RR68:207). Notably, Appellant's school records "are not consistent with a student that's mentally retarded." (RR68:207).

Forensic psychologist and neuropsychologist, Dr. Randy Price, testified that Appellant does not meet the definition of intellectually disabled as that term is described in Special Issue No. One. (RR69:14). Dr. Price became involved in Appellant's case in 2003. (RR69:18). Dr. Price was scheduled to interview Appellant on July 13, 2014, but he was unable to do so as Appellant refused. (RR69:21-22).

## SUMMARY OF THE ARGUMENT

***Issues 1-7***: The trial court did not err in denying Appellant's Batson challenges to the following prospective jurors: Biswas, Tilley, Moore, Nohe, Figures, McGowan, Prieston, and Barbosa.

***Issues 9-23***:  The trial court did not err in denying Appellant's challenges for cause to fifteen prospective jurors.  He was not denied the right to a fair and unbiased jury.

***Issues 24-30***:  The trial court did not err in granting the State's challenges for cause against the following prospective jurors:  Kingery, Morris, Davila, Hawkins, Kinzie, Flores, and Hogan.

***Issue 31***:  The decision by the United States Supreme Court in *Hall v. Florida*, 134 S. Ct. 1986 (2014), did not invalidate this Court's decision in *Ex parte Briseno*.

***Issue 32-34***:  The trial court did not err in denying Appellant's request to quash the panel of prospective jurors.  The trial court did not err in denying Appellant's request to re-question the jurors following *Hall*.

***Issue 35-36***:  Appellant was not deprived of a lawfully constituted jury.

***Issue 37***:  The trial court properly denied Appellant's Motion to Disqualify the District Attorney's Office after Appellant's former second-chair counsel, Russell Wilson, accepted a job at the Dallas County District Attorney's Office.  While it is true that Wilson was

disqualified from assisting in the prosecution of Appellant's case, the elected district attorney and his other assistants were not.

*Issue 38*: The trial court properly overruled Appellant's motion for mistrial during the competency trial when the prosecutor referred to the "murder weapon." Alternatively, any alleged error was cured by the trial court's instruction to disregard.

*Issue 39*: Appellant's objection to the prosecutor's question during the competency trial regarding the 1987 reversal of Appellant's punishment is not properly before this Court. Regardless, the same information was later received elsewhere without objection.

*Issue 40-41*: The evidence is both legally and factually sufficient to prove Appellant's competency to stand trial.

*Issue 42*: The trial court properly overruled Appellant's objection to Dr. Price's testimony that Appellant exhibits traits consistent with anti-social personality disorder. Alternatively, any alleged error is harmless.

*Issue 43*: Although Dr. Price testified regarding Appellant's lack of remorse during a sub rosa hearing, he did not do so before the jury.

***Issue 44***:  The trial court did not err in admitting a silhouette of a knife as a demonstrative aid.  Alternatively, any alleged error is harmless.

***Issue 45***:  The trial court properly admitted the photographs from Mildred's and Fred's autopsies as they help to explain the nature and extent of their injuries.  Alternatively, any alleged error is harmless.

***Issue 46***:  The trial court did not err in overruling Appellant's objection to the victim-impact testimony from the Finches' son-in-law, James Belt, Jr.

***Issue 47-48***:  Appellant failed to prove by a preponderance of the evidence that he was intellectually disabled.  The jury's answer to the intellectual disability special issue was not so against the great weight and preponderance of the evidence so as to be manifestly unjust.

***Issue 49***:  The evidence is legally sufficient to support the jury's decision to find that Appellant is a future danger.

***Issue 50***:  The trial court did not err in overruling Appellant's requested jury instructions regarding significantly sub-average general

intellectual functioning. One of the proffered instructions was incorrect. The other was a comment on the weight of the evidence.

***Issue 51***: The trial court did not err in overruling Appellant's request that the jury not be required to be unanimous regarding the intellectual disability special issue. Appellant presents no authority mandating such an instruction.

***Issue 52***: The trial court did not err in overruling Appellant's request for an instruction in the punishment charge that Lonnie Thomas was an accomplice witness. He points to no authority that this instruction is required in a punishment charge.

***Issue 53***: The trial court did not err in overruling Appellant's request for an anti-parties charge. Contrary to the statements in his brief, the guilt-innocence instruction did not include a parties' instruction.

***Issue 54***: The trial court did not abuse its discretion in denying Appellant's motion, filed prior to sentencing, for an additional inquiry into Appellant's competency to stand trial. Appellant failed to present evidence of a material change in circumstances suggesting that Appellant's mental status had deteriorated.

***Issue 55***:  Appellant's claim that the evidence is insufficient to support his conviction for capital murder presents nothing for this Court's review.  Appellant was retried on punishment only.  His guilt was not at issue.

***Issues 56-67***:  The trial court properly denied Appellant's challenges to the death penalty.  Appellant concedes that this Court has previously overruled these issues.

## ARGUMENT

***STATE'S RESPONSE TO ISSUE NOS. 1-7:  THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S BATSON CHALLENGES.***

In Issues 1 through 7, Appellant contends that the trial court erred in overruling his objection based on *Batson v. Kentucky*, 476 U.S.79 (1986), to the State's use of peremptory challenges on prospective jurors Neena Biswas, Leon Tilley, Deborah Moore, Pronsak Nohe, Cassie Figures, Mary McGowan, Artherine Prieston, and Martha Barbosa.  (Appellant's Brief pp. 34-50).  These contentions lack merit and should be overruled.

### *Applicable Law*

The U.S. Constitution prohibits the use of peremptory challenges to exclude prospective jurors on the basis of race.  *See Batson*, 476 U.S.

at 85; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). Under *Batson*, a defendant must first make a prima facie showing that the prosecution exercised its peremptory challenges on the basis of race. *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009). If the defendant makes that showing, the burden shifts to the prosecutor to present race-neutral explanations for striking the jurors in question. *Id.* The court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.*

At the second step of this process, the proponent of the strike need only tender an explanation that is race-neutral. *Watkins*, 245 S.W.3d at 447. The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's racial discrimination. *Id.* Whether the opponent satisfies his burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court to resolve in the first instance. *Id.*

This Court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous. *See Watkins*, 245 S.W.3d at 447-48. In assaying the record for clear error, *vel non*, this Court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. *Id.* at 448. A trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, should be given great deference and reversed only when that conclusion is, in view of the record as a whole, clearly erroneous. *Id.*

### *Analysis*

*Appellant failed to establish a prima facie case of discrimination but the issue is moot.*

After the competency trial, but before the punishment jury was sworn, Appellant objected to the composition of the jury under *Batson*. (RR59:66). He identified eight minority veniremembers that the State struck. (RR59:66). The Court did not immediately rule and instead asked, "What says the State?" (RR59:67). Without requesting a ruling,

51

the State introduced a copy of and read into the record, the Dallas County District Attorney's Office policy regarding Batson claims. (RR59:67-68; SX3Z). The prosecutor then provided a "breakdown [of] the strikes" to show that the State did not use a disproportionate number of strikes on the basis of race or gender. (RR59:68-70). At that point, the State objected "to the Court having found a prima facie case" and asked for a ruling. (RR59:70-71). The Court stated that it would "withhold at this moment a ruling on whether the Defense has made a prima facie case or not and have the State go into [an] explanation of their strikes." (RR59:71). The State then explained its strikes. (RR59:71-76).

At the conclusion of the State's explanation, the trial court found that "the strikes made by the State were not based upon the panel members' race. They were neutral in that respect, and denies the Batson." (RR59:77). The State then requested a ruling regarding its prior objection that Appellant failed to present a prima facie case. (RR59:77). The trial court stated that it was "of the opinion that a prima facie case was not presented by the Defense." (RR59:77).

The issue of whether Appellant established a prima facie case that the State exercised its peremptory strikes on the basis of race is moot. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991); *see also Watkins*, 245 S.W.3d at 447. Because the State articulated the reasons for its strikes and the trial ruled on the ultimate question of purposeful discrimination, the preliminary issue of whether Appellant established a prima facie case is moot and not subject to review on appeal. *See Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993) (stating, "where the State fails at trial to object to the trial court's failure to rule on the defendant's *prima facie* case, that issue becomes moot and it cannot be raised on appeal"). This Court must therefore assume that Appellant satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps. *See Watkins*, 245 S.W.3d at 447.

*The State's race-neutral explanations*

At the second step of the *Batson* process, the prosecutor need only tender an explanation that is race-neutral on its face. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (indicating the State's burden here is to present a facially valid explanation for its strike); *Watkins*, 245 S.W.3d at 447. The State satisfied this burden.

<u>Figures, Prieston, Barbosa, Tilley, Moore, Nohe</u>

At the *Batson* hearing, the State stated that it struck Figures, Prieston, Barbosa, Tilley, Moore, and Nohe because they ranked themselves as either a "3" or "4." (RR59:72-73). The State explained that it struck all qualified veniremembers who ranked themselves as either a "3" or a "4." (RR59:72-73). Question No. 2 on the questionnaire asked: "With reference to the death penalty, which of the following statements **best** represents your feelings?" (Figures, Juror 755, Q. p.1). A ranking of "3" indicated the following opinion: "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." (Figures, Juror 755, Q. p.1). A ranking of "4" indicated the following opinion: "I believe that the death penalty is appropriate

54

in some murder cases, but I could never return a verdict which assessed the death penalty." (Figures, Juror 755, Q. p.1).

The State's reasons were grounded in these jurors' opinions about the death penalty and are race-neutral. Courts have found similar grounds as facially neutral. *See, e.g., Mathis v. State*, 67 S.W.3d 918, 924-25 (Tex. Crim. App. 2002) (holding prosecutor's explanations—that he struck a juror because she was in favor of the death penalty only in two specified circumstances and she felt the death penalty was imposed too frequently—were facially race-neutral).

### *Biswas*

The State explained that it struck Dr. Neena Biswas, Juror 64, an Asian female, for a number of reasons. (RR59:73). Biswas demonstrated concern about being a part of the trial process: she asked the trial court whether and why it was necessary for Appellant to be present and she stated that as a physician and healer, she was uncomfortable dealing with the death penalty. (RR59:73). She stated that she could not take the oath. (RR59:74). She stated that she would not follow the law. (RR59:74). Biswas stated that she would require the State to re-prove guilt and that she would increase the State's

55

burden of proof. (RR59:74). She stated that she would not be able to determine credibility but that police officers have more credibility. (RR59:74). Biswas "had Fifth Amendment issues." (RR59:74). Biswas also informed the trial court that she was seeking employment, which may affect her ability to serve. (RR59:73). These explanations were race-neutral. *See, e.g., Watkins*, 245 S.W.3d at 450-51 (prosecutor's explanation in a burglary case that the juror would hold the State to a higher burden than proof beyond a reasonable doubt was race-neutral).

### *McGowan*

The State explained that it struck McGowan due to her stated belief that "prosecutors are out to get people." (RR59:75). This explanation does not reflect an inherently discriminatory intent. *See Johnson v. State*, 68 S.W.3d 644, 649-50 (Tex. Crim. App. 2002) (finding prosecutor's explanation that a juror was resentful toward law enforcement was race-neutral).

Additionally, McGowan believed that (1) a difficult childhood may lead someone to make bad choices to get attention and (2) if someone commits an offense while on drugs, he should be sent to rehab. (RR59:75). These explanations are also race-neutral. *See Adanandus v.*

*State*, 866 S.W.2d 210, 224-25 (Tex. Crim. App. 1993) (finding a veniremember's views regarding the role of rehabilitation in punishment to be a race-neutral explanation for the use of a peremptory challenge).

## *Conclusion*

The record supports all of the State's proffered race-neutral explanations for exercising peremptory strikes against the eight prospective minority jurors. Therefore, the trial court did not clearly err in finding that the State satisfied its step-two burden of production to tender facially race-neutral explanations for its peremptory strikes. *See Watkins*, 245 S.W.3d at 451.

### *Appellant failed to establish by a preponderance of the evidence that the strikes were the product of purposeful discrimination*

Appellant failed to demonstrate purposeful discrimination by the State. Here, the defendant has the burden to persuade the trial court that the prosecutor's explanations for the State's strikes were incredible or disingenuous. *Watkins*, 245 S.W.3d at 457. The focus of the *Batson* inquiry in this stage is on the genuineness, not reasonableness, of the asserted non-racial motive. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex.

Crim. App. 2012). The question of pretext is a question of fact for the trial court to resolve, subject to reversal on appeal only for clear error. *Watkins*, 245 S.W.3d at 457.

Appellant primarily contends that the State's strikes must have been racially motivated because these jurors were qualified jurors and some had characteristics potentially favorable to the State's position on the death penalty. (Appellant's Brief pp.35-41). The jurors' qualifications for jury service are irrelevant to the analysis, however. Factors relevant to determining whether purposeful discrimination has been proven include the following:

1. whether the State utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination;

2. whether the prosecutor's office trying the case followed a formal policy to exclude minority venire members from jury service which was known to at least one of the prosecutors at trial;

3. whether the State exercised its peremptory challenges to eliminate a far greater proportion of minority venire members than non-minority venire members;

4. whether the reasons the State asserted for eliminating the minority venire members in question appeared to apply equally well to many

non-minority venire members whom the State did not challenge; and

5. whether the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, in a manner that suggested an intent to single out minority venire members for elimination.

*Watkins*, 245 S.W.3d at 448-49 (relying on *Miller-El v. Dretke*, 545 U.S. 231, 240-64, 266 (2005)). This Court looks to the collective and cumulative impact of these non–exclusive factors in determining whether an inference of racial discrimination is so powerful that it overcomes the deference given to trial courts. *See id.* at 449.

An analysis of these factors demonstrates that Appellant's claim of purposeful discrimination lacks merit.

### 1. Jury Shuffle

The jury pool was not shuffled in this case. The parties selected the group of qualified jurors from a February 21, 2014 special venire. (RR9). Appellant does not assert or demonstrate that the venire was shuffled or otherwise arranged in a manner to decrease the possibility of a minority member.

### 2. Formal Policy Prohibits Discrimination

The Dallas County District Attorney's office's notorious formal

policy of excluding minorities is a relic of a bygone era. It is common knowledge that the office policy of the last several years not only forbids such discrimination, it requires an investigation into sustained *Batson* challenges and authorizes discipline ranging from reprimand to termination. At the *Batson* hearing, the trial court admitted a written copy of the District Attorney's *Batson* policy into evidence for record purposes and the prosecutor read it into the record. (RR59:67-68; SX3Z).

### 3. Proportionality of Strikes

Appellant argues that even one racially motivated peremptory strike violates *Batson* yet he fails to demonstrate a pattern of discriminatory strikes. Appellant does not identify the size or racial makeup of the pool of qualified venire members. He does not analyze the number of strikes used by either side or how they were used. Instead, he relies on the jurors' questionnaires, arguing that certain State-struck jurors gave answers similar to those who were not struck by the State. Appellant then argues that the State used 8 of its 14 peremptory strikes to eliminate 57% of the minorities on the qualified

prospective jury panel, a statistic with which the State disagrees. (Appellant's Brief p. 49).

The data evinces no discriminatory intent by the State. The panel of qualified venire members consisted of 45 people. Of these, 16 (36%) were African-American, 23 (51%) were Caucasian, 3 (7%) were Hispanic, and 3 (7%) were Asian. The State exercised 14 peremptory strikes. Of those 14 strikes, 5 (36%) were used on African-Americans, 6 (43%) were used on Caucasians, 1 (7%) was used on a Hispanic juror, and 2 (14%) were used on Asians. Appellant exercised 17 peremptory strikes. Of his 17 strikes, 6 (35%) were used on African-American jurors, 9 (53%) were used on Caucasian jurors, and 2 (12%) were used on Hispanic jurors. The result was a 12-member jury consisting of 3 African-American jurors, 8 Caucasian jurors, and 1 Asian juror, with 2 African-American alternate jurors.

By striking 8 of the 22 possible minority veniremembers, the State eliminated only 36% of the minorities on the panel, not 57% as Appellant alleges. Nevertheless, the number of minorities struck by the State is, by itself, an irrelevant statistic. It gains relevance only by establishing its correlation to the entire panel. *See Woodward v. Epps*,

580 F.3d 318, 339 (5th Cir. 2009) (holding that the State's striking 100 percent of the black jurors alone does not support a finding of discrimination and does not show any disparity in relation to the non-minority jurors). In Appellant's case, the correlation shows no discriminatory intent.

Of the 45 venire members who could conceivably be chosen for the jury, 22 (49%), were members of a minority. A random selection would yield either 6 or 7 minority jurors in the 14 jurors selected (12 plus 2 alternates) (or 49% of fourteen, equaling 6.86 jurors). *See Watkins*, 245 S.W.3d at 451-52 (holding a random selection from a 22% African-American venire would yield 2 or 3 black jurors because 22% of 12 jurors, plus 1 alternate, was 2.86). This jury panel had 4 minority jurors and 2 minority alternate jurors. Thus, 49% of the qualified jurors were minorities and 43% of the 14-person jury were minorities. This jury had only slightly less than the expected amount of minority members as would be expected from a *random selection* of the 45 qualified jurors. Statistical analysis simply fails to show any racial discrimination.

### 4. Comparative Analysis

Appellant contends on appeal that the prosecutor's stated reasons are a pretext for racial discrimination because the minority State-struck jurors gave responses to certain questions on their questionnaire that are similar to jurors not struck by the State. (Appellant's Brief p.42). Importantly, however, at the *Batson* hearing, defense counsel failed to provide any comparative analysis regarding the jurors. (RR59:66, 71, 76). And, counsel asked only one question of the prosecutor: whether the jurors who ranked themselves as "3s," "4s," or "5s" on their questionnaire were going to be struck without regard to the jurors' qualifications. (RR59:76). The prosecutor was not questioned any further regarding his reasons for not striking any similarly-situated venire members. (RR59:76). As such, the prosecutor had no opportunity to respond to counsel's allegations. Appellant should not be permitted to raise claims of disparate treatment for the first time on appeal. By failing to properly present this claim at trial, he denied the prosecutor the opportunity to create a record on the prosecutor's strategy, and he denied the trial court an opportunity to rule on the claim. Whether a prosecutor intended to discriminate on the basis of race is a question of

historical fact properly decided in the trial courts. *See Hernandez*, 500 U.S. at 367-69. State procedural rules demand that allegations of disparate treatment by the prosecutor be raised in the trial court, so that they can be properly answered by the State and decided by that court. *See* Tex. R. App. P. 33.1(a); *Watkins*, 245 S.W.3d at 457-58 (Keller, P.J., concurring); *Young v. State*, 826 S.W.2d 141, 147-49 (Tex. Crim. App. 1991) (Campbell, J., dissenting).

The State acknowledges this Court's majority opinion in *Young,* that a non-capital defendant is not required to raise a comparative analysis in the trial court to have evidence of such considered on appeal. *Young*, 826 S.W.2d at 145-46. The Fifth Circuit has applied *Young* to a capital case and criticized this Court's inconsistency in its application of the contemporaneous objection rule to *Batson* claims in capital cases. *Reed*, 555 F.3d at 370.

This Court should explicitly overrule *Young*. *See generally Watkins*, 245 S.W.3d at 457-58 (Keller, P.J., concurring). Its majority— and the courts that rely on it—view the comparative analysis as merely an appellate argument that can be fairly addressed for the first time on appeal. *Young*, 826 S.W.2d at 146. In truth, it is a factual allegation of

64

unfair treatment between jurors. If properly raised in the trial court, the prosecution's response may provide additional facts for the appellate court to consider when reviewing the *Batson* ruling. If raised at trial successfully, the trial court can cure the error before trial even begins.

If not raised at trial, the prosecutor's mental process and the trial judge's credibility decision concerning the non-strikes are simply omitted from the record. Jurors are not products of a set of cookie cutters, and the *unexplained* decision not to strike a non-minority juror who shares one trait in common with a minority juror is held against the State on appellate review. *See, e.g., Miller-El*, 545 U.S. at 244 (stating, "If, indeed, Fields's thoughts on rehabilitation did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no *evident* reservations.") (emphasis added). The prosecutor's explanation of his voir dire strategy and the trial court's ruling on the strategy is critical to a fair appellate review.

At the very least, a prosecutor should enjoy favor on appeal when the matter is not raised at trial, much like the presumption against a finding of ineffective assistance of defense counsel. In claims regarding

65

violations of a client's constitutional right to counsel, this Court has stated that "counsel should ordinarily be accorded an opportunity to explain her actions before being condemned as unprofessional and incompetent." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). A prosecutor's credibility is the heart of *Batson* review, and he should be accorded no less of an opportunity to explain his actions.

This Court should conclude that the comparative analysis is not preserved for review or, alternatively, presume that the comparative analysis favors the prosecutor absent affirmative evidence on the record.

In any event, Appellant has wholly failed to establish that the potential jurors who are the focus of his *Batson* challenge were similarly situated to non-minority potential jurors who were not struck.

### *Figures, Prieston, Barbosa, Tilley, Moore, Nohe*

The record supports the State's assertion that it struck each and every qualified prospective juror regardless of race who ranked him/herself as a "3" or a "4," on Question 2 of their questionnaire. (RR59:72-73). This includes the following prospective jurors: Cassie Figures (Juror 755, an African-American female); Artherine Prieston

(Juror 1055, an African-American female); Martha Barbosa (Juror 1095, a Hispanic female); Jeffrey Nicholson (Juror 281, a Caucasian male); Kelsey Hooten (Juror 445, a Caucasian female); and, Christen Morris (Juror 1097, a Caucasian female). (RR59:72; Figures, Juror 755, Q. p.1; Prieston, Juror 1055, Q. p.1; Barbosa, Juror 1095, Q. p.1; Nicholson, Juror 281, Q. p.1; Hooten, Juror 445, Q. p.1; Morris Juror 1097, Q. p.1).

The State also struck every person on the qualified-juror panel that selected number "4." (RR59:72-73). This includes the following prospective jurors: Leon Tilley (Juror 126, an African-American male); Deborah Moore (Juror 225, an African American female); Pornsak Nohe (Juror 497, an Asian male); Macy Haag (Juror 408, a Caucasian female); and, Suzanne Morrison (Juror 920, a Caucasian female). (RR59:73; Tilley, Juror 126, Q. p.1; Moore, Juror 225, Q. p.1; Nohe, Juror 497, Q. p.1; Haag, Juror 408, Q. p.1; Morrison, Juror 920, Q. p.1).

Appellant points to no evidence to the contrary. He cannot show disparate treatment of Figures, Prieston, Barbosa, Tilley, Moore, and Nohe compared to accepted non-minority veniremembers. As such, Appellant has failed to show that the prosecutor's explanation was a pretext for discrimination. *See Broadnax v. State*, No. AP-76,207, 2011

67

Tex. Crim. App. Unpub. LEXIS 920, at \*7-8 (Tex. Crim. App. Dec. 14, 2011) (not designated for publication) (holding no pretext where prosecutor struck all jurors who believed death penalty should never be invoked).

### *Neena Biswas*

The State explained that it struck Biswas because she was not a qualified juror. (RR59:73-74). First, Biswas voiced concerns about determining punishment without having participated in the determination regarding Appellant's guilt or innocence. According to Biswas, the guilt/innocence portion of trial is the most important part of the process, not the determination of punishment. Her concerns were so great that it would affect her ability to take the oath as a juror to follow the law. The following exchange took place:

> [Prosecutor]: Okay. So what I'm hearing from you is that the Judge may give you a jury instruction and charge that you are not allowed to consider the Defendant's guilt or innocence, because he's already been found guilty.
>
> [Biswas]: Correct.
>
> [Prosecutor]: What I'm hearing from you is that you could not follow that law.

[Biswas]: ***Absolutely. I will not actually follow it, without the evidence, without the data.*** I wouldn't do a good job. I mean, I would need a lot of details. And that is what I do in my work.

[Prosecutor]: And so in your mind, do you feel, based on your concern about hearing the facts and circumstances of the case and not being a part of part of [sic] that guilt-or-innocence decision, do you feel like you would make the State prove to you beyond a reasonable doubt again that the Defendant is guilty of capital murder?

[Biswas]: No, I would not. ***I will not make a decision.*** Because I was not involved in the actual thing, if he was guilty or not. And I think that is the actual thing. Because, what comes after the fact is just, oh, how are we going to deal with the problem? Problem's already been figured out. I was not part of that, so I would not be able to decide.

[Prosecutor]: We have to use legal terms here. You said you could not be able to decide. Does that mean - - the law says each juror would have to take an oath that they will a true verdict render, based on the law and the evidence.

Are you saying that you could not take that oath?

[Biswas]: ***I will not take that oath.*** Because I was not part of the actual decision. I could take the oath. But, like I said, I would prefer not to give a decision "yes" or "no."

[Prosecutor]: Okay. So you told me both things. So we have to have affirm [sic] "yes" or "no" that you will not take that oath or could not take that oath.

[Biswas]:  *I could not take that oath.*

(RR14:50-51) (emphasis added).  Shortly after the above-mentioned exchange, Biswas stated that she could take the oath, but the issue of guilt would remain in the back of her mind.  (RR14:54).  She stated that she would have difficulty in following an instruction not to consider Appellant's guilt or innocence in answering the special issues.  (RR14:73, 74).  The issue of Biswas' lack of participation in the guilt/innocence portion of trial was a recurring theme in her responses.  The following exchange took place:

> [Prosecutor]:  Dr. Biswas, we already talked about, in Special Issue Number One, that you may hear evidence and testimony that includes the facts and circumstances of the offense for which the Defendant was found guilty.
>
> So you already understand that, correct?
>
> [Biswas]:  Correct.
>
> [Prosecutor]:  But you still say that you would still - - it would still be stuck in your mind, and it would color your answers to these questions:  Is this person guilty or not guilty of this offense?
>
> [Biswas]:  Correct.

(RR14:75-76).

Second, Biswas expressed concern about her ability to answer the deliberateness special issue because "we don't know what was going on in that person's mind at that time. We don't know why he took that action . . . I don't know why the guilty verdict was achieved." (RR14:67). She testified that she would not be able to make credibility determinations "again, because I was not involved in the guilty or not guilty verdict, which I think is the main crux of any case." (RR14:70).

Third, when asked whether she would require the State to prove Appellant's guilt beyond a reasonable doubt before she would consider the special issues Biswas said "Yes." (RR14:52). But then a short time later, she said, "I'm not saying you have to prove it again, because it cost [sic] a lot of money." (RR14:53). With regard to the future danger special issue, however, Biswas agreed that she would hold the State to a higher burden of proof because "[she] was not part of the guilty/not guilty trial." (RR14:83).

Fourth, Biswas testified that she did not agree with a criminal defendant's Fifth Amendment right not to incriminate himself. (RR14:86). Initially, she said that if instructed not to consider the fact

that Appellant did not testify that she could not follow that instruction. (RR14:86). Then she stated that she could follow the law, but she did not agree with it and it would weigh on her mind as she deliberated the special issues. (RR14:86-87).

Finally, Biswas testified that she would place police officers' credibility above that of other witnesses. (RR14:88-89). She testified that she "would give them the benefit of the doubt." (RR14:89). During her questioning by the defense, Biswas agreed to follow the law and not start a police officer at a higher level of certainty. (RR14:108).

On appeal, in support of his argument that the prosecutor's explanations are a pretext, Appellant points out that Biswas – like 17 other jurors that the State accepted – ranked herself as a "2" on Question 2, indicating a belief that "the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." (Biswas, Juror 64, Q p.2). In truth, because the State struck all 3s and 4s, the only jurors left for the State to accept were 2s. Therefore, this argument does nothing to further Appellant's claim.

The State does not dispute that Biswas's responses to certain questions in the questionnaire are the same as those of other accepted venire members. The questionnaire should not be considered in a vacuum, however. This is especially true as it pertains to Biswas because, while she may appear to be a qualified juror on paper, during testimony, Biswas vacillated on her ability to perform the most basic duty required of a juror: taking the oath and following the law. As such, the State had legitimate reason to be concerned about Biswas sitting as a juror in a capital murder case. Since the trial court denied the State's challenge for cause, the State exercised a peremptory challenge. Notably, the State struck all 9 jurors that it had unsuccessfully challenged for cause: Biswas (Juror 64, an Asian female), Leon Tilley (Juror 126, an African-American male), Deborah Moore (Juror 225, an African-American female), Macy Haag (Juror 408, a Caucasian female), Pornsak Nohe (Juror 497, an Asian male), Cassie Figures (Juror 755, an African-American female), Suzanne Morrison (Juror 920, a Caucasian female), Mary McGowan (Juror 955, an African-American female), and Artherine Prieston (Juror 1055, an African-American female).

The record supports the genuineness of the State's explanations for striking Biswas. Appellant has failed to show that the prosecutor's explanation was a pretext for discrimination.

## *Mary McGowan*

The State explained that it struck McGowan because of her bias against the State and because of her belief in rehabilitation rather than incarceration, even in cases involving capital murder. During voir dire, after the prosecutor explained the special issues, he asked McGowan to elaborate on her response to Question 32, which asks the prospective juror to write the word that first comes to mind when they think of certain professions. (McGowan, Juror 955, Q p.6). Regarding prosecutors, McGowan wrote "they are always out to get a person." (McGowan, Juror 955, Q p.6). She affirmed this statement when she testified that "I feel like - - well, in Texas here, I feel like - - it depends on the prosecutors. The majority of them - - . . . - - I just feel like they are out to get that person." (RR42:25). She continued:

> So the prosecutor - - I can understand they have to do their job, too. Because they're a prosecutors [sic], that's their job to do that. But I think sometimes it's unfair, and I think that the prosecutor is actually out to get that person really. Just my opinion.

(RR42:25). Later in the questionnaire, on Question 36F, McGowan wrote that she "Strongly Agree[d]" with the statement, "The Criminal Justice System in Dallas County is untrustworthy." (McGowan, Juror 955, Q p.7).

McGowan also demonstrated a preference for rehabilitation rather than punishment. On Question 42 of her questionnaire, she ranked rehabilitation as the most important objective of punishment. (McGowan, Juror 955, Q p.8). She testified that rehabilitation should always be the first option in sentencing. (RR42:28). "Then, if they fail rehab, if they go back again continuously, then make another decision." (RR42:28). She continued, "But I just feel like, in some cases, where somebody do [sic] something bad, commit murder or whatever, I feel like rehab should be the first thing that should happen." (RR42:28). According to McGowan, rehabilitation should be an option even in cases involving the death penalty. (RR42:29).

On appeal, Appellant argues that the State's explanations are a pretext because McGowan's responses to certain questions on her questionnaire matched those of other veniremembers who were accepted by the State. As previously argued, the questionnaire cannot

be considered in a vacuum. McGowan (like Biswas and like the 17 jurors the State accepted) ranked herself as a "2" on her questionnaire. (McGowan, Juror 955, Q p.2). As stated above, this similarity is insignificant in light of the fact that the only jurors that the State accepted were 2s. Moreover, the State notes that despite having ranked herself as a "2," on Question 36C, McGowan wrote that she agreed that the death penalty should be abolished. (McGowan, Juror 955, Q p. 7).

The State acknowledges that McGowan answered other questions similar to jurors that the State accepted: (1) she had no moral, religious, or personal beliefs that would prevent her from sitting in judgment of another human being; (2) she had no moral, religious, or personal beliefs that would prevent her from returning a verdict that would result in the execution of another human being; (3) she agreed that life imprisonment or the death penalty are appropriate for someone guilty of intentional murder committed during the course of a burglary; (4) she agreed that some crimes call for the death penalty solely because of their facts and circumstances; (5) she ranked the strength of her belief in using the death penalty as a "7"; (6) she believed that

testimony from a police officer was the same as any other witness; and, (7) she believed in the principle of "an eye for an eye." (McGowan, Juror 955, Q p.8). Nevertheless, like Biswas, the fact that McGowan answered certain questions the same as some accepted jurors does not change the testimony she gave during voir dire. It was McGowan's testimony that set her apart from other jurors and it was that testimony that caused the State to exercise a strike against her. (RR59:75-76). The record supports the genuineness of the State's explanations for striking McGowan. Appellant has failed to show that the prosecutor's explanation was a pretext for discrimination.

### *Conclusion*

Appellant has wholly failed to show that Jurors Figures, Prieston, Barbosa, Tilley, Moore, Nohe, Biswas, or McGowan were similarly-situated to non-minority jurors that were not struck by the State.

### 5. Disparate Questioning

Appellant points to no instances of disparate questioning by the State. *Cf. Miller-El*, 545 U.S. at 256-57 (prosecutors used a graphic script when describing the death penalty to African-American jurors who were ambivalent to the death penalty more often than with white

jurors who also were ambivalent).  Nor is any disparate questioning apparent in the record.

## *Conclusion*

Appellant has not established by a preponderance of the evidence that the State's exercise of its peremptory challenges against 8 minority veniremembers was the product of racial discrimination. Appellant has not shown that the State's explanations apply equally to non-minority venire members that the State did not challenge, that the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, or that a formal policy excludes minorities from jury service.   The record before this Court supports the trial court's resolution of the fact question of pretext.  Consequently, the trial court did not err in denying Appellant's *Batson* challenges.  *See Watkins*, 245 S.W.3d at 456-57.

This Court should overrule Appellant's first eight issues.

**STATE'S RESPONSE TO ISSUE NOS. 9-23:  THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S CHALLENGES FOR CAUSE.**

In Issues 9 through 23, Appellant contends that the trial court erred in denying his challenges to 15 prospective jurors.  In so doing, Appellant argues, the trial court violated his right to a fair and

unbiased jury under the United States Constitution and article 35.16(c)(2) of the Texas Code of Criminal Procedure.

## *Applicable Law*

A prospective juror may be challenged for cause if, among other reasons, he possesses a bias or prejudice in favor of or against the defendant or he possesses a bias against an aspect of the law upon which the defendant is entitled to rely. *See* Tex. Code Crim. Proc. Ann. arts. 35.16(a)(9), (c)(2) (West 2006); *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004).

Appellant has the burden of establishing that his challenge for cause is proper. *See Feldman v. State.* 71 S.W.3d 738, 747 (Tex. Crim. App. 2002). Before a venire member can be excused for bias, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Threadgill*, 146 S.W.3d at 667. Appellant does not meet his burden of establishing that his challenge for cause is proper until he has shown that the prospective juror understood the requirement of the law and could not overcome his prejudice well enough to follow it. *See Feldman*, 71 S.W.3d at 747.

When reviewing a trial court's decision to deny a challenge for cause, the appellate court looks at the entire record to determine if there is sufficient evidence to support the ruling. *Feldman*, 71 S.W.3d at 744. The appellate court reviews a trial court's ruling with "considerable" or "great" deference because the trial judge is in the best position to evaluate the prospective juror's demeanor and was present to observe the juror and listen to his tone of voice. *Threadgill*, 146 S.W.3d at 667; *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). Particular deference is given when the venire member's answers are vacillating, unclear, or contradictory. *Threadgill*, 146 S.W.3d at 667. When the venire member is persistently uncertain about having the ability to follow the law, the reviewing court defers to the trial court decision. *See Gardner v. State*, 306 S.W.3d 274, 295-96 (Tex. Crim. App. 2009). The appellate court reverses a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).

Harm from the erroneous denial of a defense challenge for cause occurs under the following circumstances: (1) a defendant exercises a peremptory challenge on a prospective juror whom the trial court

erroneously failed to excuse for cause at the defendant's request, (2) the defendant uses all of his statutorily-allotted peremptory challenges, and (3) the trial court denies the defendant's request for an additional peremptory challenge to use on another prospective juror whom the defendant identifies as "objectionable" and who actually sits on the jury. *Saldano*, 232 S.W.3d at 91. When all of these conditions are met, the defendant has been wrongfully deprived of one of his statutory peremptory challenges in that he was forced to use a peremptory challenge to remove a prospective juror who should have been removed for cause. *See id.* If the defendant received additional peremptory challenges beyond the fifteen allotted by statute, he must show harm by proving that the trial court erroneously denied a number of defense challenges for cause equal to at least one more than the number of additional peremptory challenges granted. *Escamilla v. State*, 143 S.W.3d 814, 821 (Tex. Crim. App. 2004).

### *Analysis*

The parties asserted their challenges for cause and peremptory challenges at the conclusion of each prospective juror's individual voir dire. With the exception of Jennifer Wilder, following the trial court's

denial of their challenges for cause, the defense exercised a peremptory strike against each complained-of veniremember. Appellant exhausted all fifteen of his statutory peremptory strikes on the following jurors: Annie Fenster (Juror 36); Rebecca Sands (Juror 46); Dorce Jackson (Juror 138); David Darden (Juror 186); Delores Sawyer (Juror 270); Jonathan Henderson (Juror 288); Patricia Withers (Juror 323); Larry Middleton (Juror 427); Isaac Tschewik (Juror 440); Michael Dawson (Juror 469); Angela Thorpe-Harris (Juror 495); Christopher Weinzapfel (Juror 612); Phillip Rapp (Juror 968); Nancy Ramos (Juror 1025); and Jay Kirby (Juror 1052). (RR13:205-06; RR15:114; RR16:76; RR19:225; RR20:226; RR22:86; RR26:152, 341; RR27:153; RR28:133; RR32:90: RR42:71; RR44:20; RR45:68).

Appellant was granted two additional strikes, which he used to remove Nathan Sosa (Juror 1070) and James Martin (Juror 1190). (RR46:34; RR50:47). Appellant later asked for, and was denied, another additional strike to exercise on Jennifer Wilder, whom Appellant identified as objectionable. (RR52:87). Since Appellant received two extra peremptory challenges in addition to the fifteen allotted by statute, he must show that the trial court erroneously denied

at least three of his challenges for cause to the other veniremembers identified in Issues 9 through 23. *See, e.g., Saldano*, 232 S.W.3d at 93 (noting that Saldano would have to show 3 erroneous denials because he received two extra peremptory strikes).

*Issue 9: Rebecca Sands*

Appellant challenged Rebecca Sands for cause because she believed that "if a person committed something intentionally, that was a greater state of mind than deliberately[.]" (RR13:133). Appellant argued that Sands's definition of intentional and deliberate would then cause her to automatically answer the deliberateness special issue[21] affirmatively. (RR13:133).

Deliberate/Intentional

During the State's voir dire, the prosecutor explained the deliberateness special issue. (RR13:90-91). He explained that "[d]eliberate falls more than intentional, but short of premeditation." (RR13:91). Sands stated that she could "see the difference" between the terms. (RR13:91).

---

[21] For ease of the reader, the State will refer to the special issues as follows: "the intellectual disability special issue" (Special Issue No. One); "the deliberateness special issue" (Special Issue No. Two); "the future danger special issue" (Special Issue No. Three); and, "the mitigation special issue" (Special Issue No. Four).

Upon questioning by the defense, Sands tried to articulate what she, in her mind, understood the difference to be between intentional and deliberate conduct. (RR13:117-18). She stated, "I guess deliberate, to me, is more short-term than intentional. It's like, a knee-jerk reaction, but you knew what was going to happen." (RR13:118). The following exchange then took place:

[Defense Counsel]: Okay. So, in your mind, intentional is a higher process of thought and deliberate is a little bit more reactionary?

[Sands]: Yes. I think you can say that.

[Defense Counsel]: I think what you're saying is, if it has already been determined that this was done intentionally, then it certainly was done deliberately.

[Sands]: Yes.

[Defense Counsel]: So if you were instructed that the person had already been convicted of doing this intentionally, your answer to Special Issue Number Two would, per your definition, be automatically "yes" because of the instructions of the Court?

[Sands]: Yes.

[Defense Counsel]: Okay. That's what I want to know. A lot of people feel that way. And there's nothing wrong with it.

Isn't this cruel, we don't define these things and then we ask you to define them?

But if that's how you feel, that's - - you're fine, if that's your definition of deliberate, is something less than intentional. So question number two would be answered "yes" for you, because the Court's instructed you that it was already determined that it was an intentional act?

[Sands]: I would like to see more of the details.

[Defense Counsel]: I understand that. We're just asking you about your definitions.

[Sands]: Okay. That's my definition.

(RR13:118-19). The above-mentioned exchange continued on for several pages, with defense counsel repeatedly confirming Sands' view that "intentional" is a higher state of mind than "deliberate" while simultaneously reassuring Sands that she was entitled to her opinion. (RR13:119-24). Even when Sands appeared confused and stated, "I don't know where I'm at now[,]" defense counsel did not alleviate her confusion, but merely stated:

I don't want to confuse you. It's just that, that is a strange, archaic, dinosaur question from back in the day. A lot of people have that issue. That's why I'm asking you.

> If the answer to Special Issue Number Two is "yes" for you, if it's an intentional act already, that's fine. We just need to know that.
>
> And that's your answer?

(RR13:120). Sands testified that she would "have to see more evidence" but defense counsel cut her off, instructing that she was not asking how Sands would vote, but rather was simply concerned with Sands' definition of the terms. (RR13:122).

Importantly, at no point during the above-described exchange, did defense counsel actually instruct Sands regarding the law or do anything to correct her misunderstanding of the distinction between the terms. As such, Sands was not subject to a challenge for cause based on this exchange. *See generally Threadgill*, 146 S.W.3d at 667 (explaining that, before a prospective juror can be excused for bias, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views).

A review of the entirety of Sands' voir dire shows that she understood that there is, in fact, a distinction between the terms intentional and deliberate. (RR13:89-93, 117-18, 120). Although she may have confused legal terms when she was questioned by the defense,

the record reflects that she would not automatically answer the deliberateness special issue in the affirmative.

Questionnaire

On appeal, Appellant points to Question 9 on Sands' questionnaire, which asks, "For what crimes do you think a sentence of life imprisonment is the proper punishment?" (Sands, Juror 46, Q p.3). Sands wrote, "NA." Appellant fails to state why Sands' response makes her challengeable. Regardless, Appellant did not challenge Sands based on this answer at trial; therefore, this complaint is not preserved for review. *See* Tex. R. App. P. 33.1(a) (providing that a timely specific trial objection is prerequisite to presenting a complaint on appellate review). Regardless, during voir dire, when asked to explain this answer, Sands testified that "that's hard to elaborate on, because I don't know the crime." (RR13:112). She then agreed that life imprisonment may be proper punishment on a murder case. (RR13:112).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Sands. Issue 9 should be overruled.

*Issue 10: Dorce Jackson*

Appellant challenged Jackson for cause for the following reasons: (1) in her questionnaire, she wrote that a life sentence would be appropriate in cases of self-defense or mental illness; (2) she would place a burden on the defense to provide evidence in connection with the mitigation special issue; and, (3) she would increase the burden of proof on the intellectual disability special issue. (RR15:111-12).

## Questionnaire

After questioning concluded, Appellant challenged Jackson for cause because "in her questionnaire, she indicated that a life sentence would only be appropriate where a person did not intend to do it or it was self-defense or had some kind of mental illness." (RR15:111). This is a misstatement of Jackson's answers in her questionnaire. On Question 9, in response to a question asking "[f]or what crimes do you think a sentence of life imprisonment is the proper punishment[,]?" Jackson wrote, "maybe a crime of passion or when murder wasn't intended." (Jackson, Juror 138, Q p.3). Jackson never mentioned self-defense and she never mentioned mental illness. And, her response did not indicate that murders involving crimes of passion and lack of intent

were the *sole* offenses that should be eligible for life imprisonment.[22]

Moreover, during questioning, Jackson testified that she "would agree" with the statement that "the death penalty may not be appropriate in some cases[.]"  (RR15:40).   She testified that she is "open to anything . . . It just all depends."  (RR15:86).

## Burden of Proof – Mitigation

Appellant challenged Jackson for cause on the basis of her testimony that she would require the defense to present evidence or convince her that Appellant should receive a life sentence.  (RR15:111). During the State's voir dire, the mitigation special issue and the fact that there was no burden of proof on this issue was explained to Jackson.  (RR15:70-76).   Jackson indicated that she understood the issue and responded in the affirmative when asked whether she could consider mitigating evidence "whether it exists or not[.]"  (RR15:81-82). When she was questioned by the defense, the following exchange took place:

> [Defense Counsel]:   Again, my question was:   Would you
> require the Defense - - this table over here, the Defense - - to

---

[22] Defense counsel referenced this question during voir dire, but, because it was in the middle of a series of questions, Jackson never specifically answered him. (RR15:86).

provide you or convince you that the person should receive a life sentence instead of a death sentence?

[Jackson]: Would I want you to provide evidence to have a life sentence instead of death?

[Defense Counsel]: Correct.

[Jackson]: But that's where I'm confused. Because, based on all of this - - going through the steps, wouldn't I basically be taking that into consideration the whole time?

You're going to provide evidence and they are, too, right?

[Defense Counsel]: Well, what I'm saying, on that issue, nobody has a burden. What I'm asking you is: Would you need - - in order for you to answer that question, would you require the Defense to provide you with mitigation evidence before you could answer Special Issue Number Four?

[Jackson]: Yes.

(RR15:109-10). The defense immediately concluded its questioning. (RR15:110).

Jackson was not challengeable for cause on the basis of the above-mentioned exchange. A veniremember is not challengeable for cause simply because she will place the burden of proof on mitigation on the defense. *Saldano*, 232 S.W.3d at 92.

90

## Burden of Proof – Intellectual Disability Special Issue

During questioning, defense counsel reminded Jackson that the defense bears the burden on the intellectual disability special issue. (RR15:92). He asked Jackson what she thought about the fact that the burden – preponderance of the evidence – was "a lower burden" than beyond a reasonable doubt. (RR15:93). Jackson answered, "There should be a preponderance of the evidence. I should be able to say I'm clear on that." (RR15:93). Defense counsel attempted to clarify Jackson's definition. The following exchange took place:

[Defense Counsel]: How clear would you want to be?

[Jackson]: Clear enough to say I feel good about it.

[Defense Counsel]: And if it's more likely than not, is that enough for you?

Or would you want "I want to be really sure. I want to be sure beyond a reasonable doubt"?

[Jackson]: I want to be sure.

[Defense Counsel]: And sure, in your mind, does that also fit into your definition of beyond a reasonable doubt? However you view it. We can't define it for you.

[Jackson]:     Maybe, beyond a reasonable doubt is preponderance or different.  But the same kind of - -

[Defense Counsel]:  I'm sorry?

[Jackson]:  I said, they're kind of the same.  I want to be clear either way.

(RR15:93-94).   Defense counsel tried to understand whether Jackson's need to be "clear" was equivalent to a preponderance of the evidence or beyond a reasonable doubt.  (RR15:93-98).  Jackson would not be pinned down except to say that she would "want to be sure."  (RR15:95).  There is no evidence to suggest that Jackson would increase the burden on the defense on this issue.  Indeed, she testified that she "would want to understand and be sure, *based on whatever the criteria is.*"  (RR15:97) (emphasis added).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Jackson.   Issue 10 should be overruled.

*Issue 11: David Darden*

Appellant challenged Darden for the following reasons:  (1) the responses in his questionnaire show that Darden had already formed the opinion that the appropriate punishment in this type of case was

92

the death penalty; and, (2) he believed that if a person was guilty of capital murder, that person will always be a future danger. (RR16:72-73).

## Questionnaire

After questioning, the defense challenged Darden for cause based on his responses to two questions on his questionnaire: Question 8 and Question 11. (Darden, Juror 186, Q.p.3). Question 8 asks jurors "For what crimes do you think the **death penalty** is the proper punishment?" (Darden, Juror 186, Q p.3) (emphasis in original). Darden wrote, "murder in the commission of crimes." (Darden, Juror 186, Q p.3). Darden's response does not reflect a bias against the law or Appellant. To the contrary, Darden's response was consistent with the law. The law provides that the death penalty is available for intentional murder committed in the course of committing or attempting to commit certain specified offenses. *See* Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2015) (capital murder includes intentional murder "in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat").

Question 11 asks jurors whether they agree with the statement that "'The death penalty is reserved for those defendants that are such a threat to society that even incarceration does not remove the possibility of future violent acts.'" (Darden, Juror 186, Q p.3). Darden wrote that he agreed with the statement and that "if his/her crimes are that bad, death is appropriate in my mind." (Darden, Juror 186, Q p.3). As above, this response does not reflect a bias against the law or Appellant and, in fact, was consistent with the law. In a death penalty case, if the defendant is found guilty, jurors are asked to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" Tex. Code Crim. Proc. Ann. art. 37.0711, §3(b)(2) (West Supp. 2015). Although the wording is slightly different, the statement in Question 11 is essentially asking jurors whether they agree with the law. Darden's response indicated an agreement with – not bias against – the law.

### Future Dangerousness

Appellant also challenged Darden for cause because when he was asked for "his personal views" regarding the future danger special issue,

Darden "indicated . . . once he's been convinced that the person is guilty of capital murder . . . and he was convinced that the person would be a future danger, that he could never answer Special Issue Number Three in a way that would result in a life sentence." (RR16:73). This basis for challenge is not completely clear. If a juror were to find, as counsel's challenge suggests, that a person is a "future danger," then, following his oath, the juror would answer the future danger special issue in the affirmative. *See* Tex. Code Crim. Proc. Ann. art 37.0711(e) (West Supp. 2015). If a juror were to find that a person is a "future danger," then, following his oath, the juror would *not* answer the future danger special issue in the negative, which would then result in a life sentence.

During the Defense's voir dire, counsel asked multiple questions about Darden's *feelings* about voting for a convicted capital murderer to receive a life sentence. (RR16:63-67). At no point, however, did he explain the *law* and then ask whether Darden could set aside his feelings and follow the law. *See generally Threadgill*, 146 S.W.3d at 667 (explaining that, before a prospective juror can be excused for bias, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views).

95

To the extent that any of Darden's responses during the defense voir dire may be interpreted as contradicting his responses during the State's voir dire, this Court should defer to the trial court's resolution of his responses. *See Feldman*, 71 S.W.3d at 744. The reviewing court must give great deference to the trial court's decision on a challenge for cause based on the trial judge's opportunity to observe the venire member during voir dire. *Id.* When the record reflects that a prospective juror vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge. *Gardner*, 306 S.W.3d at 295.

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Darden. Issue 11 should be overruled.

### *Issue 12: Delores Sawyer*

Appellant challenged Sawyer for cause because, on two occasions, she testified that in deciding the mitigation special issue, she would take Appellant's facial expressions into account. (RR19:224-25). During the State's voir dire, in response to a line of questioning

regarding her ability to find that a person would not be a future danger,

the following exchange took place:

> [Sawyer]: Because, once again, I haven't heard all the facts. I believe, if a person shows remorse or some sign of rehabilitation, there's a possibility that that may not occur in future situations.
>
> [Prosecutor]: Okay. Tell me what you mean by "remorse". [sic]
>
> [Sawyer]: What I do, I pay a lot [of] attention to their demeanor, the body language, if they appear to be somewhat hostile or somewhat combative. You don't have to be verbal, as far as being combative or hostile. You can look at a person's body language, his or her eye contact. I'm very good be [sic] reading someone.
>
> I guess, it comes from my law enforcement training in the past. Because, a lot of times in-law enforcement, you cannot survive if you are not aware of a potential act or an attack within the law enforcement environment. Not only do you have to work in a law enforcement environment, it can happen on your job. We see this everyday.
>
> What just recently happened in Fort Hood. No one came to work that day and think [sic] that they're going to have an adverse situation to deal with. So it just depends on a lot of variables and factors. But the individual - - I don't know the history. It just kind of depends on what I find out about that person. It doesn't have to be verbal. Body language, like I said. Showing some sign of remorse.

(RR19:179-80).   During the defense's voir dire, counsel questioned

Sawyer as follows:

[Defense Counsel]:   Let me just ask you this:   Do you feel like that you would need to hear from the Defendant, to find out if he had remorse for something, in a hypothetical case?

Would you need to hear how that person felt about it, before you could consider a life sentence?

[Sawyer]:   No.   Like I said, the facts would have already been presented.   Like I said earlier, I would watch the Defendant's body language.   He doesn't have to say anything.   You can tell a lot about a person, whether or not he is feeling remorse, by his body language.   If you're in a court of law and the Defendant (demonstrating).   [sic]   If you're in a court of law and the Defendant is, like, just so distraught by what has occurred - -

[Defense Counsel]:   Okay.   All right.   So you can read 'em, kind of.

[Sawyer]:   Yes.

[Defense Counsel]:   Have you been able to read the Defendant in this courtroom today?

[Sawyer]:   Well, when I came in here, I was focusing over here.   I saw him.   Now, I'm looking at him now.   He seems calm and - - I don't want to use - - well, tranquil means the same as calm.   But he seems just calm.   Not agitated, not - - he doesn't appear hostile to me.

[Defense Counsel]: Okay. So have you formed any opinions about his character, in just observing him in court?

[Sawyer]: No, I have not. Once I hear the facts, I may. But, at this point, no.

[Defense Counsel]: Okay. And how he reacts to whatever he hears in court.

[Sawyer]: Yes.

(RR19:218-20). The prosecutor objected that the defense was "inviting the juror to consider any facts and circumstances that would be outside of the record." (RR19:220). The objection was sustained. (RR19:220).

A defendant's non-testimonial demeanor is not evidence subject to reference by the State or the defense. *See Good v. State*, 723 S.W.2d 734, 736 (Tex. Crim. App. 1986)(discussing comment on defendant's demeanor by the State). It follows that jurors should not consider the defendant's non-testimonial demeanor. *See* Tex. Code Crim. Proc. Ann. art. 38.08 (West 2005) (prohibiting any comment on the right of an accused to remain silent or his failure to testify).

In this case, defense counsel never explained to Sawyer that if she were selected as a juror, she would not be allowed to consider Appellant's non-testimonial demeanor. She never asked whether

99

Sawyer could set aside her desire to consider Appellant's demeanor and consider only the evidence properly presented. *See Threadgill*, 146 S.W.3d at 667.

On appeal, Appellant also challenges Sawyer because, in her questionnaire, she indicated support for the death penalty; she thought the death penalty was seldom used; and she agreed with a statement that jurors should do what they believe is right, even if it is contrary to the law. (Appellant's Br. p.59). These complaints are not preserved for review because they were not raised at trial. *See* Tex. R. App. P. 33.1(a) (providing that a timely specific trial objection is prerequisite to presenting a complaint on appellate review).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Sawyer. Issue 12 should be overruled.

### *Issue 13: Jonathan Henderson*

Appellant challenged Henderson for cause because: (1) once he found a person to be a future danger, the mitigation issue "would really not be much to him"; and (2) he was evasive. (RR20:201-02).

<u>Future Dangerousness/Mitigation</u>

Appellant challenged Henderson on the basis that he would automatically assess the death penalty if he found that the murder was committed deliberately and if the defendant was not intellectually disabled and was a future danger. During the State's voir dire, however, Henderson testified that he was "[a]bsolutely" open to hearing evidence in mitigation. (RR20:157). He affirmed that he would keep an open mind and consider all evidence when deciding the mitigation special issue. (RR20:163-64). He confirmed his understanding that there are no "automatic answers." (RR20:164).

> During the defense's voir dire, the following exchange took place:
>
> [Defense Counsel]: Right. In a hypothetical situation, what are your feelings about the person not receiving the death penalty but receive [sic] a life sentence instead?
>
> Do you have any feelings, either way?
>
> [Henderson]: Yes, I do.
>
> [Defense Counsel]: Tell me. What are they?
>
> [Henderson]: With the hypothetical situation of a man or woman or a person, I should say, committing that type of a crime, it's almost like an eye for an eye. If they can do it, then they ought to be able to receive it.

. . .

[Defense Counsel]: "You take a life, we take your life."

What do you think about that?

[Henderson]: That's when I say the facts have to be in line. Because taking a life for a life, and all the facts are the same, leading to that point, then it should be.

[Defense Counsel]: Then this should be the death penalty instead of life?

Is that what you're saying?

[Henderson]: Yes.

(RR20:174-76). Henderson did not testify that he would not consider evidence in mitigation or that he would automatically answer the special issues in a way that the death penalty would result. He testified that "the facts have to be in line." (RR20:175).

Defense counsel later returned to the subject and asked for Henderson's thoughts about a life sentence if the capital murder was committed deliberately by a defendant who is not intellectually disabled and is a future danger. (RR20:191). Henderson said that "[his] answer right now would be no life sentence." (RR20:191). At this point in

questioning, however, counsel did not remind Henderson that he would still have to consider the mitigation special issue; he asked only for his feelings up to the future danger special issue. *See Threadgill*, 146 S.W.3d at 667. In any event, when counsel suggested that Henderson would not "need to go on anymore[,]" Henderson's answer changed. (RR20:193). Henderson testified that "that's where that two-fold question comes in again." (RR20:193). He testified that "[w]ith [his] open mind, [he] would still want to go on." (RR20:193). He later testified that "of course [he] would" be open to answering the mitigation special issue in a way that a life sentence would result. (RR20:195-96).

Evasive

Appellant also challenged Henderson on the basis that he was evasive during the defense voir dire. A thorough review of the transcript shows that Henderson was not evasive. Rather, he was simply finding it difficult to answer some of counsel's questions with just a yes or no answer. The following exchange took place:

> [Defense Counsel]: No, I know. Because I'm asking you about your feelings.
>
> [Henderson]: And I'm telling you. And I want you to understand that my feelings still ride with, I want to go

103

through the process before I make a decision.  But you're wanting to know, if I had all of these things and all of that came about, then would I say "yes" or "no" to this.  That's an answer.  And I don't want to answer.  But I've got to give you something.  And that answer is what you want to hear right now, is an answer.  So I'm giving you an answer, but I'm not answering you, according to how I feel.  If that makes any sense.

(RR20:193-94).    A reviewing court should give particular deference when the veniremember's answers unclear or contradictory.  *See* *Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Henderson. Issue 13 should be overruled.

*Issue 14:  Isaac Tschewik*

Appellant challenged Tschewik for cause on the basis that he would place a burden on the defense in connection with the mitigation special issue.  (RR26:340).  The following exchange took place during the defense voir dire:

> [Defense Counsel]: . . .    "For me to be able to say that person should receive a life sentence instead of a death sentence, you're going to have to prove to me mitigation.  I'm going to place that burden on you to show me that I should not give him the death penalty."

What do you think?

[Tschewik]:  I think that's exactly where I am.

[Defense Counsel]:  Okay.  . . .  The law says you can't place a burden on us.

Are you telling me that you would place the burden on the Defense to convince you that he shouldn't receive the death penalty, after you've been convinced that he's a future danger?

[Tschewik]:  Well, I haven't thought of it that way.  I don't know that I'm placing a burden on the Defense.  I'm just trying to keep an open mind.  I'm just saying that, you know, it would be difficult to find something in my own mind that will mitigate the circumstances.

If I heard it and I believed it then, yes, I could do that. I could certainly accept life punishment.

[Defense Counsel]:  Okay.  You say you may not place a burden.  But would you want us - - would you require the Defense to provide you that evidence?

[Tschewik]:  Well, I don't know where else it's going to come from.

(RR26:335-36).  Tschewik was not challengeable for cause on the basis of this exchange.   Because there is no law which places the burden of proof on the State regarding the mitigation issue, a veniremember is

105

not challengeable for cause simply because he would place the burden of proof on this issue on the defense. *Ladd v. State*, 3 S.W.3d 547, 559 (Tex. Crim. App. 1999) (citing *Barnes v. State*, 876 S.W.2d 316, 329-330 (Tex. Crim. App. 1994).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Tschewik. Issue 14 should be overruled.

## *Issue 15: Michael Dawson*

Appellant challenged Dawson for cause on the basis that (1) he believes in the principle of an eye for an eye; (2) he believes intentional murder deserves the death penalty; and, (3) he has reservations about an individual with intellectual disability receiving a life sentence because that person knows the difference between right and wrong.

## Eye for an Eye

Appellant challenged Dawson for cause "based on his questionnaire which, over and over again, he would tell us under oath that he believed in the principle of an eye for an eye[.]" (RR27:153). On Question #1, which asked whether he was in favor of the death penalty, Dawson wrote that he "believe[s] in the principle of an eye for

an eye." (Dawson, Juror 469, Q p.1). On Question #18, he agreed that he believes in the principle of an eye for an eye and referenced his answer to Question #1. (Dawson, Juror 469, Q p.8). Dawson's answers to these questions do not demonstrate a clear bias against the law. The State notes that in response to Question #5, Dawson agreed that a life sentence would be appropriate in the proper circumstances. (Dawson, Juror 469, Q p.3). During questioning, he agreed on multiple occasions that a life sentence may be the appropriate punishment in the proper case. (RR27:110, 114, 131, 144-45). And, on multiple occasions he agreed that he could listen to the evidence and follow the law. (RR27: 96, 101-02, 105, 119-21). He testified that "If I'm chosen as a juror, I have to abide by the law." (RR27:137).

### Intentional Murder

Next, Appellant challenged Dawson based on his belief that "once you committed a murder that's intentional, the death penalty is really the only option." (RR27:153). Appellant cited four responses on Dawson's questionnaire wherein he indicated that intentional murder warrants the death penalty. (RR27:153; Dawson, Juror 469, Q pp.2, 3, 4). During questioning, Dawson acknowledged that in response to

Question 2 on his questionnaire he wrote that the death penalty is appropriate in all murder cases. He also testified, however, that this was just "an answer to a question. But there's definitely circumstances, that all of those things should be weighed." (RR27:127-28). He testified that he did not "have an issue" with a life sentence for an intentional murder. (RR27:131). He agreed that a life sentence could be the proper punishment for intentional murder. (RR27:131).

<u>Right from Wrong</u>

Appellant challenged Dawson because he expressed reservation about an individual with intellectual disability not being eligible for the death penalty if the individual knows right from wrong. (RR27:153). During questioning, Dawson initially testified that he understood that an individual with intellectual disability is not eligible to receive the death penalty. (RR27:132). He stated, "You don't want to pass judgment on someone who committed a crime that was not in their full capacity, making judgments." (RR27:132-33). When asked for his thoughts about an individual with intellectual disability not being eligible for the death penalty even though that person knows right from wrong, Dawson testified:

108

It's definitely an interesting dilemma, in that you're saying someone does meet that criteria and knows right from wrong. I would say that's more rare than not. But I guess, in that circumstance, you know, it's kind of - - I don't know. Almost a gray area. You have to weigh what you're given and make a decision, I guess.

(RR27:134). Dawson agreed with defense counsel's proposition that his "belief system" tells him that even if a person is intellectually disabled, that person should face the death penalty if that person knows right from wrong. (RR27:136). Nevertheless, he testified that if he was chosen as a juror, he would abide by the law. (RR27:137). Additionally, later in voir dire, Dawson disagreed that he would increase the burden on intellectual disability special issue in an effort to ensure the death penalty. (RR27:141-42). The following exchange took place:

[Defense Counsel]: Some people will say, "Do you know what? Because of the way I value life, I'm not going to let this person avoid the death penalty unless I'm positive that they're mentally I [sic] retarded.

"They killed somebody. They knew right from wrong, and they did it intentionally."

What do you think about that?

[Dawson]: I think that's a little too harsh. This questionnaire is very direct and black and white. You know, what you're proposing, there's things to be considered. There are gray areas. There are definitely circumstances. That's why we do this process. I'm definitely open-minded, and I can hear that and decide.

[Defense Counsel]: I have no doubt that you will keep an open mind and listen to the evidence. But what I'm asking you is this: There's some people that say, "Do you know what? For me to say this person is mentally retarded and just let them avoid the death penalty when I know they committed an intentional murder of another human being while committing a felony, I'm going to have to be really convinced that they're mentally retarded.

"If not, I may be letting some guy off from getting the death penalty, who I believe deserves it."

[Dawson]: It's about what the law requires. That's what I have to follow. That's what I have to base my opinion on. It's not whether or not I think he's really mentally retarded or not. It's based on what the law says.

(RR27:141-42).

A review of Dawson's voir dire shows no bias as a matter of law. Indeed, as previously stated, Dawson agreed on multiple occasions that he could listen to the evidence and follow the law. (RR27:96, 101-02, 105, 119-21).

110

On appeal, Appellant lists a number of other responses Dawson wrote in his questionnaire that he claims made Dawson challengeable for cause. (Appellant's Brief p.64). These arguments were not presented to the trial court and therefore are not preserved. *See* Tex. R. App. P. 33.1(a).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Dawson. Issue 15 should be overruled.

## *Issue 16: Angela Thorpe-Harris*

Appellant challenged Thorpe-Harris for cause on the basis of her testimony that she would place a burden on the defense in connection with the deliberateness special issue. (RR28:129).

## Burden of Proof

During the voir dire, defense counsel asked Thorpe-Harris for her thoughts about a life sentence for an individual who committed the offense deliberately and was not intellectually disabled. (RR28:120). The following exchange took place:

[Thorpe-Harris]: If they did it deliberately?

[Defense Counsel]:  Uh-huh.

[Thorpe-Harris]:  I could consider it.  But I know personally it would take a little bit of proving.

[Defense Counsel]:  Who would have to prove what, for a life sentence?

[Thorpe-Harris]:  You (indicating).  Your side.  You have to convince me.

. . .

[Defense Counsel]:  Okay.  The law says, you can't place that burden on me.  But, honestly, you'd do that, correct?

[Thorpe-Harris]:  Right.

[Defense Counsel]:  And there's nothing wrong with saying that.  Like I said, that's why we ask these questions.  I'm sure you didn't get up today saying to yourself "I know everything about capital murder law and I know exactly how I would act."  But you know yourself.

[Thorpe-Harris]:  I know the burden is supposed to be on the State's side for that question.  But I'm also going to be keying in on what you're saying, too.

[Defense Counsel]:  You would still place a burden on us to show you that it wasn't deliberate.  Because it's kind of an important decision that you have to make, right?

[Thorpe-Harris]:  Yes.

[Defense Counsel]: That's really how you feel?

[Thorpe-Harris]: Yes.

[Defense Counsel]: So if the Judge were to ask you, "Hey, Ms. Thorpe-Harris, you understand that you can't place a burden on the Defense," you would, correct?

[Thorpe-Harris]: Yeah. I'm going to listen to you. Yeah.

(RR28:120-22).

After the defense asserted its challenge against Thorpe-Harris, she was returned to the courtroom for the judge to clarify her testimony. (RR28:130). The judge confirmed Thorpe-Harris' understanding that the State – and not the Defense – has the burden of proof on the deliberateness special issue. (RR28:130-31). The following exchange then took place:

[Trial Court]: Okay. Would you require that the Defense prove to you that the act was not deliberately?

Or would you follow the law and just - - if the State proved to you beyond a reasonable doubt that it was deliberate, could you make your decision based on that?

Or if the State failed to prove to you that it was deliberate, then could you make your decision based on that?

113

[Thorpe-Harris]: Yeah, I could. I could do it, based on whatever the State decides.

[Defense Counsel]: Your Honor, I think she also told us that she would place a burden on us to prove - - somewhat of a burden on us to prove that it wasn't deliberate. I would ask you to inquire - - first of all ask, if she did say that to us on the record.

[Trial Court]: Do you recall saying that?

[Thorpe-Harris]: Yeah. Because I'm just sort of assuming that the Defense is going to be speaking to it - - I assume - - during the phase. So I'm going to be listening to what they say, too. But I know the burden of proof, from what they've told me, is on the State.

[Trial Court]: You understand that the burden of proof is solely upon the State?

[Thorpe-Harris]: Yes.

(RR28:32).

The totality of Thorpe-Harris's testimony shows that she would not place a burden on the defense in connection with the deliberateness special issue. Rather, she "just sort of assum[ed] that the Defense is going to be speaking to" that issue and she would listen to their evidence. (RR28:132). To the extent that Thorpe-Harris was

114

equivocating on her ability to follow the law, the reviewing court must defer to the trial judge. *Gardner*, 306 S.W.3d at 295.

Claims on Appeal

On appeal, Appellant challenges Thorpe-Harris because she would require severe intellectual disability to assess a life sentence and because she did not trust expert testimony. He also cites a number of the responses she gave on her questionnaire. (Appellant's Brief p. 66-67). These complaints are not preserved for review because they were not raised at trial. *See* Tex. R. App. P. 33.1(a) (providing that a timely specific trial objection is prerequisite to presenting a complaint on appellate review).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Thorpe-Harris. Issue 16 should be overruled.

*Issue 17: Christopher Weinzapfel*

Appellant challenged Weinzapfel for cause because: (1) he was familiar with the case; (2) he was evasive in answering questions; and (3) he invoked the Fifth Amendment. (RR32:89).

115

<u>Familiarity with Case</u>

Weinzapfel was in high school when the instant offense occurred. (RR32:14-15). He did not recall all of the details of the case, but he did remember that it "was the headlined story" and "that there was mental health that was in question and whether or not they were going to seek the death penalty[.]" (RR32:50, 51). At the time, in school, the issue "from a generic standpoint" was used as a source of discussion and debate. (RR32:51). "We argued both sides of that [issue]." (RR32:51). Although he knew the details of this case when he was in school, he could not presently recall them "off the top of [his] head." (RR32:87).

Weinzapfel was not challengeable for cause simply because he had some knowledge of the facts of the case. Qualified jurors need not be totally ignorant of the facts and issues involved in the case. *See Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). Even if this Court assumes that Weinzapfel had some limited knowledge of the case, he nevertheless denied having a pre-formed opinion regarding the case. (RR32:51-52). Indeed, he stated, "I have to be honest with you, I don't remember which side it went. I've had too much other stuff on my plate

116

to think too much about it." (RR32:52). There is nothing in the record to show that Weinzapfel was biased against Appellant.

## Evasive

Appellant challenged Weinzapfel on the basis of his being "evasive" during questioning. At one point during questioning, defense counsel began a series of questions asking Weinzapfel for his thoughts about a life sentence if the offense was determined to be deliberate, and then if the person is found to be a future danger. (RR32:79-81). Weinzapfel testified that he was "stuck in the thought process." (RR32:81). He was having difficulty answering counsel's questions without having the evidence. (RR32:81). Counsel took the questioning a step further and asked whether the circumstances of the defendant's childhood or disabilities would be relevant. (RR32:82). Weinzapfel responded:

> Again, that's why I'm hoping that it's not a matter of what I think but it's a matter of what I see and what evidence is presented. And then - - I'm not trying to evade that answer. I don't know. It's a pretty serious answer, to just be halfhearted about.

(RR32:82). A review of the record shows that Weinzapfel was not trying to be evasive; he was simply finding it difficult to thoughtfully answer counsel's questions without knowing the evidence. (RR32:82).

## Fifth Amendment

Appellant also challenged Weinzapfel because he invoked the Fifth Amendment. (RR32:62, 64). A review of the record shows that Weinzapfel asked to "take the Fifth" on two occasions, but he did so, not in the traditional sense. (RR32:62, 64). The first time Weinzapfel asked to take the Fifth, he and defense counsel were discussing Weinzapfel's ability to concentrate on the evidence given the fact that he is the sole provider in his family and would be missing two weeks of work if he were seated as a juror. (RR32:60-62). The following exchange took place:

> [Defense Counsel]: So, tell me: Would it be such a concern that it would be hard for to [sic] you concentrate on the evidence?
>
> [Weinzapfel]: Can I take the Fifth? I have to be honest with you, I work in a profession where I go to work everyday. I deal with life and death. The things that are happening, I can't take with me. So I wouldn't be very honest with you, if I said it would sway me. I have to make those decisions, regardless. It is a financial burden. It's

118

going to cost my family - - cost me the ability. But, hey, like
I said before, that's part of it.

(RR32:62).

The second time Weinzapfel asked to take the Fifth he and
defense counsel were discussing Weinzapfel's connection with the Darlie
Routier capital murder case. (RR32:64). Weinzapfel is a firefighter
and paramedic. (RR32:17). His colleagues, including his best friend,
were "the primary medics on the case." (RR32:64). His testimony is
not completely clear, but it appears that Weinzapfel helped "prep" his
colleagues for trial. (RR32:64). Defense counsel asked what
Weinzapfel thought "about all that?" (RR32:64). Weinzapfel testified:

> Again, I take the Fifth on that. I'd rather not give an
> opinion. It's one of those things to sit back and watch the
> drama unfold. Knowing what was known and the fact [sic]
> as they were, with all the details and everything else, it's a
> little different than watching it on the news.

(RR32:64).

The fact that Weinzapfel continued to respond to questioning
despite his requests to "take the Fifth," proves that he was not truly
attempting to invoke the Fifth Amendment. Indeed, he continued to
respond to questioning for an additional 24 pages. (RR32:64-88). This

119

refutes trial counsel's claim that Weinzapfel "would just not answer the question purported [sic] to him." (RR32:89). It appears that Weinzapfel used his request to "take the Fifth" in an effort to try to bring questioning on a particular topic to a close.

<u>Darlie Routier</u>

On appeal, Appellant also challenges Weinzapfel on the basis of his involvement in the Routier case. He fails to state, however, how this renders him challengeable. Regardless, this complaint was not preserved for review because it was not raised at trial. *See* Tex. R. App. P. 33.1(a). In any event, Weinzapfel testified that he was not involved in investigating the Routier case. (RR32:63-64). As stated above, Weinzapfel was apparently involved in helping his colleagues prepare to testify for trial. (RR32:64). He testified that his "directions were very specific . . . to make sure those guys were articulate and comfortable and knew exactly what they were needing to know, as far as from the medical side of it." (RR32:64).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Weinzapfel. Issue 17 should be overruled.

*Issue 18: Phillip Rapp*

Appellant challenged Rapp for cause for the following reasons: (1) in his questionnaire he indicated strong feelings in favor of the death penalty; and (2) he did not understand the questions asked during voir dire.

Death-Prone

Appellant challenged Rapp because he "indicated in his questionnaire he has strong feelings for the death penalty," which Appellant contended demonstrated a bias against a life sentence. (RR42:70). Counsel's challenge is overly general and fails to specifically describe why he believes Rapp is biased.[23] Regardless, the record reflects that Rapp would have to hear "[e]verything in the facts" before he could make a decision regarding punishment. (RR42:42-43). He denied that he was the type of person that would automatically vote to assess the death penalty. (RR42:65). During questioning by the defense, Rapp testified that he "would be open to what is presented. But, [he] still feel[s] more strongly to the death penalty as oppose [sic]

---

[23] On appeal, Appellant cites a number of responses in Rapp's questionnaire which he contends demonstrate Rapp's bias. (Appellant's Brief pp.69-70). When trial counsel made his challenge in the trial court, he did not specify the responses that formed the basis for his challenge. As such, it is the State's position that he has failed to properly preserve this claim for appellate review.

to a life sentence." (RR42:67-68). A juror may express strong feelings for imposing a death sentence, but "if he also unequivocally states that he could set aside those feelings and follow the trial court's instructions on the law and would base his verdict or his answers to the special issues on the evidence adduced," he is not disqualified as a matter of law. *See Cordova v. State*, 733 S.W.2d 175, 184 (Tex. Crim. App. 1987). Thus, the trial court properly denied Appellant's challenge on this basis.

### Confusion

Appellant also challenged Rapp because "he might not understand exactly the questions that were proposed to him and may have a misunderstanding as to how the scheme works." (RR42:70). During the State's voir dire, Rapp affirmed that he understood the process. (RR42:45, 49, 50, 54, 57). During questioning by the defense, however, Rapp got confused by counsel's questions. Defense counsel asked whether Rapp could answer the intellectual disability special issue in the affirmative, if proven by the evidence. (RR42:65-66). Initially, Rapp said no. (RR42:66). When counsel rephrased his question to be sure that Rapp understood his question, Rapp apologized and testified that his answer was yes, he could answer the intellectual disability

issue in the affirmative. (RR42:67). Later in the exchange, counsel asked whether Rapp could "answer it 'no[.]'" (RR42:68). Rapp answered that he could not. (RR42:68). Counsel again attempted to clarify his question. (RR42:68). Rapp asked whether counsel was asking if he could answer the intellectual disability question no. (RR42:68). He then testified that he could answer the intellectual disability special issue in the negative. (RR42:68).

Appellant complains that Rapp was confused, yet the questions Rapp was being asked were, in fact, confusing. At times, it was unclear what special issue counsel was asking Rapp to respond to. Once the questions were clarified, Rapp was able to respond appropriately. There is nothing in the record to show that Rapp misunderstood the process to be followed in this case.

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Rapp. Issue 18 should be overruled.

### Issue 19: Nancy Ramos

Appellant challenged Ramos for cause because she ranked herself as a "1" on Question 2 of her questionnaire, indicating a belief that "the

death penalty is appropriate in all murder cases." (Ramos, Juror 1025, Q p.2). Other responses on her questionnaire, however, demonstrate that Ramos' beliefs regarding the death penalty are not quite as rigid as her self-ranking would make it seem.

For example, even though Ramos ranked herself as a 1, she answered "yes" to Question 5, which asked whether she agreed "that a life sentence, rather than the death penalty, would be appropriate under the proper circumstances[.]" (Ramos, Juror 1025, Q p.2). In response to Question 15, she ranked herself a 5 out of 10 on a scale of how strongly she holds her belief in the use of the death penalty. (Ramos, Juror 1025, Q p.3). In response to Question 36C, she indicated that she was "uncertain" about whether the death penalty should be abolished. (Ramos, Juror 1025, Q p.7). In response to Question 41, Ramos ranked herself a 2 out of 10 on a scale of her attitude toward punishment in the criminal justice system. (Ramos, Juror 1025, Q p.8). During voir dire, Ramos affirmed that if selected as a juror, she could listen and answer the special issues based on the evidence presented. (RR44:10, 12, 14, 16, 17, 18).

## Claims on Appeal

On appeal, in addition to Ramos' self-ranking, Appellant cites a number of other responses Ramos gave in her questionnaire. (Appellant's Brief p.71). He contends that these responses show Ramos' bias. During voir dire, however, Appellant did not question Ramos about these responses and he did not mention them during his challenge for cause. As such, these complaints are not preserved for review. *See* Tex. R. App. P. 33.1(a).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Ramos. Issue 19 should be overruled.

## *Issue 20: Jay Kirby*

Appellant challenged Kirby for cause because (1) he indicated in his questionnaire that the death penalty is appropriate in all murder cases; and, (2) he declined to name his friend who is a police officer.

## Questionnaire

Appellant challenged Kirby "based on his answers on the questionnaire; that he believes the death penalty is appropriate in all murder cases." (RR45:68). Kirby ranked himself as a "1" on Question 2

of his questionnaire, indicating a belief that "the death penalty is appropriate in all murder cases." (Kirby, Juror 1052, Q p.1). On Question 5, he answered "no" to a question asking if he agreed that a life sentence may be appropriate under the proper circumstances. (Kirby, Juror 1052, Q p.2). He wrote that "[i]f found guilty of murder with intent the death penalty should be used." *Id*. On Question 9, Kirby wrote that he did not think that "life should be considered in a murder case." (Kirby, Juror 1052, Q p.2).

While many of Kirby's responses demonstrate that he is strongly in favor of the death penalty, they also demonstrate a willingness to follow the law. For example, on Question 47, in response to a question asking whether he agreed or disagreed with the following statement, "Regardless of what the Judge says the law is, Jurors should do what they believe is the right thing to do, even if it goes against the law[,]" Kirby wrote, "Disagree. If the Judge asked me to disregard I will." (Kirby, Juror 1052, Q p.9). When questioned by the State about his ability to "keep an open mind to this process and base [his] answers on the evidence," Kirby testified that he "[could] keep an open mind." (RR45:56). He agreed that he could keep an open mind to the process

involved in this case. (RR45:56-57). He testified that although he did not agree that a defendant does not have to testify, he would follow the law. (RR45:59). During questioning by the defense, the following exchange took place:

> [Defense Counsel]: Some jurors come in and tell us, "You know what? I thought we would just hear evidence and we just check a box, life or death."
>
> But now that you understand how this works, are you telling us that you could answer each special issue "yes" or "no" just depending on what you're convinced of from the evidence?
>
> [Kirby]: Yes, I can.
>
> [Defense Counsel]: Even if that leads to a life sentence, you can do that?
>
> [Kirby]: I believe I can.
>
> [Defense Counsel]: Because you can see how we would be a little concerned, based on your questionnaire. But now you're telling us here in court, under oath, that you can do that?
>
> [Kirby]: Yeah, I believe I can.

(RR45:66-67). Based on the foregoing, it is clear that Kirby was not disqualified as a matter of law. *See Cordova*, 733 S.W.2d at 184.

127

## Police Officer Friend

Appellant also challenged Kirby for cause because Kirby declined to provide the name of his friend who is a Dallas police officer. (RR45:68). During questioning by the defense, counsel inquired about the fact that, in his questionnaire, Kirby wrote that he has friends who are police officers. (RR45:65). Kirby testified that has "a friend" who works out of the Northwest Police Department. (RR45:65). When asked for his name, Kirby responded that he "would prefer not to, if that's okay." (RR45:65). Defense counsel did not press Kirby to provide the friend's name, but asked whether he knew if the friend was involved in the investigation of Appellant's case. (RR45:65). Kirby testified that he knows the friend "socially" and that he did not know whether he was involved. (RR45:65). Without more information, Appellant's challenge fails as there is no evidence that Kirby's friendship with a police officer makes him disqualified as a matter of law. In any event, when asked whether he could set aside his relationship with that friend and listen to the evidence and make a decision based on what he hears in court, Kirby testified, "Sure, I could. Yeah." (RR45:66).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Kirby. Issue 20 should be overruled.

### *Issue 21: Nathan Sosa*

Appellant challenged Sosa for cause because (1) his responses on his questionnaire; and, (2) he would only consider a life sentence in limited circumstances. (RR46:32).

### Questionnaire

Appellant challenged Sosa for cause "based on his answers in the questionnaire." (RR46:32). Appellant did not identify the responses in the 22-page questionnaire that he contends render him challengeable for cause. As such, this complaint is not preserved for review. *See* Tex. R. App. P. 33.1(a).

### Closure

Appellant also challenged Sosa for cause because "he's limited himself - - as to when he can consider a life sentence." (RR46:32). On Question 9 of his questionnaire, in response to the question, "For what crimes do you think a sentence of life imprisonment is the proper punishment[,]" Sosa wrote, "Someone who gives information so as to

give closure to love [sic] ones." (Sosa, Juror 1070, Q p.3). During questioning, defense counsel inquired regarding this response. (RR46:27-28). Sosa explained that his answer simply represented an example of a case in which he would agree that a life sentence was proper: if someone committed murder and hid the victims' bodies, he should get a life sentence if he discloses the location of the bodies so that the family has "closure." (RR46:28). Importantly, Sosa did not testify that his example represented the only situation in which a life sentence would be appropriate. Quite to the contrary, he testified that he could keep an open mind. The following exchange took place:

> [Defense Counsel]: But now that you have heard the way it works here, can you see there might be other circumstances - -
>
> [Sosa]: Oh, yeah.
>
> [Defense Counsel]: - - that might lead someone to vote for a life sentence?
>
> Is that what you're telling us here today; that you can keep an open mind to that?
>
> [Sosa]: Like I say, you don't know what people been through. You can't just judge one action by being simple about it. You know, everything comes to a climax. Like I said, I'm always open-minded. I don't judge people. I don't

have no preconceptions of people. I try not to let that get in my way, because I don't want to have any preconceived notions about myself. So I try to be fair to everybody, of all walks of life, throughout my life.

As far as, you know, you show me the evidence, I'll use my own free mind, my own free will, and I'll make my own decision.

(RR46:29). The foregoing proves that Sosa was not limited in his ability to consider a life sentence.

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Sosa. Issue 21 should be overruled.

*Issue 22: James Martin*

Appellant challenged Martin for cause because (1) his responses on his questionnaire; and, (2) he is biased as a result of the fact that his grandson was killed.

Questionnaire

Appellant challenged Martin "just based on his questionnaire." (RR50:45). Appellant did not identify the responses in the 22-page questionnaire that he contends render him challengeable for cause. As

such, this complaint is not preserved for review.  *See* Tex. R. App. P. 33.1(a).

## Martin's Grandson

Appellant also challenged Martin "based on the fact that his grandson was killed."  (RR50:45).  Appellant asserted that Martin's grandson's death would affect his ability to be a fair juror in Appellant's case.  (RR50:45).

On Question 67 of his questionnaire, in response to a question asking whether he knew anyone who was killed accidentally or otherwise, Martin wrote that "[his] grandson was shot a [sic] killed by a stray bullit [sic]."  (Martin, Juror 1190, Q p.11).  Martin testified that his grandson's case occurred in 2005.[24]  (RR50:43).  His grandson's case was prosecuted by the Dallas County District Attorney's Office, but it would not cause him to be unfair in Appellant's case.  (RR50:38).  Indeed, Martin denied that there was anything about his grandson's case that would keep him from being able to listen in Appellant's case.  (RR50:37-38).  During the defense voir dire, Martin promised that his

---

[24] It is not clear whether the offense against Martin's grandson occurred in 2005 or whether the perpetrator's trial occurred in 2005.  (RR50:43).

132

grandson's case would not affect his ability to be a fair juror in Appellant's case. (RR50:43).

The record supports the trial court's ruling. Martin's voir dire does not show a bias against Appellant or the law. The record shows that he is in favor of the death penalty, but he testified that he would be comfortable with assessing a life sentence in the proper circumstances. (RR50:39, 41).

### Claims on Appeal

On appeal, Appellant cites a number of other responses Martin gave in his questionnaire, which he contends show his bias. (Appellant's Brief p.76). Appellant did not cite these responses during his challenge for cause. As such, these complaints are not preserved for review. *See* Tex. R. App. P. 33.1(a).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Martin. Issue 22 should be overruled.

### *Issue 23: Jennifer Wilder*

Appellant challenged Wilder for cause because (1) she would increase the burden on the defense regarding the intellectual disability

special issue; (2) she would lower the burden on the State regarding the future danger special issue; and, (3) she would impose a burden on the defense regarding the mitigation special issue.

Intellectual Disability

Appellant challenged Wilder for cause because she would hold the defense "to a burden of beyond a reasonable doubt on Special Issue Number One." (RR52:85-86). During the State's voir dire, the prosecutor explained that with regard to the intellectual disability special issue, the burden of proof is on the defense to prove it by a preponderance of the evidence. (RR52:26-33). Wilder affirmed that she could abide by the law with regard to this special issue. (RR52:29). She denied that she would automatically answer the intellectual disability special issue in the negative simply because the offense at issue is capital murder. (RR52:33).

When questioned by the defense, Wilder gave a response that suggested that she would increase the burden of proof:

> [Defense Counsel]: You know, sometimes people have told us also . . . I want to be really sure they're mentally retarded. I don't want to be sure, just more likely than not. I want to be the most sure I can be, under the law.

134

"I want to be sure beyond a reasonable doubt. I don't want to have any doubt, for me to just say this person shouldn't receive the death penalty because they're mentally retarded. I want to be convinced more than just a preponderance. I have to be convinced beyond a reasonable doubt.

"We're holding the State to beyond-a-reasonable-doubt standard. I want to hold the Defense to that burden also."

What do you think?

[Wilder]: Yes. You've got to be fair. I notice you have mentally retarded first, instead of last. It seems like everybody do [sic] a crime, and then they want to say that they are mentally retarded. You can even fool a doctor that you're mentally retarded. You just got to prove it beyond, as you say, a reasonable doubt. And then you can see some features in a mentally-challenged person also.

(RR52:64-65). It appears from this exchange that Wilder may have been confused and thought that beyond a reasonable doubt was the appropriate burden on this special issue. Later in the exchange, defense counsel returned to the subject and explained that the burden on the defense is a preponderance of the evidence. (RR52:66-67). Wilder affirmed that she would be okay with the defense proving the intellectual disability special issue by a preponderance of the evidence. (RR52:68).

To the extent that Wilder provided contradictory responses, the appellate court should defer to the trial judge. When the record reflects that a venire member vacillated or equivocated on her ability to follow the law, the reviewing court must defer to the trial judge. *Gardner*, 306 S.W.3d at 295.

Future Danger

Appellant challenged Wilder because she would only require the State to prove "just a mere chance or a possibility" that Appellant would be a future danger. (RR52:86). During voir dire, the prosecutor explained that the burden on the future danger special issue is on the State. (RR52:40-41). The State must prove that there is a probability – more than a possibility, but less than a certainty – that Appellant would be a future danger. (RR52:44-46). Wilder agreed that she would be open to either possible answer and testified that "[a]nybody can be rehabilitated." (RR52:46).

When questioned by the defense, Wilder again agreed that the State would have to prove a probability. (RR52:74). Then, however, as the exchange continued, she gave a response that was equivocal. The following exchange took place:

[Defense Counsel]: So if the law says that you have to hold the State to prove more than a mere chance and they have to prove to you a probability, which is more, would you agree?

[Wilder]: Yes.

[Defense Counsel]: Could you follow that?

Or would a mere chance be enough for you?

Because, if that's the way you feel, you can tell us. You can say, "I can follow the law and say a probability is what I would hold them to." You tell me.

What would make you more comfortable?

[Wilder]: A mere chance. I think both sides would be a chance. Proving it beyond a reasonable doubt and thinking that this person is going to rehabilitate, even if they ever get out of prison. I could go either way. You've got to prove it. But then, nothing is 100 percent proven.

(RR52:74).

To the extent that any of Wilder's responses may be interpreted as contradictory, this Court should defer to the trial court's resolution of her responses. *See Feldman*, 71 S.W.3d at 744. The reviewing court must give great deference to the trial court's decision on a challenge for cause based on the trial judge's opportunity to observe the venire

137

member during voir dire. *Id.* When the record reflects that a prospective juror vacillated or equivocated on her ability to follow the law, the reviewing court must defer to the trial judge. *Gardner*, 306 S.W.3d at 295.

## Mitigation

Appellant challenged Wilder because she would place a burden on the defense regarding the mitigation special issue. (RR52:86). At no point, however, did Wilder ever say that she would place a burden on the defense on this issue. Importantly, neither side instructed Wilder that there is no burden as it relates to this issue. *See generally Threadgill*, 146 S.W.3d at 667.

Defense counsel asked Wilder about the fact that some people would only answer the mitigation special issue in the affirmative if "the Defense proves it to [them]." (RR52:75). Wilder responded as follows:

> You got the Defense over here, then you have the person that's defending the Defendant. You would want your government to really bring everything that they would have in order to prove the Defendant - - if they should receive life or death. It's just looking at the evidence.

(RR52:76). Wilder's response suggests that she would consider the evidence presented, not that she would impose the burden of proof on

the defense. (RR52:76). Even if her response can be interpreted as imposing a burden on the defense, which the State does not concede, this Court has stated that a veniremember is not challengeable for cause simply because he would place the burden of proof on the defense regarding mitigation. *Saldano*, 232 S.W.3d at 92 (citing *Ladd*, 3 S.W.3d at 559).

## Claims on Appeal

On appeal, Appellant cites a number of other responses Wilder gave in her questionnaire, which he contends show her bias. (Appellant's Brief p.78). Appellant did not mention these responses during his challenge for cause. As such, these complaints are not preserved for review. *See* Tex. R. App. P. 33.1(a).

Appellant has failed to show that the trial court abused its discretion in denying his challenge for cause against Wilder. Issue 23 should be overruled.

## *Conclusion*

Appellant has not shown even one erroneous ruling on his challenges for cause, much less three erroneous rulings. *See Gonzales*, 353 S.W.3d at 837. Therefore, he has not shown this Court that he was

denied the use of a statutorily provided peremptory strike. Issues 9 through 23 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. *24-30:* *THE TRIAL COURT DID NOT ERR IN GRANTING THE STATE'S CHALLENGES FOR CAUSE.***

In Issues 24 through 30, Appellant contends that the trial court erred in granting the State's challenges for cause against veniremembers Sheryly Kingery, Kimberly Morris, Consuelo Davila, Gloria Hawkins, Jenna Kinzie, Raul Flores, and Kellye Hogan. He contends the exclusion of these jurors violated article 35.16 of the Texas Code of Criminal Procedure. Appellant's contentions lack merit and should be overruled.

## *Applicable Law*

Article 35.16(b) of the Texas Code of Criminal Procedure provides as follows:

A challenge for cause may be made by the State for any of the following reasons:

1. That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty.

2. That he is related within the third degree of consanguinity or affinity as determined under

Chapter 573, Government Code, to the defendant; and

3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

Tex. Code Crim. Proc. Ann. art. 35.16(b) (West 2006).  A "bias against the law" is the refusal to consider or apply the relevant law.  *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998).  The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law.  *Threadgill*, 146 S.W.3d at 667.

On appeal, a reviewing court will overturn the trial court's ruling on a challenge for cause only if it clearly abused its discretion. *Gonzales*, 353 S.W.3d at 831.  The reviewing court gives great deference to the trial court's decision on a challenge for cause because the trial judge was in the best position to observe the venire member during voir dire.  *Id.*  When the record reflects that a venire member vacillated or equivocated on her ability to follow the law, the reviewing court must defer to the trial judge.  *Id.*

*Issue 24:  Sheryl Kingery*

On her questionnaire, in response to Question 2, Kingery ranked

141

herself a "5," indicating a belief that she "could never, under any circumstances, return a verdict which assessed the death penalty." (RR13:22; Kingery, Juror 32, Q p.1). Kingery wrote that she could not be a part of taking someone's life. (Kingery, Juror 32, Q p.1). She made statements in multiple other places, which made her beliefs regarding the death penalty clear: she has moral, religious, or personal beliefs that would prevent her from returning a verdict which would result in the execution of another human being (Kingery, Juror 32, p.3); "(death sentence) provides no purpose" (Kingery, Juror 32, p.3); "I do not believe in the death penalty" (Kingery, Juror 32, p.4); "I simply do not believe in the death penalty" (Kingery, Juror 32, p.4); "[the death penalty] just never made any sense to me. It seems contradictory. Murder is a crime but putting someone to death is not" (Kingery, Juror 32, p.5); "I want to be sure to make it clear my stance against the death penalty and it would be an influence on my thoughts" (Kingery, Juror 32, p.20).

During voir dire by the State, when asked if she was saying, "I can't be part of [this process], because of my beliefs[,]" Kingery testified that the prosecutor was correct. (RR13:23). Kingery testified that if

she were a juror, she "would have to answer [the special issues] truthfully[,]" but later, she conceded the possibility that she would be looking for a way to answer the questions in such a way that the death penalty would not result. (RR13:25). Serving as a juror in this case would do harm to her conscience. (RR13:25-26). Kingery repeatedly affirmed that she does not believe in the death penalty and believes that it should be abolished. (RR13:28-29).

When questioned by the defense, Kingery testified that if she were selected as a juror, she would show up. (RR13:44). She intimated, however, that her participation would be less than honest. The following exchange took place:

> [Defense Counsel]: If you're selected as a juror, would you just refuse to participate at all in the process?
>
> [Kingery]: No, I would not refuse to participate. But I know how I would participate.
>
> [Defense Counsel]: Okay. That's what we're going to talk about.
>
> Would you do it honestly?
>
> I mean, you've indicated, when they were asking you questions, that you would participate honestly in the process.

[Kingery]: As honestly as I can. I know I have this strong belief.

(RR13:44). Later, counsel asked Kingery whether she could honestly answer "no" to the mitigation special issue if she did not find any mitigating evidence. (RR13:55). Kingery testified that "it would kill [her]." (RR13:55). As the exchange continued, however, she gave answers that suggested that her participation would be less than completely honest:

[Defense Counsel]: But would you be honest and do it?

[Kingery]: I would have to. Because, one way or the other, my conscience is going to - -

[Defense Counsel]: So you would have to answer it honestly.

[Kingery]: Yes.

[Defense Counsel]: Even if your answer's "no" you would be honest and answer "no" that there's no mitigation, right?

Even if it would be hard - - extremely hard - - for you, you could do it?

[Kingery]: Put in that situation, can I absolutely, honestly answer that today?

144

[Defense Counsel]: No. We don't know what you're going to hear.

[Kingery]: I would hope I would do it. But I still can't say, when it came down to that wire. I can only hope that I will do it.

(RR13:55-56). Kingery then contradicted herself and testified that she "[could] answer the questions honestly." (RR13:57).

A veniremember may not be excused for her general opposition to the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968); *Rachal v. State*, 917 S.W.2d 799, 810 (Tex. Crim. App. 1996). A veniremember is challengeable for cause, however, if his beliefs against capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the court's instructions and the juror's oath. *See Colburn*, 966 S.W.2d at 517. A juror must be able to set aside her personal preferences and biases to consider as death eligible all those defined as death eligible by section 19.03 of the penal code and article 37.071 of the criminal procedure code. *Rachal*, 917 S.W.2d at 812.

The totality of Kingery's voir dire testimony shows that her beliefs about capital punishment would prevent or substantially impair the

145

performance of her duties as a juror as required by law. She had a bias against the law governing a defendant's eligibility for the death penalty. As a result of her bias, Kingery could not ensure the parties that she would follow the law and answer the special issues honestly. *See Clark v. State*, 929 S.W.2d 5, 8-9 (Tex. Crim. App. 1996) (a prospective juror who maintains she will consciously distort her answers must be excused on challenge for cause). At a minimum, Kingery vacillated. Where the venire member either vacillates or equivocates on her ability to follow the law, the Court should defer to the trial court's judgment on the challenge for cause. *Granados v. State*, 85 S.W.3d 217, 231 (Tex. Crim. App. 2002).

The record supports the trial court's decision to grant the State's challenge. To conclude otherwise would controvert this Court's policy of encouraging trial court's to liberally grant challenges for cause rather than err by denying a challenge on a close question. *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998).

Issue 24 should be overruled.

### Issue 25: Kimberly Morris

At the beginning of the State's voir dire, Morris testified that

although she believes in the death penalty, she was concerned about being the person "to say that that should happen to someone[.]" (RR13:213). Indeed, she testified that she could not take the oath because of her beliefs about the death penalty. (RR13:218-19). The following exchange took place:

[Prosecutor]: Your moral beliefs, they're yours . . . What I'm hearing you say, when you tell me it might be hard to return a verdict that would result in the execution of somebody else, tells me that you might have some moral dilemma with actually being on a jury that actually imposed a verdict that resulted in the execution of somebody else.

[Morris]: Yes.

[Prosecutor]: Is that how you feel?

[Morris]: That's how I feel.

[Prosecutor]: Okay. What I'm saying is that you would have to take an oath to follow the law, even if the law conflicted with your own moral standard.

Some jurors have told me, "I can't take that oath, because I don't want to be in a position of making a determination that, while in line with the law, is not in line with my own morals."

Does that make sense?

[Morris]:  Yes.

[Prosecutor]:   Some people have a moral opposition to imposing the death penalty, by their verdict.  Okay?  And what I'm hearing you tell me is that you could not take that oath.

Is that right?

[Morris]:  Correct.

[Prosecutor]:  You couldn't assure me that you would take the oath and follow it all the way through because of your moral dilemmas with the death penalty, correct?

[Morris]:  Correct.

(RR13:217-19).   Later, the prosecutor returned to the subject and Morris maintained her position, stating, "No.  I couldn't assure you that [she would take the oath to follow the law]."  (RR13:239).

During voir dire by the defense, however, Morris contradicted herself.   She testified that she would answer all of the special issues honestly.  (RR13:249-50, 254-55, 259).  She testified that she would take the oath if she had to.  (RR13:260).    In an effort to clarify Morris' position, the trial judge inquired of her as follows:

[Trial Court]:  . . . Now, one side, you're saying, no, you can't.  The other side, you're saying, yes, you can.

148

I need to know "yes" or "no" can you take the oath?

[Morris]:  No.

(RR13:264).

Given Morris' repeated statements that she could not take the oath, the trial court properly granted the State's challenge for cause.  A veniremember is challengeable for cause if she states that her convictions are so strong that she cannot take an oath, knowing that a death sentence is a possible result at trial.  *See Goodwin v. State*, 799 S.W.2d 719, 731-32 (Tex. Crim. App. 1990).  The record supports the trial court's decision to grant the State's challenge.  *See King v. State*, 29 S.W.3d 556, 568 (Tex. Crim. App. 2000).   To conclude otherwise would controvert this Court's policy as stated earlier.  *Jones*, 982 S.W.2d at 394.

Issue 25 should be overruled.

### *Issue 26:  Consuelo Davila*

On Question 2 of her questionnaire, Davila ranked herself a "5," indicating a belief that she "could never, under any circumstances, return a verdict which assessed the death penalty."  (Davila, Juror 103,

Q p.1).  She wrote in 3 places that she did not think that she could "send someone to [the] death penalty."  (Davila, Juror 103, Q pp.3, 4, 20).

She also answered "yes" to Questions 3 and 4, which ask whether the juror has any moral, religious or personal beliefs that would prevent them from sitting in judgment of another human being or would prevent them from returning a verdict that would result in the execution of another human being.  (Davila, Juror 103, Q p.3).

During questioning by the State, Davila affirmed the answers on her questionnaire.  (RR14:133-36).  She agreed that her beliefs regarding the death penalty would affect her ability to answer the special issues.  (RR14:154).  The following exchange took place:

> [Prosecutor]:  Okay.  So your views then on the death penalty will impact how you consider whether somebody is mentally retarded or not; is that right?
>
> [Davila]:  Yes.
>
> [Prosecutor]:  Okay.  In other words, you would change or consider Special Issue Number One really not in the context of whether the person suffers from mental retardation, but whether you want him to get the death penalty or not; is that right?
>
> [Davila]:  Yes.

150

(RR14:154). The prosecutor asked Davila whether her feelings would affect her answer to the deliberateness special issue, "knowing that if you answer it 'yes' you're moving closer toward that verdict of death?" (RR14:159). Davila responded, "I think it would. But I still can't send no one to death penalty." (RR14:159). Her views would affect her answers to the future danger and the mitigation special issues as well. (RR14:159-60, 167). Because of her moral beliefs, she is unable to be a part of the process involved in this case. (RR14:169). When Davila was questioned by the defense, she appeared to contradict herself because she agreed that she could answer the special issues. (RR14:178-87). At the end of questioning, however, she testified that she could not take the oath to serve as a juror. (RR14:187-88). The following exchange took place:

> [Defense Counsel]: . . . So now that you know how it works, do you think you could take the oath to serve as a juror and be part of the process, as long as all you're asked to do is answer the questions honestly and base your answers on the evidence?
>
> Do you think you could do that?
>
> [Davila]: Honestly, no.

(RR14:187-88).

Given Davila's testimony that her beliefs would affect her answers to the special issues and that she could not take the oath, the trial court properly granted the State's challenge for cause. *See Goodwin*, 799 S.W.2d at 731-32. The record supports the trial court's decision to grant the State's challenge. *See King*, 29 S.W.3d at 568. To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

Issue 26 should be overruled.

### *Issue 27: Gloria Hawkins*

In response to Question 1 on her questionnaire, Hawkins wrote that she is not in favor of the death penalty. (Hawkins, Juror 176, Q p.1). During questioning by the State, Hawkins affirmed the statements in her questionnaire that she does not believe in the death penalty. (RR15:216). She testified, "No, I wouldn't be part of a process where someone is executed. I will not be." (RR15:215). Importantly, Hawkins refused to provide any assurance that if she were selected as a juror that she would take the oath and follow the law. (RR15:219-21). The following exchange occurred:

> [Hawkins]: I said, I'm against the death penalty. Yes, that's what I wrote. That's what I mean.

[Prosecutor]: Can you take the oath to follow the law and render a true verdict?

[Hawkins]: What do you think?

[Prosecutor]: I think you can. What do you think?

[Hawkins]: I'm not gone [sic] give the death penalty.

[Prosecutor]: Because of how you feel, you're not going to give the death penalty?

[Hawkins]: And may not even want to give a life penalty. But go ahead.

. . .

[Prosecutor]: And even if you [heard the evidence], you couldn't impose the death penalty in any case.

Is that what you're telling me?

[Hawkins]: If I heard witnesses. No, I will not impose the death penalty. That is too final. And people change.

. . .

[Prosecutor]: Are you able to give me your assurance right now that you can take the oath to follow the law and render a true verdict, based on the law and the evidence?

[Hawkins]: That I could follow the law?

[Prosecutor]: And render - -

[Hawkins]: I'm not a part of that. I don't have to follow that. No, I don't have to follow that. I'm not a part of your law.

(RR15:219-21). In contrast, when she was questioned by the defense, Hawkins testified that she could answer the special issues honestly. (RR15:227-28). She testified that she could follow the law. (RR15:230-31, 234-35, 239).

The totality of Hawkins' voir dire testimony shows that her beliefs about capital punishment would prevent or substantially impair the performance of her duties as a juror as required by law. To the extent, if any, that some of her other remarks could be interpreted as contradictory, the trial court was the fact finder during voir dire and, thus, free to resolve her conflicting answers in the State's favor. *See King*, 29 S.W.3d at 568 (particular deference is given to the trial court's conclusion that venire member cannot follow law when venire member's answers are vacillating, unclear, or contradictory). To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

## Judgment

On Question 4 of her questionnaire, Hawkins answered "yes" to a question asking whether she has "any moral, religious or personal beliefs that would prevent [her] from returning a verdict which would result in the execution of another human being." (Hawkins, Juror 176, Q p.2). During voir dire, she testified, "I don't believe I have a right to, you know, judge anybody, to say that they should die for what they did." (RR15:184). The totality of Hawkins' voir dire shows she could not sit in judgment of another individual and her statements support the trial court's decision.

## Guilt

When Hawkins was told that the Judge would instruct her that Appellant has already been found guilty, Hawkins testified, "Well, I didn't see the trial. It's hearsay to me." (RR15:190). The prosecutor explained that another jury already found Appellant guilty. (RR15:190). Hawkins testified that she would "have to see it for [her]self[.]" (RR15:190). As above, Hawkins' testimony shows that she was unable (or unwilling) to follow the law. The record supports the trial court's decision.

## Fifth Amendment

On Question 36A of her questionnaire, Hawkins wrote that she agreed with the statement, "Even though the law says a Defendant has the right to remain silent, a person accused of capital murder should testify." (Hawkins, Juror 176, Q p.7). During voir dire, the prosecutor explained that jurors are not allowed to consider the fact that a defendant does or does not testify in his own defense as evidence of guilt. (RR15:195). Hawkins testified that she "[doesn't] follow that law." (RR15:195). In contrast, she later contradicted herself when she testified that she would follow an instruction not to consider whether the defendant elects to testify as evidence of guilt. (RR15:196). To the extent that Hawkins was a vacillating juror, the record supports the trial court's decision. *See King*, 29 S.W.3d at 568.

## Future Danger

Hawkins testified that she could not find a person to be a future danger unless she talks to that person or if that person testifies and she hears what that person has to say. (RR15:209). She could not answer the future danger special issue unless the defendant testifies. (RR15:210). Even so, "[y]ou can't tell a person's heart. You don't know

what he's going to do or what he's not going to do in the future. You can't do it. You can only predict." (RR15:211). As a result, she could never answer the future danger special issue. (RR15:211, 212). She testified:

> I can't do that. Because I can't look at a person's heart and tell what they're going to do. I can't do that. And you can't either.

(RR15:211-12). In contrast, she later contradicted herself when she testified that she could answer the the future danger special issue "yes." (RR15:235-36). To the extent that Hawkins was a vacillating juror, the record supports the trial court's decision. *See King*, 29 S.W.3d at 568.

The record supports the trial court's decision to grant the State's challenge. To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

Issue 27 should be overruled.

### *Issue 28: Jenna Kinzie*

On Question 1 of her questionnaire, Kinzie wrote that she is "not sure what [she] think[s] about the death penalty but [she does] not think it should be [her] decision whether someone lives or dies." (Kinzie, Juror 243, Q p.2). She ranked herself a "3" on Question 2,

157

indicating a belief that, "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." (Kinzie, Juror 243, Q p.2). During the State's voir dire, she described herself as "teeter-tottery" about the subject. (RR17:114). When the prosecutor asked if taking the oath would violate her conscience, Kinzie said it would. (RR17:125). Kinzie testified that she thought that she could take the oath; however, her views on the death penalty would affect her answers to the special issues. (RR17:128-29). During questioning by the defense, however, Kinzie agreed that she could take the oath and render a verdict based on the law and evidence. (RR17:139, 142, 158).

After she was questioned by both sides, the trial court brought Kinzie back into the courtroom and asked whether she could "take the oath or not[.]" Kinzie testified that she could not. (RR17:170-71). To the extent that Kinzie was a vacillating juror, the record supports the trial court's decision. *See King*, 29 S.W.3d at 568.

<u>Fifth Amendment</u>

On Question 36A of her questionnaire, Kinzie wrote that she agreed with the statement, "Even though the law says a Defendant has

the right to remain silent, a person accused of capital murder should testify." (Kinzie, Juror 243, Q p.7). During the State's voir dire, she testified that she would prefer that a capital murder defendant testify. (RR17:133). She was unsure whether she would require the defendant's testimony. (RR17:133). She would consider it, however, in deciding the special issues. (RR17:135). When questioned by the defense, Kinzie agreed that she would not consider the defendant's failure to testify. (RR17:157). To the extent that Kinzie was a vacillating juror, the record supports the trial court's decision. *See King*, 29 S.W.3d at 568.

Police Officers

One of Kinzie's brothers is a police officer. (RR17:129, 154). As a result, even though the law says that police officers are to be judged as any other witness, Kinzie would find them to be more credible. (RR17:130-31). She later contradicted herself and agreed that she would wait and listen to their testimony before judging their credibility. (RR17:155-56).

The totality of Kinzie's voir dire testimony clearly shows her beliefs about capital punishment and sitting in judgment of another

person would prevent or substantially impair her ability to carry out her obligations as a juror. And, she vacillated on multiple issues. Indeed, Kinzie was the classic vacillating juror; she gave different answers depending on who was questioning her. Where the venire member either vacillates or equivocates on his ability to follow the law, the Court should defer to the trial court's judgment on the challenge for cause. *Granados*, 85 S.W.3d at 231. The record supports the trial court's decision to grant the State's challenge. To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

Issue 28 should be overruled.

### *Issue 29: Raul Flores*

On his questionnaire, Flores wrote that he is not in favor of the death penalty and described it as "barbaric." (Flores, Juror 244, Q p.2, p.5). On Question 4, he answered "yes" to a question asking whether he has "any moral, religious or personal beliefs that would prevent [him] from returning a verdict which would result in the execution of another human being." (Flores, Juror 244, Q p.3). He wrote that he was "very unsure that [he] could send a person to their death." (Flores,

160

Juror 244, Q p.3).   On Question 19, Flores answered "no," that the death penalty is not applied fairly in Texas.  (Flores, Juror 244, Q p.4). On Question 22, Flores wrote that the death penalty is used too often and that "it's used as a political tool to gain votes from people thirsty for punishment, rather than what benefits society."  (Flores, Juror 244, Q p.4).   He answered "agree" to Question 36C, which asked whether the death penalty should be abolished.  (Flores, Juror 244, Q p.7).

During questioning by the State, Flores' testimony revealed considerable distrust in the prosecution.  The following exchange took place:

> [Flores]:  Everybody has their agenda.  Everybody wants something.  It just seems that with the prosecutor, lately, I've been hearing about wins and losses.  And that's all that matters.  This morning, I heard about a receipt was [sic] withheld, evidence was withheld, and the guy went to prison for 25 years.
>
> [Prosecutor]:  Yep.
>
> [Flores]:  That happened, because a prosecutor wanted to win.  I'm suppose to believe what you tell me - -
>
> [Prosecutor]:  Actually, you don't have to.
>
> [Flores]:  Well, I'm not too succinct [sic] right now.

. . .

[Flores]:  So you just told me that, okay, we're here because this happened and this happened and this happened.  And I'm supposed to believe you?

[Prosecutor]:  In one sense, yes.  In another sense, you don't have to necessarily agree with it.

Does that make sense to you?

[Flores]:  You're telling me these things, and we're going to proceed onward, as if I believe you.  And that's - -

[Prosecutor]:  That's a problem for you?

[Flores]:  (Venireperson nods.)

[Prosecutor]:  That's all right.  I can tell.

(RR18:21-23).  The prosecutor asked Flores whether his personal experiences and "things that [he has] read about" meant that the State was "already behind in this case."  (RR18:39).  Flores responded that "That's accurate."  (RR18:39).

Flores openly admitted that he is biased.  He testified, "I'm very biased."  (RR18:33).  He testified that his "biases will factor into how [he] act[s]."  (RR18:34).  At one point, Flores testified that he thought that he could look at evidence objectively.  (RR18:40).  But then he

162

returned to his initial stance. The following exchange took place:

> [Prosecutor]: . . . In other words, you could not be a part of this process that would result in the execution because of how you feel; is that right? "Yes" or "no"?

> [Flores]: No, I couldn't.

> [Prosecutor]: Okay. All right.

> [Flores]: I'd be fine disregarding the instructions, you know.

> [Prosecutor]: You would be fine disregarding the instructions?

> [Flores]: If the alternative is sending someone to die.

(RR18:40-41).

Later, when he was questioned by the defense, Flores equivocated regarding his ability to serve as a juror and answer the special issues based on the law and evidence. (RR18:66-67). Counsel tried to pin Flores down, but Flores testified that the best answer he was able to give was "I don't know."

The totality of Flores' voir dire testimony clearly shows that his beliefs about capital punishment and his clear bias against the State would prevent or substantially impair his ability to carry out his oath and follow instructions in accordance with the law. *Threadgill*, 146

163

S.W.3d at 667. Flores was equivocal about his ability to take the oath. Even if he did take the oath, however, by his testimony, he would "be fine disregarding [the court's] instructions[.]" (RR18:41). The record supports the trial court's decision.

Issue 29 should be overruled.

*Issue 30: Kellye Hogan*

In her questionnaire, Hogan wrote that she is in favor of the death penalty in the appropriate case, but she is "hesitant to make a decision for someone else's fate." (Hogan, Juror 1110, Q p.2, 20). During voir dire, after hearing the prosecutor summarize the process involved, Hogan testified that she did not feel like she could be a part of the process. (RR47:69). She testified, "I don't feel like I can handle making that type of decision, based on an individual." (RR47:69). Hogan acknowledged that her testimony differed from the answers in her questionnaire; she said that she has "had time to think about it[.]" (RR47:70). Initially, Hogan agreed that the death penalty "would be playing on [her] mind" as she answered the special issues. (RR47:74). But then she testified that if she were a juror that she "would obviously tell the truth" and that her views on the death penalty would not affect

164

her answers to the special issues. (RR47:75-76). Where the venire member either vacillates or equivocates on her ability to follow the law, the Court should defer to the trial court's judgment on the challenge for cause. *Granados*, 85 S.W.3d at 231. The record supports the trial court's decision to grant the State's challenge. To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

## Burden of Proof

Hogan also testified that she would hold the State to a higher burden of proof than beyond a reasonable doubt. (RR47:99). The prosecutor explained that although the beyond-a-reasonable-doubt standard is the highest burden in the criminal justice system, it "does not mean with 100 percent certainty or beyond all possible doubt." (RR47:99). When asked if she would hold the State to its burden of beyond a reasonable doubt or whether she would hold it to a higher burden, Hogan testified that "it would have to be a higher burden than reasonable doubt - - beyond a reasonable doubt." (RR47:99). The prosecutor explained that the law only requires the State to prove something beyond a reasonable doubt but Hogan maintained that she

165

would hold the State to a higher burden. (RR47:100-01). The following

exchange took place:

> [Prosecutor]: The law is, you would be instructed that I'm only suppose to prove it beyond a reasonable doubt, if I can prove it at all. Even if you were convinced beyond a reasonable doubt about something, about Special Issue Number Two, Special Issue Number Three, you would still hold me to that higher burden, because of your thoughts on capital murder; is that correct?
>
> [Hogan]: That's correct.
>
> [Prosecutor]: You would hold me to beyond all possible doubt?
>
> [Hogan]: Yes.

(RR47:101). When she was questioned by the defense, Hogan appeared

to change her answer. (RR47:112-14). She agreed that she would not

hold the State to an impossible burden, but would hold the State to its

burden of beyond a reasonable doubt. (RR47:114). In an attempt to

clear up the confusion, the trial court inquired of Hogan regarding the

burden of proof:

> [Trial Court]: . . . All right. I'm confused now, Ms. Hogan. And I want you to tell me. Because, when Mr. Birmingham was talking to you . . . you told him that you would hold him to a higher burden of proof. Mr. Sanchez has been over this

166

with you.

You understand, the law is beyond a reasonable doubt? That's the burden of proof that the State has to prove. Beyond a reasonable doubt can mean anything to you. We don't have a legal definition of it. It means whatever it means to you, each juror. But that is the burden of proof. It's not beyond all doubt. It's not beyond a shadow of a doubt. It's not beyond - - it's not 100 percent. It's not to a certainty. It's beyond a reasonable doubt.

Now, would you hold the State to that burden?

Or would you hold them to a higher burden?

Just be real truthful and honest with us.

[Hogan]: Okay. Well, that's what I thought I answered, was it would be a higher - - it would be a higher burden.

[Trial Court]: A higher burden than beyond a reasonable doubt?

[Hogan]: Yes.

(RR47:115). A review of Hogan's testimony shows that she has a bias against the law regarding the State's burden of proof. Her bias would prevent or substantially impair her ability to carry out her oath and instructions in accordance with the law. *Threadgill*, 146 S.W.3d at 667. At a minimum, Hogan was a vacillating juror. *See generally Ladd*, 3

167

S.W.3d at 559. The record supports the trial court's decision.

Issue 30 should be overruled.

*Conclusion*

The trial court did not abuse its discretion in granting the State's challenges for cause regarding Kingery, Morris, Davila, Hawkins, Kinzie, Flores, and Hogan. Even assuming their excusal was erroneous, it was harmless. The erroneous excusal of a venireperson warrants reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury. *Jones*, 982 S.W.2d at 394. Appellant makes no such showing. Moreover, no evidence indicates that the jurors who served on Appellant's jury were in any way biased, interested, or otherwise disqualified from serving. As a result, reversal is unwarranted.

Issues 24 through 30 should be overruled.

**STATE'S RESPONSE TO ISSUE 31: THE SUPREME COURT'S DECISION IN HALL V. FLORIDA DID NOT INVALIDATE THIS COURT'S DECISION IN EX PARTE BRISENO.**

Appellant contends that the recent Supreme Court decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014) invalidates and renders unconstitutional this Court's decision in *Ex parte Briseno*, 135 S.W.3d 1

(Tex. Crim. App. 2004). Appellant's contention lack merit.

### *Pertinent Facts*

On June 3, 2014, Appellant filed a motion to quash the jury panel based on the United States Supreme Court opinion in *Hall*. (CR:23-24). Defense counsel argued that under *Hall*, it is unconstitutional to instruct the potential jurors that an IQ of "70 or below" as "it's actually a moving scale now, depending on the evidence from an expert." (RR47:7). Counsel argued that "by application and by statutory statement through the Brisenio [sic] case, we feel that there's an unconstitutionality there." (RR47:7). The trial court overruled Appellant's objection to the State being permitted to instruct the potential jurors that the first prong of the test for intellectual disability requires an IQ of 70 or below. (RR47:11-12).

On June 13, 2014, the trial court conducted a second hearing on Appellant's motion. At that time, Appellant argued that "Briseno no longer applies" after *Hall*. (RR53:15). The defense maintained its June 3rd argument that the jury had been improperly questioned on the matter during voir dire. (RR53:16-17). The trial court denied Appellant's motion to quash the panel. (RR56:4).

## *Applicable Law*

### *Atkins*

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the United States Supreme Court held that the execution of intellectually disabled defendants violates the Eighth Amendment.  A fundamental premise of *Atkins* is that the clinical definition of intellectual disability takes into account "that IQ scores represent a range, not a fixed number[.]" *Hall*, 134 S. Ct. at 1999.  "And those clinical definitions have long included the [standard error or measurement "SEM".]" *Id.*

### *Briseno*

For the purposes of an *Atkins* claim, this Court has defined intellectual disability in accordance with the criteria adopted by the American Association on Mental Retardation (AAMR) and the Texas Health and Safety Code as (1) significant sub-average general intellectual functioning, usually evidenced by an intelligence quotient (IQ) score below 70, that is accompanied by, (2) related limitations in adaptive functioning, (3) the onset of which occurs prior to the age of 18. *See Briseno*, 135 S.W.3d at 7-8; *see also* Tex. Health & Safety Code Ann. § 591.003(7-a) (West Supp. 2015).  The *Briseno* Court defined

significantly subaverage intellectual functioning as an IQ of *about* 70 or below (*approximately* two standard deviations below the mean). *Id*. at 7 n.24; *see also Williams v. State*, 270 S.W.3d 112, 113-14 (Tex. Crim. App. 2008) (noting this Court's adoption of the AAMR definition of intellectual disability, which is defined, in part, as "an IQ 'of about 70' or below")) (citing *Briseno*, 135 S.W.3d at 7 n.24). Regarding adaptive functioning, this Court recognized that the determination may be difficult as the criteria "are exceedingly subjective" and articulated seven factors that a fact-finder may consider when resolving that prong:

- Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially unacceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

171

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Id.* at 8-9.

## *Hall v. Florida*

In *Hall*, the United States Supreme Court held that Florida's interpretation of its intellectual disability statute was unconstitutional. 134 S. Ct. at 2000. Freddie Hall filed a motion claiming that he was intellectually disabled and could not be executed. *Id.* at 1991-92. He presented in IQ score of 71.[25] *Id.* at 1992. Florida argued that Hall was not allowed to present any additional evidence of his intellectual disability because he had failed as a threshold matter to present evidence of an IQ score of 70 or below. *Id.* The Florida court's interpretation of the strict 70 cutoff did not permit consideration of the SEM. Because Hall failed to meet the strict cutoff, he was not allowed to present evidence of adaptive deficits. *See id.*

---

[25] Hall presented multiple IQ scores, but some were excluded, leaving only scores between 71 and 80. *Id.*

The United States Supreme Court noted that, on its face, there was nothing in the Florida statute to preclude consideration of the standard error of measurement. *Hall*, 134 S.Ct. at 1994. The problem was that the Florida Supreme Court had interpreted the provisions of the intellectual disability statute too narrowly:

> It has held that a person whose test score is above 70, including a score within the margin for measurement error, does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited.

*Id.* at 1994 (citing *Cherry v. State*, 959 So. 2d 702, 712-13 (Fla. 2007) (per curiam)). This interpretation contradicts established medical practice because it uses an IQ score as "final and conclusive evidence of a defendant's intellectual capacity" even though an IQ score is "on its own terms, imprecise" and because experts in the field would still consider other evidence. *Id.* at 1995. *Hall* holds that individual states may not bar a defendant from litigating an intellectual disability claim by implementing a mandatory and rigid IQ test-score cutoff, without considering the IQ test's SEM. *Id.* at 2001.

### Texas post-Hall

Nearly six months after *Hall*, in *Ex parte Cathey*, this Court

173

reaffirmed Texas' use of the definition of intellectual disability adopted in *Briseno. Ex parte Cathey*, 451 S.W.3d 1, 9 fn.15 (Tex. Crim. App. 2014). *Briseno* was affirmed again in *Ex parte Moore*, 470 S.W.3d 481 (Tex. Crim. App. 2015), *cert. granted in part*, 136 S. Ct. 2407 (2016). In *Moore*, this Court reiterated that, in the absence of action by the Legislature, Texas would "continue to follow the AAMR's 1992 definition of intellectual disability . . . adopted in *Briseno* for *Atkins* claims presented in Texas death-penalty claims." *Id.* at 486 (citing *In re Allen*, 462 S.W.3d 47, 52 (Tex. Crim. App. 2015)). Citing *Hall*, this Court stated that "the legal test we established in *Briseno* remains adequately 'informed by the medical community's diagnostic framework.'" *Id.* at 487 (citing *Hall*, 134 S.Ct. at 2000).

## *Analysis*

Appellant's contention that *Briseno* was rendered unconstitutional after *Hall* lacks merit. *Hall* stands for the proposition that states cannot implement bright line IQ cutoff scores when considering a capital defendant's claim of intellectual disability. 134 S. Ct. at 2001. *Briseno* does not call for the use of a bright-line IQ cutoff score. Appellant cites no Texas cases implementing a bright-

line IQ cutoff score. Indeed, in *Moore*, this Court stated:

> Regarding *Briseno's* first prong, general intellectual functioning is defined by the IQ and obtained by assessment with a standardized, individually administered intelligence test. There is a measurement error of approximately five points in assessing IQ, which may vary from instrument to instrument. Therefore, when determining whether an applicant has met *Briseno's* first prong, we consider the fact that any IQ score could actually represent a score that is five points higher or five points lower than the score than he actually obtained.

*Moore*, 470 S.W. 3d at 487 (internal quotations and citations omitted); *see also Ex parte Hearn*, 310 S.W.3d 424, 428 (Tex. Crim. App. 2010) (noting that there is a measurement error of approximately 5 points in assessing IQ, which varies from instrument to instrument; thus, depending on the IQ test used, a score could actually represent a score that is five points higher or five points lower than the actual test result); *Ex parte Woods*, 296 S.W.3d 587, 608 n.35 (Tex. Crim. App. 2009) (taking into account a potential five-point deviation up or down in an IQ score). Notably, the *Hall* Court did not identify Texas as a state that, like Florida, employs a bright-line IQ cutoff score. Because the definition of intellectual disability announced in *Briseno* does not preclude consideration of the SEM, it is not unconstitutional under

175

*Hall.*

In his brief, Appellant invites this Court to reconsider *Briseno* in light of *Hall.* He cites Judge Price's concurring opinion in *Cathey* and Judge Alcala's dissent[26] in *Ex parte Lizcano*, in support of his contention that *Briseno* is un-scientific and unconstitutional. *See Cathey*, 451 S.W.3d at 28 (Price, J., concurring); *Ex parte Lizcano*, No. WR-68,348-03, 2015 Tex. Crim. App. Unpub. LEXIS 331, at *2 (Tex. Crim. App. Apr. 15, 2015) (Alcala, J., dissenting) (not designated for publication). Neither opinion advances Appellant's argument. In his brief opinion in *Cathey*, Judge Price criticized *Briseno*, however, his disagreement was "with the Court's decidedly non-diagnostic approach to evaluating the adaptive deficits prong[,]" not the subaverage-IQ prong. *Cathey*, 451 S.W.3d at 28. In *Lizcano*, Judge Alcala criticized *Briseno*, but, like Judge Price, her criticism concerned the factors used to determine the adaptive functioning prong, not the subaverage-IQ prong. *Lizcano*, 2015 Tex. Crim. App. Unpub. LEXIS at *5-6. As argued above, *Hall* concerns the subaverage-IQ prong, not the adaptive functioning prong.

---

[26] In fact, Appellant refers to "Judge Newell's dissenting opinion" in *Lizcano*. Although Judge Newell did dissent, it was Judge Alcala who filed the dissenting opinion.

On appeal, Appellant also complains that *Briseno* requires a defendant to prove that his deficits in adaptive functioning are the result of an intellectual disability and not a personality disorder. (Appellant's Brief pp.90-98). This argument is procedurally barred as Appellant failed to raise it in the trial court. *See* Tex. R. App. P. 33.1(a).

Regardless, Appellant's complaint lacks merit. *Briseno* does not require a defendant to prove that his adaptive deficits are not the result of a personality disorder. The complained-of language from *Briseno* provides as follows:

> The adaptive behavior criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides of the issue in most cases. There are, however, some other evidentiary factors which factfinders in the criminal trial context ***might also focus upon in weighing evidence as indicative of mental retardation or of a personality disorder***.

*Briseno*, 135 S.W.3d at 8 (emphasis added). The above-quoted language does not impose an additional evidentiary requirement upon the defense. This language simply explains that the proposed "evidentiary factors" may help to distinguish between adaptive deficits related to intellectual disability and adaptive deficits related to

177

something other than intellectual disability. *See Moore*, 470 S.W.3d at 488 (stating that "An applicant must . . . demonstrate by a preponderance of the evidence that his adaptive behavior deficits are related to significantly sub-average general intellectual functioning rather than some other cause.").

In any event, use of the *Briseno* evidentiary factors - - which would then be used to weigh evidence "as indicative of mental retardation or of a personality disorder" - - is not mandatory. *Id*. at 8. This Court stated that the factfinders "**might** . . . focus" on the listed evidentiary factors. *Id*. (emphasis added); *Ex parte Sosa*, 364 S.W.3d 889, 892 (Tex. Crim. App. 2012) (stating that "we did not make consideration of any or all of [the *Briseno*] factors mandatory").

Issue 31 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. *32-34*: *THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S MOTION TO QUASH, HIS MOTION TO RE-QUESTION JURORS, AND HIS MOTION TO LIMIT THE STATE'S VOIR DIRE.*[27]**

In Issue 32, Appellant contends that the trial court erred in overruling his motion to quash the jury after the Supreme Court decision in *Hall*. In Issue 33, Appellant contends that the trial court

---

[27] Because Appellant presents Issues 32-34 together, the State will do so as well.

178

erred in overruling his request to re-question the qualified jurors in light of *Hall*.  In Issue 34, Appellant contends that the trial court erred in overruling his objection that the State not be allowed to voir dire the jury under *Briseno*.  Appellant's contentions lack merit.

### *Pertinent Facts*

Individual voir dire began on March 31, 2014.  (RR12).  On May 27, 2014, while jury selection was still underway in this case, the Supreme Court decided *Hall*.  *See Hall*, 134 S.Ct. 1986.  At the time *Hall* was decided, ten jurors had been seated on Appellant's jury.[28]

On June 3, 2014, Appellant filed a Motion to Quash the Jury Panel based on *Hall*.  (CR:23-24).  The visiting judge conducted a hearing on Appellant's motion but deferred a ruling until the motion was presented to the trial court.  (RR47:5-12).  Appellant also "object[ed] to the State . . . telling jurors that the burden on the Defense is to prove an IQ of 70 or below, or below 70."  (RR47:5).  Appellant argued that "may be unconstitutional or is unconstitutional" under *Hall*.  (RR47:5-6).  This objection was overruled. (RR47:11-12).

On June 13, 2014, the trial court conducted a second hearing on

---

[28] Dunn-Jelen (#208); Daquiera (#256); Blomberg (#259); Kvalheim (#316); Clark (#353); Davenport (#504); Agnes (#588); Kiefer (#685); Wells (#802); and, McElyea (#857).

Appellant's motion.  At that time, Appellant argued that "Briseno no longer applies" after *Hall.*  (RR53:15).  The defense maintained its June 3rd argument that the jury had been improperly questioned about the *Briseno* factors during voir dire.  (RR53:16-17).  Seven days later, the trial court convened a third hearing, during which it denied Appellant's motion and stated:

> The Court is denying that motion.  And offering the Defense the opportunity as well as the State to bring the panel in either collectively or one at a time to revisit the issue of 70 benchmark for mental retardation.  The State - - made reference by the State.  Bearing in mind that the Court will note for the record that in its questioning, the State did include other factors that the jury may take into consideration when making a determination of mental retardation.  However, since the majority of the questions asked to the majority of the jurors indicated 70, I think it is appropriate to revisit with the jurors.  The Defense will have the option of whether it wishes to proceed in that manner.  Or the Court is also of the opinion should the issue surface during the trial, that the matter could be cured by a jury instruction.

(RR56:4-5).

After the competency trial, but before the beginning of the punishment trial, the trial court conducted a fourth hearing in connection with Appellant's motion to quash.  (RR59:9).  The trial court

180

stated that, in light of *Hall*, it was going to individually question each of the jurors on the panel. (RR59:9). The judge described the procedure to be followed:

> Defendant having been found competent to stand trial, there's several issues we need to address, one being reviewing the . . . mental retardation issue with the panel. The Court is proposing to do that individually, by calling in the jurors in the order they were selected.
>
> In the event any indicate they are not able to follow the law, then we do have alternate jurors that we can question. The Court is proposing to do that questioning and, in the event that the jurors raise issues or questions, then I'll allow the attorneys to address or answer those questions or question jurors as they may be needed.
>
> In that absence, however, if the jurors indicate they are able to follow the law, then that will conclude the Court's questioning, with respect to each and every juror, and that will be the only issue that the Court will go into.

(RR59:9-10). Appellant objected to the proposed procedure. (RR59:13-18).

Each juror was then brought into the courtroom individually, informed that during jury selection the United States Supreme Court issued an opinion regarding intellectual disability and now, the trial court was meeting with each of the jurors to clarify the definition of

181

intellectual disability. The judge reminded each juror of the three-prong definition of intellectual disability and then advised that with regard to IQ scores, the score is not fixed, but represents a range or approximation of the IQ. (RR59:21-61). Each juror was asked whether he or she could follow the law and whether he or she had any questions. Each of the jurors testified that they could follow the law. None had any questions. (RR59:22, 25, 30-33, 35-36, 38-45, 47, 49-50, 52, 55-56, 58, 60-61).

After the trial court concluded its questioning of the jurors, Appellant made a bill of exception at which time he recited a list of questions that he proposed to ask the prospective jurors following *Hall*. (RR59:61-65).

### *Standard of Review*

#### *Motion to Quash*

An appellate court reviews a trial court's denial of a motion to quash a jury panel under an abuse of discretion standard. *See Mendoza v. State*, 552 S.W.2d 444, 447 (Tex. Crim. App. 1977).

#### *Limitation on Questioning*

An appellate court reviews a trial court's limitation on questioning

prospective jurors for an abuse of discretion. *See Tamez v. State*, 27 S.W.3d 668, 672 (Tex. App.—Waco 2000, pet. ref'd).

### *Applicable Law*

Preventing defense counsel from asking proper questions of the venire is not an error of constitutional dimension per se. *See Easley v. State*, 424 S.W.3d 535, 536 (Tex. Crim. App. 2014). The trial court retains the authority to impose reasonable restrictions "for various reasons, among them to curb the prolixity of what can become the lengthiest part of a criminal proceeding." *Bodde v. State*, 568 S.W.2d 344, 350 (Tex. Crim. App. 1978).

### *Analysis*

Appellant's issues are insufficiently briefed and therefore nothing is presented for this Court's review. *See* Tex. R. App. P. 38.1(i). After describing the facts underlying his claims, Appellant devotes a single paragraph to argue three issues. He fails to recite the standard of review and he fails to offer any specific argument or discussion of the authority in support of his contentions regarding any of the three complained-of issues. This Court is not required to make Appellant's case for him. *Garcia v. State*, 887 S.W.2d 862, 882 (Tex. Crim. App.

183

1994) (stating that a reviewing court "will not brief appellant's case for him").

## *Issue 32: Motion to Quash*

The trial court did not abuse its discretion in overruling Appellant's motion to quash the jury panel after the Supreme Court's decision in *Hall*. As argued above, *Hall* stands for the proposition that states may not prevent a defendant from litigating an intellectual disability claim by implementing a mandatory and rigid IQ test score cutoff, without considering the IQ test's SEM. *Hall*, 134 S.Ct. at 2001. Unlike Florida, Texas does not utilize a cut-off IQ score as a threshold for litigating an intellectual disability claim. Because Texas has no applicable statute, intellectual disability claims in death penalty cases are governed by *Briseno*. *Briseno* allows for consideration of the SEM in connection with an IQ test. *Briseno*, 135 S.W.3d at 7 n.24. As a result, even after *Hall*, *Briseno* remains valid law. The jurors in this case were questioned in accordance with *Briseno*. Appellant points to no place in the transcript where any juror was questioned improperly.[29]

---

[29] During the second hearing on Appellant's motion to quash, defense counsel argued that the jurors were instructed "that the IQ was 70 or below, and sometimes they were told below 70[.]" (RR53:5). Counsel did not identify the jurors she claims were improperly questioned.

Before the jury was sworn, the trial court conducted a brief hearing with each individual juror. Each juror was informed of the Supreme Court's recent decision in *Hall*, reminded of the three-prong test for intellectual disability, and informed that the significantly-subaverage-IQ score of 70 is not a fixed number, but represents a range. Each juror was asked whether he or she could follow the law. The jurors were asked if they had any questions. Although none had questions, if a juror had asked one, the trial court planned to "allow the attorneys to address or answer those questions or question jurors as they may be needed." (RR59:9-10).

From the beginning, the jurors were questioned in accordance with valid law. Nevertheless, the trial court took the added precaution of informing each juror individually that an IQ score is not a fixed score. Each of the jurors said that they could follow the law. Accordingly the trial court did not abuse its discretion in overruling Appellant's motion to quash. *See Mendoza*, 552 S.W.2d at 447. At a minimum, the decision falls within the zone of reasonable disagreement. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

Issue 32 should be overruled.

*Issue 33:  Re-question Jurors*

The trial court did not err in denying Appellant's motion to re-question the jurors following *Hall*.  Again, *Hall* did not change the law in Texas.  Like the State, during individual voir dire, Appellant had forty-five minutes to question each prospective juror and at that time he could have asked them about the SEM.  Notably, Appellant offers no explanation as to why he was unable to ask the questions he proposed during his bill of exception during his regular voir dire.

It was well within the trial court's discretion to deny Appellant's motion to re-question the jurors.  *See Bodde*, 568 S.W.2d at 350 (stating that a trial court may impose reasonable restrictions on voir dire).  Appellant's proposed questions – all of which he could have asked during his portion of voir dire – would have simply and unnecessarily prolonged voir dire.  In any event, any alleged harm was cured when the trial court conducted its own questioning, informed each juror that an IQ score is not a fixed number, and ensured that each juror could follow the law.

Issue 33 should be overruled.

*Issue 34: Objection to State's Voir Dire*

The trial court did not err in denying Appellant's objection to the State being allowed to say "70 or below" in explaining the definition of intellectual disability. The only basis for Appellant's objection to the State's voir dire is his claim that it is not allowed under *Hall*. As argued above, *Hall* did not change the law in Texas. *Hall* rejects bright-line 70 IQ cutoff scores, which Texas does not apply. Appellant points to no evidence that the State informed any juror during voir dire that an IQ score is fixed or that the SEM is not to be considered.

Issues 34 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. *35-36*: APPELLANT WAS NOT DEPRIVED OF A LAWFULLY CONSTITUTED JURY**.

In Issues 35 and 36, Appellant contends that the trial court's rulings "in reference to each juror complained about previously" deprived him of a lawfully constituted jury resulting in violations of his rights under the state and federal constitutions and under article 35.16 of the Texas Code of Criminal Procedure. (Appellant's Brief pp. 105-07).

Appellant's contentions lack merit as he has failed to show that he was deprived of a lawfully constituted jury. He has failed to show the trial court's rulings on any of the challenges resulted in the seating of a juror who was biased or prejudiced. If an appellant does not present record evidence demonstrating that the trial court's error deprived him of a jury comprised of legally qualified jurors, he has suffered no harm and the reviewing court should presume the jurors are qualified. *See Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007).

Issues 35 and 36 should be overruled.

**STATE'S RESPONSE TO ISSUE *37*: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S MOTION TO DISQUALIFY THE DISTRICT ATTORNEY'S OFFICE.**

Appellant contends that the trial court erred in denying his pre-trial motion to disqualify the Dallas County District Attorney's Office from prosecuting the instant case. He contends that he was denied due process as the result of a conflict of interest that arose when his former second-chair counsel was hired as an Assistant District Attorney while the case was in the pretrial stages. Appellant's contentions lack merit.

### *Pertinent Facts*

Appellant was originally tried in September 1987. (CR:208). At

188

the time, he was represented by Wayne Huff and Doug Parks. (CR:208). When his case was remanded for a new trial on punishment, the trial court appointed new counsel. In January 2011, Russell Wilson was appointed second-chair trial counsel. (CR:196; RR3:6, 14). On October 6, 2011, Wilson filed a motion to withdraw from Appellant's case. (CR:196). In his motion, Wilson wrote that "[i]n June of 2011 [he] accepted employment with the Dallas County District Attorney's Office." (CR:196). "After accepting employment, [Wilson] no longer performed work on Mr. Thomas's behalf." (CR:196). The trial court granted Wilson's motion to withdraw. (CR:197).

On September 7, 2011, Appellant filed a motion to disqualify the Dallas County District Attorney's Office. (CR4:9-12). The basis for Appellant's motion was that Wilson, one of the attorneys who represented him prior to trial, was now employed by the office responsible for his prosecution.[30] (CR4:9-12). The trial court conducted a hearing on Appellant's motion. At the hearing, Wilson testified that he was appointed to Appellant's case as "the second chair." (RR3:6). Regarding his work on the case, Wilson testified that he had at least

---

[30] Wilson could not the recall specific date he began at the District Attorney's Office, but he believed it was either July 1, 2011 or July 5, 2011.

189

one conversation with Appellant, some conversations with lead defense counsel, and he had received a packet of discovery from the State. (RR3:8-10). According to Wilson, he had "not functioned as [Appellant's] attorney . . . since [he] knew that [he] was going to be taking a position at the district attorney's office." (RR3:7). He did not believe that he had any information about the case or witnesses that lead counsel did not also have. (RR3:17-18).

Wilson testified that prior to accepting employment at the District Attorney's Office, he discussed with then-elected District Attorney Craig Watkins "certain understandings regarding the law and the discretion of the district attorney has [sic] as it relates to whether or not to seek a recusal. (RR3:21-22). Wilson and Watkins later had another conversation during which Wilson was instructed that he was not allowed to discuss Appellant's case with "anybody." (RR3:20). The lead prosecutor, Brandon Birmingham, was not allowed to discuss Appellant's case with Wilson either. (RR3:20).

Wilson testified that he does not supervise Birmingham or anyone else in the felony trial bureau division. (RR3:22). He agreed, however, that if Appellant were sentenced to death, lawyers in one of the

190

divisions that he does supervise would be responsible for reviewing Appellant's case. (RR3:12-13).

Appellant's motion was denied. (RR4:4).

### *Applicable Law*

It is well-settled law that a district attorney's office, not a trial court, determines at its discretion when a conflict of interest exists that requires recusal. *See Coleman v. State,* 246 S.W.3d 76, 81 (Tex. Crim. App. 2008); *State ex. rel. Hill v. Pirtle*, 887 S.W.2d 921, 939 (Tex. Crim. App. 1994) (indicating the district attorney must initiate his own recusal). The offices of the district attorneys in Texas are constitutionally created and constitutionally protected. *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 4 (Tex. Crim. App. 1990). The authority of a district attorney cannot be abridged or taken away, and a court may not remove a district attorney from an individual case absent one of three statutorily defined circumstances: (1) incompetency, (2) official misconduct, or (3) intoxication. *Id.* at 4-5; Tex. Loc. Gov't Code Ann. §§ 87.013, 87.018(a) (West 2008). Moreover, a trial by jury must be held before removal. *Eidson,* 793 S.W.2d at 5. If a trial court removes a district attorney and his office from a case by court order, it

191

does so "without authority or jurisdiction." *See id.* at 5 (concluding error occurred where the trial judge's order disqualified the district attorney because prior defense counsel became an assistant prosecutor and the trial court sought to avoid the appearance of impropriety).

In *Eidson*, defense counsel Ross Adair represented the defendant during the investigation stage of a case and at an examining trial. *Eidson*, 793 S.W.2d at 3. Adair later joined the district attorney's office and conducted research for the State's response to the motion to recuse the district attorney in his former client's case. *Id.* When the elected district attorney realized Adair had previously represented the defendant, the district attorney gave him instructions not to discuss the case with anyone in the District Attorney's office nor allow anyone to discuss it in his presence. *Id.* The trial judge granted the defense's motion to recuse the district attorney's office based on an appearance of impropriety. *Id.* Because no statutory factor for removal was met, this Court held the trial judge entered the order without authority or jurisdiction, stating that if a conflict of interest exists, responsibility for recusal lies with the district attorney's office, not the trial court. *Id.* at 6.

*Analysis*

As a threshold matter, it is the State's position that Appellant failed to properly brief this issue. *See* Tex. R. App. P. 38.1(i). Appellant asserts that the trial court erred and provides a few facts in connection with his complaint, but other than the citation to *Eidson,* he fails to offer any specific argument or discussion of the authority in support of his contention. This Court is not required to make Appellant's case for him. *Garcia,* 887 S.W.2d at 882.

In any event, Appellant's argument fails. Current Texas law provides that if an assistant district attorney has previously represented a defendant in a particular proceeding, then that particular attorney is disqualified from assisting in the prosecution of the case, but the elected prosecutor and his other assistants are not. *Scarborough v. State,* 54 S.W.3d 419, 424 (Tex. App.—Waco 2001, pet. ref'd). Therefore, although Wilson could not participate in the instant prosecution, nothing prevented the district attorney or any of his assistants from prosecuting Appellant.

The State notes that in his motion and at the hearing, Appellant did not raise any *statutory* grounds for District Attorney Craig Watkins'

disqualification, and no statutory grounds existed. Appellant argued at trial and contends on appeal that a trial court may disqualify a district attorney where a conflict of interest rises to the level of a due process violation, but he failed to assert or show how the alleged conflict violated due process. He now asks this Court to conclude that this case constitutes an exception to *Eidson* and current Texas law because (1) it is a death case, (2) former counsel worked on the case, (3) appellate attorneys in the District Attorney's office involved in prosecuting the case fall under Wilson's supervision, (4) the district attorney determined to seek death before hiring Wilson, and (5) "the appearance of impropriety in the due process of the case." (Appellant's Brief p. 108).

In *State ex rel. Hill v. Pirtle*, this Court held that "[a] trial court may not disqualify a district attorney or his staff on the basis of a conflict of interest that does not rise to the level of a due-process violation." *Landers v. State*, 256 S.W.3d 295, 304 (Tex. Crim. App. 2008) (citing *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 927 (Tex. Crim. App. 1994)). At trial, as on appeal, Appellant argues generally that his due process rights were violated based on an alleged conflict of interest, but he does not point to any evidence of it in the record. Appellant does

194

not allege his former counsel conveyed information to the prosecution and he does not allege wrongdoing by anyone involved. There is no evidence or even suggestion of any impropriety in the record. *See Landers,* 256 S.W.3d at 297-98 (holding no due process violation in prosecution for intoxication manslaughter where elected district attorney previously represented defendant in DWI prosecution because there was no evidence the State used any confidential information).

Appellant's assertion the State violated his due process rights—based on an "appearance of impropriety," that this is a death penalty case, that his former counsel worked extensively on the case, that Wilson supervised the appellate division, or that the District Attorney made the decision to seek a death sentence prior to hiring Wilson—carries no weight because no actual due process violation occurred.

The trial court properly denied Appellant's motion to disqualify the District Attorney. Issue 37 should be overruled.

**STATE'S RESPONSE TO ISSUE 38: THE TRIAL COURT PROPERLY OVERRULED APPELLANT'S MOTION FOR MISTRIAL DURING APPELLANT'S COMPETENCY TRIAL.**

Appellant contends that the trial court erred in overruling the motion for mistrial that he made during his competency trial. He

contends that the prosecutor's remark regarding the "murder weapon" violated his right to due process and due course of law and prejudiced the jury impaneled to determine his competency. Appellant's contentions lack merit.

### *Pertinent Facts*

Prior to voir dire in connection with Appellant's competency trial, the defense filed a motion in limine "with respect to informing the jury in any manner the offense for which the Defendant is accused[.]" (CR:68). The trial court granted Appellant's motion and stated:

> . . . I did grant the Motion in Limine filed by Defense. Both sides instruct their witnesses not to go into the offense.

(CR:70; RR57:8).

During the competency trial, while cross-examining Appellant's expert, the prosecutor referred to the lack of a *"murder* weapon." (RR58:29). The following exchange took place:

> [Prosecutor]: He has enough understanding of these proceedings to tell you that he was framed, right?
>
> [McGarrahan]: I'm not sure I understand the question.
>
> [Prosecutor]: You mentioned that he told you that the jury in this trial that was upcoming wasn't fixing to see nothing. And he used the words because he was "convicted without a

weapon." That was something that was important to him.

He kept coming back to the fact there was no weapon; is that right?

[McGarrahan]: The fact that there was no weapon; and there must be, by law, a weapon. Yes.

[Prosecutor]: All right. Now, it is a fact - - it is not fiction, but it is a fact that there was no murder weapon - - I'm sorry.

(RR58:29). At that point, defense counsel objected and asked for the jury to disregard the prosecutor's last statement. (RR58:30). Outside the presence of the jury, the defense requested a mistrial and argued that an instruction to disregard would not "remove this harm from this jury's mind[.]" (RR58:31-33). The prosecutor stated that his use of the word "murder" was unintentional. (RR58:34). He pointed out that in the testimony prior to that time, the jury had already heard several terms tending to indicate a serious underlying felony: "weapon," "exoneree," and "Conviction Integrity Unit." (RR58:34). The State argued that an instruction to disregard would cure any alleged error. (RR58:34).

The trial court denied Appellant's motion for mistrial and gave the

197

jury the following instruction:

> . . . Ladies and Gentlemen, during the prosecutor's questioning of the witness, reference was made to the underlying offense alleged against the Defendant. You are hereby instructed to disregard any reference to that offense and not consider it for any purpose, whatsoever.

(RR58:36-37, 40).

## *Applicable Law*

### *Mistrial*

An appellate court reviews the trial court's denial of a motion for mistrial under an abuse-of-discretion standard. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). A mistrial is an appropriate remedy in extreme circumstances for a narrow class of highly prejudicial and incurable errors. *Hawkins*, 135 S.W.3d at 77; *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). A mistrial should only halt trial proceedings when an error is so prejudicial that continuing the trial would be wasteful and futile because an impartial verdict cannot be reached or a conviction would have to be reversed on appeal due to obvious error. *Ladd*, 3 S.W.3d at 567.

### *Competency Trial*

Because a defendant's guilt or innocence is not at issue during a

hearing on his competency to stand trial, it is improper to introduce evidence of the offense during that hearing. *See Callaway v. State*, 594 S.W.2d 440, 443 (Tex. Crim. App. 1980) (citing *Ex parte Hagans*, 558 S.W.2d 457 (Tex. Crim. App. 1977)). However, not every mention of the crime itself is prejudicial; to be prejudicial, "[t]he evidence of the offense presented to the competency jury must be of such a nature as to deny the accused a fair and impartial determination of his competency." *Brandon v. State*, 599 S.W.2d 567, 580 (Tex. Crim. App. 1979), *vacated on other grounds*, 453 U.S. 902, 101 S. Ct. 3134, 69 L. Ed. 2d 988 (1981).

In the event of an error during the competency proceedings, the appropriate remedy is to abate the appeal and remand the cause to the trial court to determine the feasibility of a retrospective competency proceeding. *See Owens v. State*, 473 S.W.3d 812, 816 (Tex. Crim. App. 2015) (citing *Turner v. State*, 422 S.W.3d 676, 696-97 (Tex. Crim. App. 2013)).

## *Analysis*

Appellant was not denied a fair determination of his competency because the prosecutor referred to the "murder weapon" during cross-examination. *See Goodman v. State*, 701 S.W.2d 850, 863 (Tex. Crim.

App. 1985) *overruled on other grounds by Hernandez v. State*, 757 S.W.2d 744, 752 (Tex. Crim. App. 1988) (finding no reversible error where the single reference to "the term 'capital murder' did not so confuse or prejudice the jury against [Goodman] that he was deprived of a fair determination on the matter of his competency to stand trial.").

That the prosecutor made a single, passing reference to a "murder weapon" implied only the nature of the offense. Importantly, the prosecutor did not refer to the facts of the offense: Appellant broke into the Finch home, stabbed Fred and Mildred to death, and then stole a significant portion of Fred's wardrobe and a number of his other personal belongings. *Compare Barber v. State*, 757 S.W.2d 359, 362 (Tex. Crim. App. 1988) (finding no reversible error because the use of the term "capital murder" during Barber's competency trial referred only to the nature of the offense, but not to the facts of the case) *with Callaway*, 594 S.W.2d at 441-42 (finding deprivation of a fair determination of competency where prosecutor argued that Callaway would be "back on the streets" and witnesses referred to Callaway's prior offenses and that he wanted to be placed in a psychiatric facility because it would be easy to escape). The jury heard general testimony

about the existence of fingerprints and DNA, but they did not learn specific details or any of the other evidence against Appellant. Notably, the jury did not learn the true nature of the charged offense: ***capital*** murder.

In any event, any alleged error was cured when the trial court sustained Appellant's objection and instructed the jury to disregard the prosecutor's statement. Our system presumes that judicial admonishments to the jury are efficacious. *Waldo v. State*, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988). There is no evidence that shows the jury disregarded the trial court's instruction, and the remark was not so prejudicial that they could not ignore it. As such, the trial court acted within its discretion in denying the motion for mistrial and there was no harm. *See Barber*, 757 S.W.2d at 362 (finding any error caused by witness's reference to underlying "capital murder" during Barber's competency trial cured when trial court sustained the objection and instructed the jury to disregard).

Issue 38 should be overruled.

***S*TATE'S RESPONSE TO ISSUE NO. 39:** **A*PPELLANT'S* CLAIM THAT THE TRIAL COURT ERRED IN OVERRULING HIS OBJECTION DURING THE COMPETENCY TRIAL IS NOT PROPERLY BEFORE THE C*OURT***.*

Appellant contends that the trial court erred in overruling his objection during the competency trial. He complains that the prosecutor's question regarding the reversal of Appellant's 1987 trial was inadmissible under Rule 403. Appellant's contention is not properly before the Court.

## *Pertinent Facts*

During the competency trial, the prosecutor questioned Appellant's expert about the fact that Appellant was hoping to get a "harsher sentence" so that he would have "more appeals." (RR58:23). The following exchange occurred:

> [State]: So he has more appeals. It is true that Kenneth Thomas - - appeals have been very fruitful for Kenneth Thomas, haven't they?
>
> [McGarrahan]: They have.
>
> [State]: Okay. That first trial that happened in '87 in February, that case was reversed on appeal, correct?

(RR58:23-24). Defense counsel objected "to relevancy." (RR58:24). The objection was overruled. (RR58:24). The prosecutor asked his question

again, after which Appellant objected again "to relevancy." (RR58:24). The objection was again overruled. (RR58:24).

### Applicable Law

Grounds of error urged on appeal must comport with the objections made at trial or error is not preserved. *Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Crim. App. 2003).

### Analysis

Appellant's objection on appeal does not comport with the objection he made at trial. At trial, Appellant objected to the prosecutor's question on the basis of relevancy. (RR58:24). On appeal, Appellant argues that he is entitled to a reversal on the basis of a violation of Rule 403. (Appellant's Brief pp. 113-14). Thus, Appellant failed to preserve error regarding the complained-of question. *See Guevara*, 97 S.W.3d at 583.

The fact that Appellant's first trial was reversed on appeal was highly relevant. *See* Tex. R. Evid. 401. Indeed, as the prosecutor's subsequent questioning showed, Appellant articulated to Dr. McGarrahan that his prior sentence was "vacated" and his case "remanded." (RR58:24-25). That Appellant's prior sentence was

vacated and that he was capable of articulating this information was probative of his knowledge and understanding of the legal process. This evidence was relevant to the competency determination: whether Appellant had a "rational as well as factual understanding of the proceedings against [him]." Tex. Code Crim. Proc. Ann. art. 46B.003(a) (West 2006).

On appeal, Appellant contends that the complained-of evidence "allowed the jury to confuse the issue of competency with the underlying offense of murder." (Appellant's Brief p.114). He fails, however, to explain this confusion and he fails to specify how he was prejudiced. As such, this argument is insufficiently briefed and nothing is presented for this Court's review. *See* Tex. R. App. P. 38.1(i).

Regardless, the same information came in elsewhere without objection. (RR58:61). The complained-of question occurred during the State's cross-examination of Dr. McGarrahan. (RR58:24). Later, during the direct examination of defense witness Cynthia Short, defense counsel asked a question to which Short responded, "Kenneth had a belief that Judge White, in particular, had played a specific role in getting the case reversed." (RR58:61). Defense counsel did not object

to this statement.  (RR58:61).    This Court has held that the erroneous admission of evidence will not result in reversal when the same evidence was received elsewhere without objection.  *See Coble v. State*, 330 S.W.3d 253, 282 (Tex. Crim. App. 2010).

Issue 39 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. 40-41:  THE EVIDENCE WAS SUFFICIENT TO PROVE APPELLANT'S COMPETENCY TO STAND TRIAL.**

In two issues, Appellant contends that the evidence is legally and factually insufficient to support the jury's verdict that he was competent to stand trial for capital murder.  Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

### *Appellant's Case*

Dr. Antoinette McGarrahan, a forensic and neuropsychologist, was contacted by the defense in 2012 to conduct a neuropsychological evaluation as well as a competency-to-stand-trial evaluation of Appellant.  (RR57:163-64, 167).  Since then, she has spent "a little over twelve hours" evaluating Appellant.  (RR57:167).   In connection with Appellant's recent competency evaluation, Dr. McGarrahan reviewed: Appellant's prior mental health evaluations; transcripts of prior

proceedings; affidavits from Appellant's family; medical records; and, school records. (RR57:170).

According to Dr. McGarrahan, the results of her neuropsychological evaluation "are almost identical to the results [of his neuropsychological evaluation conducted] about 28 years ago." (RR57:173). She testified that it would be difficult "to be able to fake from one period to 28 years later on the same tests[.]" (RR57:173). She also administered tests to determine whether Appellant was malingering and found that "he was putting forth good effort[.]" (RR57:173). Indeed, Appellant tried to present himself in a positive light, without intellectual disability, "because he believes that that belittles him and removes some of his credibility[.]" (RR57:174).

Dr. McGarrahan testified that Appellant was "not presently competent to stand trial." (RR57:171-72). Her opinion was based on: neuropsychological testing, which showed that Appellant has a full scale IQ of 71. (RR57:172). Additionally, "he has significant impairment in his ability to problem solve, plan, organize, [and] think rationally." (RR57:172). Appellant perseverates; he "has difficulty getting past certain beliefs that he has, that are not based in reality[.]"

206

(RR57:172). Appellant is "not able to rationally assist his attorneys, as he proceeds to trial." (RR57:172).

For twenty-eight years, Appellant has maintained the belief, despite being informed to the contrary, that the he cannot be convicted "if the State does not have a weapon." (RR57:175). He has been told by counsel and others that the weapon is not necessary for conviction, but his belief remains strong. (RR57:175). Dr. McGarrahan testified that the reason Appellant maintains his belief is rooted in his mental illness. (RR57:175). His belief is more than just a simple misunderstanding of the legal system. (RR57:175-76).

Another belief that Appellant has maintained over the years is that a State's witness has been involved in "pulling the strings to make sure that he gets the worst situation possible." (RR57:177). "He believes that this individual dressed in a jail uniform and escorted him over to court, on one occasion." (RR57:177). Appellant also believes that it would be to his benefit to "get the worst punishment possible." (RR57:179). Given Appellant's irrational beliefs, he is unable to rationally consult with his attorneys regarding a strategy for his defense. (RR57:179).

Dr. McGarrahan testified that Appellant has a factual, but not rational understanding of the proceedings against him. (RR57:181). And, distortions in his memory and false beliefs affect his ability to disclose information to counsel. (RR57:182). He does, however, have a good understanding of the adversarial nature of the proceedings and can exhibit appropriate courtroom behavior. (RR57:184). If he were to testify, he could respond to questions and verbalize his responses, but "he would have significant difficulty testifying in a rational, logical manner." (RR57:184). Appellant could be helped with medication and competency restoration training. (RR57:186).

According to Dr. McGarrahan, Appellant has a delusional disorder but conceded that he is not schizophrenic and is not responding to outside voices or voices in his head. (RR57:185; RR58:6). Appellant is intellectually disabled, evidenced by his low IQ and deficits in his adaptive behavior, many of which began prior to the age of 18. (RR57:185).

Dr. McGarrahan conceded that in 1979, Appellant was involved in a trial and testified in his own defense. (RR58:11). At that time, he responded to questions on direct and cross-examination in front of a

jury. (RR58:11). To Dr. McGarrahan's knowledge, no competency issues were raised at the time of that trial. (RR58:13). The first time competency was raised was in October of 1986, during jury selection. (RR58:13). At that time, Drs. Crowder, Koons, Lovett, and Nottingham testified or wrote a report. (RR58:13). Drs. Koons and Nottingham found Appellant to be competent. (RR58:15). Drs. Crowder and Lovett found him to be incompetent. (RR58:46). In 1996, in connection with another proceeding, Appellant was evaluated by Drs. Pittman and Rogers. (RR58:15-16). Dr. Pittman found him to be competent. (RR58:16). Dr. McGarrahan testified that Dr. Rogers' opinion "wasn't very clear." (RR58:16). In 2006, there was a hearing regarding Appellant's case and no issues of competency were raised at that time. (RR58:16-17).

Regarding the evidence against him in this case, Appellant told Dr. McGarrahan that he "was fucked over 27 years ago, because they only have he said/she said." (RR58:18). He said it was "hearsay." (RR58:19). Appellant told Dr. McGarrahan that the fingerprints found at the scene were being reviewed by the Innocence Project. (RR58:20-21). He told her that when the fingerprints are reviewed, they will not

match him.  (RR58:21).  This "will stop everything and the Judge will set him free immediately."  (RR58:27).  He identified the then-elected District Attorney, Craig Watkins, and said that Watkins would be forced to drop the charges.  (RR58:27).  Appellant also told Dr. McGarrahan that DNA testing "rendered him innocent."  (RR58:22).

Appellant wants a "harsher sentence" so that he will have "more appeals."  (RR58:23).  He told her that his prior sentence was "vacated" and his case "remanded."  (RR58:24-25).  He pointed out to her two cases from the Supreme Court relevant to his case and was "somewhat" able to describe the difference between them.  (RR58:25-26).

Dr. McGarrahan testified that Appellant is not on any psychoactive medications.  (RR58:41).

Cynthia Short, an attorney who performs client advocacy, was appointed by the trial court in 2011 to assist in Appellant's case.  (RR58:54).  Since then, she has spent sixty hours interviewing Appellant.  (RR58:55).  Appellant resembles prior clients who were found incompetent.  (RR58:58).  He maintains a "fixed-false belief" about his case and that belief informs his decisions.  (RR58:59).  He also did not understand that the trial judge did not have a role in the

210

reversal of his case. (RR58:61).

Short did not believe that Appellant could make rational choices regarding his legal strategies. (RR58:63). For example, he did not want to be examined by the State's expert despite being told that failure to do so would affect his lawyers' ability to present evidence gathered on his behalf. (RR58:63-65).

Short described Appellant as follows:

In many ways, Kenneth is very engaging. He can be very animated. He is able to engage in a conversation. He's very, very spiritual. He's very faithful. And we have had many long, animated, good conversations about faith.

But when we switch to talk about things that are related to the legal process, to criminal justice, then there is a different way in which he understands or attends. He becomes more rigid and flexible [sic], in terms of his understanding of the system and how to make decisions.

(RR58:65-66). She believes that Appellant would not be able to testify in his own defense. (RR58:68). She testified that Appellant has "poor auditory memory" and poor reasoning skills. (RR58:70).

Short testified that Appellant sustained a brain injury in 1976. (RR58:71).

On cross-examination, Short conceded that Appellant testified in

his own defense after the Linwood incident in 1979, years after his brain injury. (RR58:71-72). After his arrest for the instant offense, Appellant spoke with a detective and gave an alibi.[31] (RR58:74-75). He also gave a TV reporter his alibi. (RR58:76). Short conceded that Appellant, if he testified in this case, could tell the jury his version of the evidence (that he was not present at the scene of the crime, that the DNA exonerates him, and that there is no murder weapon). (RR58:86-88).

### *The State's Case*

Dr. Kristi Compton, a clinical and forensic psychologist, was appointed by the trial court to evaluate Appellant's competency to stand trial. (RR58:92-93). Dr. Compton evaluated Appellant on July 3, 2014 at the Dallas County Jail. (RR58:94-95). Over the course of three hours, she interviewed and tested Appellant. (RR58:94; SX1-2). She administered the Test of Memory Malingering ("TOMM"), an effort test. (RR58:99). Appellant was required to look at a series of 50 pictures, then identify what he saw. (RR58:99-100). A person with normal intellect would correctly identify 45 of the 50 pictures. (RR58:99-100).

---

[31] According to Short, Appellant maintains that he did not meet with detectives. (RR58:73-76),

An individual with intellectual disability will generally identify 30 correctly. (RR58:101). A score of 25 or below is indicative of overt malingering. (RR58:101). Appellant was administered two trials; he correctly identified 24 out of 50 on the first and 26 out of 50 on the second. (RR58:102). His scores reflected that "he was not putting forth the full effort during the evaluation[.]" (RR58:102).

Dr. Compton also administered the Kaufman Brief Intelligence Test. (RR58:97, 103). Appellant obtained a full-scale IQ of 40. (RR58:104). A person taking this test gets 40 points just for showing up. (RR58:104). Someone with a 40 IQ "would not be able to communicate." (RR58:105). "[I]t's very, very unlikely [a person with a 40 IQ] would be able to communicate in full sentences or understand much beyond that of a three- to four-year-old child." (RR58:105). Appellant's score was inconsistent with his previous scores, which "indicate a range between high 60s to low 70s." (RR58:105).

Dr. Compton administered the CAST-MR, a test to evaluate competency-related abilities in an individual with low intellect. (RR58:109). In the Basic Legal Concepts section of this test, the mean number of correct responses for individuals who are incompetent is 13.

(RR58:110). Appellant answered no questions correctly. (RR58:110). On the Skills to Assist Defense Section, the mean number of correct responses for individuals with intellectual disability is 8, with an SEM of 3. (RR58:111). Appellant scored a 5, which is "somewhere within the range" of those with intellectual disability. (RR58:111). When asked for spontaneous recall of the roles of the parties (unlike the structured question-and-answer), Appellant answered all of the questions sufficiently. (RR58:111).

Appellant correctly described the roles of the parties: the defense attorneys; prosecutor; and, judge.[32] (RR58:106). He understands that he has been convicted, that the upcoming trial concerns punishment, and that there are two possible sentences. (RR58:107-08). Appellant's responses were inconsistent with a 40-point IQ. (RR58:107). According to Dr. Compton, Appellant "responded to [her] rationally and logically and processed what [she] was asking, and responded accordingly." (RR58:107). And, "there's no identifiable nexus between mental illness and [Appellant's] ability to consistently engage with counsel." (RR58:109). Dr. Compton ranked Appellant's abilities as follows:

[32] Appellant indicated that he knew a judge is supposed to ensure a fair trial, but told Dr. Compton that they do not. (RR58:106). There was no evidence of a nexus between this belief and Appellant's mental state. (RR58:107).

ability to disclose facts and events to counsel-below average; ability to engage in a reasoned choice of legal strategies-below average; ability to testify and cross-examine witnesses-below average; ability to assist counsel with a defense-below average. (RR58:128-29).

Throughout the evaluation, Appellant was cooperative with Dr. Compton. (RR58:113). He "related spontaneously" and made eye contact. His hygiene was good. (RR58:113).

Dr. Compton testified that Appellant "functions in the borderline to mental/mild mental retardation." (RR58:114). She did not know where in the range "because [she did] not do adaptive deficits." (RR58:114). She did not identify a clinical disorder such as depression, mania, bipolar disorder, or intense anxiety. (RR58:114). She did not observe that he was overtly psychotic or responding to hallucinations. (RR58:114). He does, however, have subclinical paranoid delusions about being framed and about the lack of a weapon. (RR58:115). Someone with a clinical delusion cannot remove himself from his delusion. (RR58:126). Someone with a subclinical delusion is capable of recognizing other possibilities. (RR58:126). Appellant's subclinical delusions are not sufficient to impair his competency status.

(RR58:116).

In Dr. Compton's opinion, Appellant was competent to stand trial. (RR58:98). He has sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding and has a rational, as well as factual understanding of the proceedings against him. (RR58:98).

### *Applicable Law*

#### *Competency*

"A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent[.]" Tex. Code Crim. Proc. Ann. art. 46B.003(b) (West 2006). A defendant is not competent to stand trial if he lacks:

(1) Sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or

(2) A rational as well as factual understanding of the proceedings against the person.

*Id*. art. 46B.003(a). Evidence relevant to the competency determination includes whether the defendant can: (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of

mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and, (6) testify. *See* Tex. Code Crim. Proc. Ann art. 46B.024(1) (West Supp. 2015).

The burden is on the defendant to prove incompetency by a preponderance of the evidence. *Id.* art. 46B.003(b).

*Legal Sufficiency*

A claim regarding a jury's refusal to find a defendant incompetent to stand trial – a determination which he has the burden to prove – is similar to an affirmative defense. *See Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). An appellate court reviewing the legal sufficiency of an affirmative defense should assay the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015) (citing *Matlock*, 392 S.W.3d at 669-70).

*Factual Sufficiency*

The appellate standard of review for factual sufficiency regarding a jury's adverse finding on competency is whether the jury's finding of

competency is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 154-55 (Tex. Crim. App. 1990). The appellate court must consider all of the relevant evidence and may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Matlock*, 392 S.W.3d at 671. The defendant's claim is sustained only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.*

### *Analysis*

Appellant has failed to properly brief the issues. He recites the evidence and the standard of review, however, he fails to offer any argument or authority in support of his claims. *See* Tex. R. App. P. 38.1(i).

Regardless, the evidence is both legally and factually sufficient to support the jury's determination that Appellant was competent to stand trial.

## Issue 40: Legal Sufficiency

A review of the record reveals more than a scintilla of evidence to support the jury's finding. The following evidence supports the jury's finding of competency:

- Appellant can be engaging and animated and can participate in long conversations about faith. (RR58:65-66).

- He understands that he has been convicted, that the upcoming trial concerns punishment, and that there are two possible sentences. (RR57:181; RR58:107-08).

- Appellant can articulate that his prior sentence was "vacated" and his case "remanded" and can cite relevant Supreme Court cases and "somewhat" describe the difference between them. (RR58:25-26).

- Appellant can relate his mental state, alleged offense, and events related to this stage of his case. (RR58:125).

- Appellant can correctly describe the roles of the parties: the defense attorneys; prosecutor; and, judge. (RR57:187; RR58:106).

- Appellant can exhibit appropriate courtroom behavior. (RR57:184).

- If called to testify, Appellant could respond verbally to questioning. (RR57:184). He could tell the jury his version of the evidence, including his claim that he was not present at the scene of the crime, that there is no murder weapon, and that the DNA shows he is innocent. (RR58:86-88).

- According to Dr. Compton, "there's no identifiable nexus between mental illness and [Appellant's] ability to consistently engage with counsel." (RR58:109).

- Dr. Compton testified that Appellant "functions in the borderline to mental/mild mental retardation." (RR58:114). She did not know where in the range, "because [she did] not do adaptive deficits." (RR58:114).

- Dr. Compton identified no clinical disorder such as depression, mania, bipolar disorder, or intense anxiety. (RR58:114). She did not observe that he was overtly psychotic or responding to hallucinations. (RR58:114).

- Appellant is not schizophrenic and does not respond to outside voices or voices in his head. (RR58:6).

- Appellant is not on any psychoactive medications. (RR58:41).

In short, the jury had substantial evidence from which it could have concluded that Appellant had sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding and that he had a rational as well as factual understanding of the proceedings against him. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a). Appellant did not conclusively prove that he was incompetent. The jury was entitled to believe Dr. Compton's testimony that Appellant was competent to stand trial. (RR58:98).

Issue 40 should be overruled.

## Issue 41: Factual Sufficiency

The evidence is factually sufficient to support the jury's determination that Appellant was competent to stand trial. The following evidence, when considered in a neutral light, proves that the jury's finding that Appellant was competent to stand trial was not against the great weight and preponderance of the evidence:

- Dr. McGarrahan testified that Appellant was not competent to stand trial. (RR57:171-72).

- Dr. Compton testified that Appellant was competent to stand trial. (RR58:98). He had sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding and had a rational, as well as factual understanding of the proceedings against him. (RR58:98).

- Dr. McGarrahan testified that Appellant had a factual (but not rational) understanding of the proceedings against him. (RR57:181). He understood that his prior sentence was "vacated" and his case "remanded." (RR58:24-25). In the upcoming trial, he wants a "harsher sentence" so that he will have "more appeals." (RR58:23).

- Dr. Compton testified that Appellant understands that he has been convicted, that the upcoming trial concerns punishment, and that there are two possible sentences. (RR58:107-08).

- Appellant understands the adversarial nature of the

proceedings. (RR57:184). He understands the roles of the parties: the defense attorneys; prosecutor; and, judge. (RR58:106).

- Regarding the evidence against him, Appellant told Dr. McGarrahan that the State "only [has] he said/she said." (RR58:18). He told her that the fingerprints at the scene will not match him and the DNA testing "render[s] him innocent." (RR58:20-22).

- Dr. McGarrahan testified that Appellant is not able to rationally assist his attorneys. (RR57:172). He persists in his belief he cannot be convicted if the State does not have the murder weapon. (RR57:172, 175).

- Short testified that that Appellant's "fixed-false belief" informs his decisions regarding the case. (RR58:59).

- Short did not believe that Appellant could make rational choices regarding his legal strategies. (RR58:63). For example, he did not want to be examined by the State's expert even though it would affect his lawyers' ability to present evidence gathered on his behalf. (RR58:63-65).).

- Dr. McGarrahan testified that if Appellant were to testify, he could respond to questions and verbalize his responses, but would have difficulty doing so in a rational, logical manner. (RR57:184).

- Short testified that Appellant would not be able to testify in his own defense but later conceded that if he did, he could tell the jury his version of the evidence (that he was not present at the scene of the crime, that the DNA exonerates him, and that there is no murder weapon). (RR58:68, 86-88).

- Dr. Compton testified that Appellant "responded to [her]

rationally and logically and processed what [she] was asking, and responded accordingly." (RR58:107).

- According to Dr. Compton, there is "there's no identifiable nexus between mental illness and [Appellant's] ability to consistently engage with counsel." (RR58:109). "[E]ven a mentally ill defendant who resists cooperating with his counsel may nevertheless be found competent if the manifestations of his particular mental illness are not shown to be the engine of his obstinacy." *Turner v. State*, 422 S.W.3d 676, 691 (Tex. Crim. App. 2013).

- Appellant can exhibit appropriate courtroom behavior. (RR57:184).

- When tested by Dr. McGarrahan, Appellant put forth good effort and tried to present himself in a positive light. (RR57:174). Dr. McGarrahan's testing showed a full scale IQ of 71. (RR57:172).

- When tested by Dr. Compton, Appellant did not put forth good effort. (RR58:102). Her IQ testing showed a full scale IQ of 40, which is inconsistent with his prior scores. Additionally, given the fact that someone with a 40-point IQ would not be able to communicate, Appellant's 40-point IQ score was inconsistent with the fact that he was able to communicate with her. (RR58:104-05). On the CAST-MR, Appellant answered no questions correctly in the Basic Legal Concepts section. (RR58:110). On the Skills to Assist Defense Section, he scored within the range of those with intellectual disability. (RR58:111).

- Dr. McGarrahan testified that Appellant is intellectually disabled. (RR57:185).

- Dr. Compton testified that Appellant "functions in the

borderline to mental/mild mental retardation." (RR58:114). She did not know where in the range, "because [she did] not do adaptive deficits." (RR58:114).

- Dr. McGarrahan testified that Appellant suffers from a delusional disorder, but is not schizophrenic and does not respond to outside voices or voices in his head. (RR57:185; RR58:6).

- Dr. Compton did not identify a clinical disorder such as depression, mania, bipolar disorder, or intense anxiety. (RR58:114). She did not observe that he was overtly psychotic or responding to hallucinations. (RR58:114). He has subclinical paranoid delusions but they are not sufficient to impair his competency status. (RR58:116).

- Appellant is not on any psychoactive medications. (RR58:41).

The jury was faced with conflicting opinions from two psychologists. On the one hand was Dr. McGarrahan, the defense expert involved in the case for at least two years, who testified to her opinion that Appellant was incompetent. (RR57:166-67, 171-72). On the other hand was Dr. Compton, the trial court's neutral expert appointed only days before the competency trial, who testified to her opinion that Appellant was competent. (RR58:93-95, 98).

The jury was entitled to credit Dr. Compton's testimony that Appellant was competent to stand trial. Dr. Compton was a neutral

witness who offered specific testimony regarding her testing and evaluation of Appellant and her opinion regarding his competency. Dr. Compton testified that Appellant's belief in his innocence was "not sufficient to impair rational communication" with counsel. (RR58:108-09). She testified that Appellant understood the charges against him; that he was already convicted; that the upcoming trial concerned punishment only; and the potential punishments. (RR58:107-08, 136). *See Morris v. State*, 301 S.W.3d 281, 291 (Tex. Crim. App. 2009) (agreeing with lower court holding that Morris' jury "was entitled to credit the opinion testimony of the State's experts that appellant was competent under art. 46B.003(a)."); *see also Williams v. State*, 191 S.W.3d 242, 248 (Tex. App.—Austin 2006, no pet.) (stating that "[t]he jury is the judge of the credibility of the witnesses at the competency hearing and the weight to give to the testimony."). The fact that some evidence was presented that could support a finding of incompetency does not render the evidence insufficient. *See Butcher*, 454 S.W.3d at 20.

On appeal, Appellant suggests that the reason he performed poorly on Dr. Compton's tests was because he did not want to be found

disabled and because he thought the evaluation was meant to belittle and shame him. (Appellant's Brief p. 118). Appellant's argument lacks merit. If, as Appellant suggests, he did not want to be found intellectually disabled, it would stand to reason that his scores would be higher, reflecting *increased* effort. Instead, on Dr. Compton's IQ test, Appellant's score was so low that it was not only inconsistent with his prior IQ testing, but also inconsistent with the level that he was able to communicate with Dr. Compton. (RR58:104-05). On one trial of Dr. Compton's malingering test, Appellant's score was so low that it was indicative of overt malingering. (RR58:101-02). In any event, Appellant fails to explain how his lack of participation proves that he was incompetent to stand trial.

Appellant suggests that Dr. Compton's opinion was not reliable because her appointment and evaluation took place only days before trial; therefore, she "did not have the time to fully research [Appellant's] childhood, his brain injury, or his prison history." (Appellant's Brief p.119). Appellant does not specify, however, how further research into the identified areas would have shed light on his competency to stand trial.

Given all of the testimony and evidence presented, the jury could have weighed the conflicting evidence and reasonably found that Appellant was sufficiently capable of consulting with his attorneys and with a reasonable degree of rational understanding and that he had a rational as well as factual understanding of the proceedings against him. The jury's determination that Appellant was competent to stand trial was not so against the great weight and preponderance of the evidence as to be manifestly unjust.

Issues 40 and 41 should be overruled.

***STATE'S RESPONSE TO ISSUE NO. 42: THE TRIAL COURT PROPERLY OVERRULED APPELLANT'S OBJECTION TO DR. PRICE'S TESTIMONY THAT APPELLANT EXHIBITS TRAITS CONSISTENT WITH ANTI-SOCIAL PERSONALITY DISORDER.***

Appellant contends that, during the punishment phase of trial, the trial court erred in overruling his objection to Dr. Price's proffered testimony that Appellant exhibits traits consistent with anti-social personality disorder. In support of his contention, Appellant points to the fact that Dr. Price did not diagnose Appellant with this disorder. Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

During a hearing outside the presence of the jury in the punishment phase of trial, Dr. Price testified that he planned to testify before the jury that Appellant exhibits traits consistent with anti-social personality disorder. (RR69:8). Dr. Price testified, however, that he would not diagnose Appellant with anti-social personality disorder because he is not aware of any evidence of a conduct disorder prior to the age of 15. (RR69:8). At the conclusion of the hearing, Appellant objected that Dr. Price's testimony would be inadmissible under Rule 403. (RR69:11). Defense counsel objected as follows:

> Your Honor, I do have - - I will object to him testifying in front of the jury about him having the traits of someone with anti-social personality disorder, since he can't make that diagnosis. I think, because he's an expert, he gives that inference to the jury. I think it's dangerous testimony put in front of them, when he can't even make the diagnosis himself.
>
> So I would object to him testifying that he has those traits, without being able to make the diagnosis. Even if the Court thinks it's relevant somehow, I just think that the prejudicial effect outweighs the probative value, in the way he's going to present it.

(RR69:11). The trial court overruled Appellant's objection. (RR69:12-13).

Before the jury, Dr. Price testified that anti-social personality disorder is not a mental disorder, but a long-term personality disorder. (RR69:66-67). An individual with this disorder is "kind of against society. It's an individual who breaks the rules, breaks the law, [and] doesn't accept responsibility for it." (RR69:67). One requirement for a diagnosis of anti-social personality disorder is evidence of a conduct disorder prior to the age of 15. (RR69:67-68). A child with a conduct disorder "gets in trouble all the time, skips school, gets in trouble with the law, sets fires, is aggressive towards others, et cetera." (RR69:68). Based on his review of the case and his interaction with Appellant, Dr. Price testified that Appellant "does have traits and features consistent with this anti-social personality." (RR69:68). Appellant renewed his prior objection and it was overruled. (RR69:68). Dr. Price then briefly explained the basis for his opinion. (RR69:69-72). Importantly, Dr. Price testified that he lacked evidence regarding one of the traits necessary for a diagnosis of anti-social personality disorder. (RR69:71).

Dr. Price lacked evidence that the traits began prior to 15 years of age. (RR69:71-72).

During cross-examination, defense counsel asked Dr. Price about his opinion that Appellant exhibits traits consistent with anti-social personality disorder. (RR69:87, 90). He pointed out on at least two separate occasions that Dr. Price could not diagnose Appellant with the disorder. (RR69:87, 90).

### *Standard of Review*

An appellate court reviews a trial court's ruling on the admissibility of evidence under an abuse of discretion standard of review. *See Weatherred*, 15 S.W.3d at 542. The trial court's ruling should be upheld if it is within the zone of reasonable disagreement. *Id*. And, it will be upheld if it is correct on any theory of law applicable to the case. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

### *Applicable Law*

#### *Expert testimony*

Rule 702 authorizes the admission of testimony from a witness possessing scientific, technical, or other specialized knowledge if the witness is qualified as an expert by knowledge, skill, experience,

training, or education and his testimony will assist the fact finder to understand the evidence or to determine a fact in issue. Tex. R. Evid. 702.

## *Rule 403*

Under Rule 403, all relevant evidence is admissible unless "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. All probative evidence proffered by an adverse party will be prejudicial, but only *unfair* prejudice warrants exclusion of the evidence. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990) (citing *United States v. Figueroa*, 618 F.2d 934, 943 (2nd Cir. 1980). A reviewing court's consideration of this issue includes, but is not limited to: (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006).

## *Analysis*

### *Rule 702*

As a threshold matter, it is unclear whether, at trial, Appellant intended to object to Dr. Price's testimony under Rule 702. Defense counsel's statement that "I would object to him testifying that he has those traits, without being able to make the diagnosis" is insufficient to alert the trial court that Dr. Price was unqualified or that his opinion was in some way irrelevant or unreliable. As a result, he has not preserved this argument for review. *See* Tex. R. App. P. 33.1(a).

On appeal, Appellant states that "the testimony was beyond the expert's discipline to opine on the subject[.]" (Appellant's Brief p.121). He cites *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998), and Texas Rule of Evidence 702, but offers no further argument or analysis. This Court is not required to make Appellant's case for him. *Garcia*, 887 S.W.2d at 882 (stating that a reviewing court "will not brief appellant's case for him"). To the extent Appellant is suggesting that a psychologist is unable to testify that, based on his review of documents, an individual is symptomatic of a specific condition, he points to no authority in

support of his claims.  He points to no authority suggesting that such testimony is prohibited in that profession.

In any event, any complaint Appellant had regarding Dr. Price's qualifications was waived at the time of trial.  During the sub rosa hearing prior to Dr. Price's testimony before the jury, the following exchange occurred:

> [State]:  Judge, I believe, as we have done with Dr. McGarrahan, I believe Dr. Hom and Dr. Crowder, I don't anticipate objections from Defense that Dr. Price is an expert who is qualified to give certain opinions.  I believe that's the agreement that we have from Mr. Sanchez.
>
> [Sanchez]:  That's correct, Your Honor.
>
> [Trial Court]:  Very well.
>
> [State]:  So this will be just me - - I will tender him as an expert at this point.
>
> [Trial Court]:  Very well.
>
> [State]:  And then we'll ask what his opinions are, and we'll go from there.

(RR68:241-42).  The parties agreed that Dr. Price was, in fact, an expert and the only issue to be addressed was the *basis* for his opinions.  *See* Tex. R. Evid. 705(b) (stating that an adverse party is entitled to

question an expert outside the presence of the jury regarding the facts or data underlying the expert's opinion). Appellant did not challenge Dr. Price's qualifications at the time of trial and he cannot do so for the first time on appeal. Tex. R. App. P. 33.1(a).

Appellant argues that Dr. Price's testimony was "misleading and designed to give the jury the impression that Appellant had a diagnosed anti-social personality disorder[.]" (Appellant's Brief pp.120-21). This is incorrect. In fact, Dr. Price was upfront about the limitations of his testimony. He testified that Appellant "does have traits and features consistent with" anti-social personality disorder, but he lacked evidence of one of the features required to render a diagnosis: evidence that the symptoms began before 15 years of age. (RR69:68, 71-72). On cross-examination, he agreed with defense counsel on two separate occasions that he could not diagnose Appellant with anti-social personality disorder. (RR69:87, 90). The jury was not misled in any way.

## Rule 403

At trial, Appellant objected to Dr. Price's testimony under Rule 403. Defense counsel stated "that the prejudicial effect outweighs the probative value, in the way he's going to present it." (RR69:11). In his

234

brief on appeal, Appellant states that "any probative value was outweighed by the prejudicial effect." (Appellant's Brief p.121). As above, he offers no argument or analysis on this issue; therefore, nothing is presented for this Court's review. *See* Tex. R. App. P. 38.1(i) (requiring that a brief contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record); *see, e.g., Walder v. State*, 85 S.W.3d 824, 827 (Tex. App.—Waco 2002, no pet.) (setting forth the elements necessary to satisfy the mandatory requirement of a "clear and concise argument" pursuant to Rule 38.1).

Regardless, the probative value of Dr. Price's testimony was not substantially outweighed by the danger of unfair prejudice. First, Dr. Price's testimony was relevant to rebut Appellant's claim that he is intellectually disabled. His testimony was presented during the State's case-in-rebuttal to offer an alternate explanation for Dr. McGarrahan's testimony regarding Appellant's symptoms. As such, his testimony was highly probative to rebut the evidence that the defense presented.

Dr. Price's testimony was also relevant to the jury's determination of Appellant's future dangerousness. *See Griffith v.*

*State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) (potential of future dangerousness is a question of fact which the jury must answer and testimony from mental health experts is relevant to future dangerousness special issue); *see Powell v. State*, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994) (trial court has wide discretion in admitting evidence relevant to the jury's determination of a capital murder defendant's death-worthiness).

Second, there was no chance that the evidence would impress the jury in some irrational and indelible way. While Dr. Price testified that Appellant exhibits traits consistent with antisocial personality disorder, he was clear that he could not diagnose Appellant with the disorder. (RR69: 68, 71-72, 90).

Third, Dr. Price's testimony regarding antisocial personality disorder, which was presented during the State's case-in-rebuttal, was extremely brief. The State's questioning on this subject consumed less than seven pages of transcript. (RR69:16, 66-72).

Finally, the State needed Dr. Price's testimony to rebut Dr. McGarrahan's testimony regarding Appellant's alleged adaptive

deficits. Dr. Price's testimony offered an alternate explanation for what Dr. McGarrahan testified were Appellant's adaptive deficits.

Even if the trial court erred in overruling Appellant's objections (which the State does not concede), any alleged error is harmless. Error in the admission of evidence is non-constitutional error and must be disregarded unless the error affects a defendant's substantial rights. *See* Tex. R. Evid. 103; Tex. R. App. P. 44.2(b); *Walters v. State*, 247 S.W.3d 204, 218-19 (Tex. Crim. App. 2007). "[S]ubstantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (internal quotation marks omitted).

Examining the record as a whole, it is clear that any error in the trial court's ruling did not have a substantial and injurious effect or influence on the jury. Dr. Price testified that someone with antisocial personality disorder "breaks the rules, breaks the law, doesn't accept responsibility for it." (RR69:67). That Appellant was one who breaks rules and laws was already well known to the jury. By the time Dr.

Price testified, the jury already knew that Appellant broke into the Finch home, stabbed Mildred and Fred to death, and then stole numerous items from Fred's wardrobe. The jury already knew that Appellant had stabbed Linwood in the head with a screwdriver. The jury already knew about Appellant's misconduct in prison. Dr. Price's testimony had no negative impact on Appellant. Any alleged error did not affect Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).

Issues 42 should be overruled.

### STATE'S RESPONSE TO ISSUE *43*: DR. PRICE DID NOT TESTIFY BEFORE THE JURY REGARDING APPELLANT'S REMORSE.

Appellant contends that the trial court erred in allowing Dr. Price to testify regarding his lack of remorse. Appellant's contentions lack merit.

### *Pertinent Facts*

During a sub rosa hearing, Dr. Price was asked for the basis of his opinion that Appellant exhibits traits of anti-social personality disorder. (RR69:7). He responded as follows:

> Criminal history, his history; especially, prior to 2010, and as far back as 1979, which indicates a repeated pattern of violation of the law; a lack of remorse for those incidents; deceitfulness by repeated lying through the record, both in

238

response to the offenses and in talking to individuals in prison and others that have evaluated him; at least, a history or irritability and aggressiveness.

(RR69:8). At the conclusion of the hearing, Appellant objected to this testimony and complained that it would "violate the Defendant's Fifth Amendment right[.]" (RR69:13). The objection was overruled. (RR69:13).

## *Applicable Law*

A reference to a defendant's lack of remorse is tantamount to a comment on his failure to testify. *Howard v. State*, 153 S.W.3d 382, 385 (Tex. Crim. App. 2004). The law does not prohibit such a reference where it is supported by record evidence. *Id.* Consequently, the State is not barred from presenting evidence that the accused has demonstrated by his words or actions a lack of remorse. *See, e.g., id.* (prosecutor's comment on lack of remorse supported by accused's statement to officer that he had no remorse for crime).

## *Analysis*

Appellant has failed to properly brief this issue. *See* Tex. R. App. P. 38.1(i). Importantly, Appellant does not specify where in Dr. Price's testimony ***before the jury*** that he refers to Appellant's lack of remorse.

239

The State is unable to locate any exchange before the jury wherein Dr. Price refers to Appellant's remorse. Additionally, beyond the statement that the unspecified error "violated Appellant's right to remain silent and is of constitutional error dimension [and] denied Appellant a fair punishment hearing," Appellant offers no argument or analysis. He does not explain how Dr. Price's testimony violated his right to remain silent. This Court is not required to make Appellant's case for him. *Garcia*, 887 S.W.2d at 882.

Issue 43 should be overruled.

**STATE'S RESPONSE TO ISSUE *44*: THE TRIAL COURT DID NOT ERR IN ADMITTING A SILHOUETTE OF A KNIFE AS A DEMONSTRATIVE AID.**

Appellant contends that the trial court erred in overruling his objection to State's Exhibit #206, a PowerPoint presentation, which depicts silhouettes of a single edged blade, because it was speculative. Appellant points to the fact that the purported murder weapon was never introduced into evidence. Appellant's contentions lack merit.

### *Pertinent Facts*

State's Exhibit #206 is a PowerPoint presentation that the State and the medical examiner, Dr. Edward McDonough, compiled to assist

the doctor in his testimony regarding the autopsy on Mildred. It was admitted over Appellant's objection for record purposes only. (RR61:49). Appellant's objection related to two slides of the exhibit, slides 2 and 5. Slide 2, entitled, "Stab Wound – Single Edge Blade Characteristics," contains a computer generated image of a single edged knife next to State's Exhibit #63, a photograph of one of Mildred's stab wounds. (SX206). Slide 5, entitled, "Stab Wound Depth Analysis," depicts three silhouettes that correspond to wounds of various depths. (SX206).

In a hearing outside the presence of the jury, Appellant objected to State's Exhibit #206.[33] (RR69:11). He stated the following:

> One thing further, Your Honor. I think the State, as part of their presentation with the medical examiner, will have a PowerPoint which shows a silhouette of a knife next to the pictures. I would object to that as speculative. Especially since there is no knife that's ever been introduced into evidence.
>
> For example, this (indicating). I think it would be misleading to the jury that that's the way the knife looked, when there's no evidence in any way that there's - - a knife like that was ever used.

---

[33] On appeal, Appellant refers to State's Exhibit #205. This exhibit is a penitentiary pack. (SX205). The State believes Appellant is actually referring to State's Exhibit #206, which includes photographs from Mildred's autopsy along with a silhouette of a single edge blade. (SX206).

(RR61:11). The State responded that it was offering the exhibit purely as a demonstrative aid. (RR61:11). "The purpose of this picture is to show there's a sharp edge and dull edge and how a knife like that might be - - is consistent with causing a wound like we see in State's Exhibit Number 63[.]" (RR61:11). The photograph will "show the jury why it is that this medical examiner will give the opinion that this is consistent with a single-edge knife." (RR61:12). The trial court overruled Appellant's objection. (RR61:12). The exhibit was subsequently admitted and utilized by him to explain his autopsy findings.

In particular, Dr. McDonough testified that Mildred "had extensive sharp-force trauma over almost all the surfaces of her body." (RR61:54). He explained that as part of an autopsy, the medical examiner examines sharp-force wounds in an effort to determine "what the weapon might be, possibly the length of the weapon, the width of the blade[.]" (RR61:56-57). The examiner looks at the features of the wound, including the edges, where "[t]here might be a sharp edge and blunt edge." (RR61:56). The features of the wound may suggest the type of knife used. (RR61:56, 60-61). In the instant case, he opined that Mildred's and Fred's wounds were consistent with a single edged

blade. (RR61:58). Dr. McDonough acknowledged, however, that he was never presented with a knife to examine or compare to Mildred's wounds. (RR61:57).

## *Standard of Review*

An appellate court reviews a trial court's admission of demonstrative evidence for an abuse of discretion. *See Simmons v. State*, 622 S.W.2d 111, 113 (Tex. Crim. App. 1981).

## *Applicable Law*

Demonstrative evidence is evidence admitted to serve as a visual aid or illustration of a witness' testimony. *Baker v. State*, 177 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2005, no pet.). It is admissible if it tends to solve some issue in the case and is relevant to the cause. *See Simmons*, 622 S.W.2d at 113. An item of demonstrative evidence must be properly identified by showing that the item in question is what its proponent claims as opposed to any idea of speculation, conjecture, or presumption of what the exhibit represents. *Torres v. State*, 116 S.W.3d 208, 213 (Tex. App.—El Paso 2003, no pet.) (citing *Vollbaum v. State*, 833 S.W.2d 652, 657 (Tex. App.—Waco 1992, pet. ref'd)).

## *Analysis*

The trial court did not err is overruling Appellant's objection to the State's use of a computer-generated silhouette of a generic single edged knife as a demonstrative aid during the medical examiner's testimony. As an initial matter, the silhouette of the knife was properly identified. *Torres*, 116 S.W.3d at 213. Dr. McDonough agreed that the slide entitled "Stab Wound – Single Edge Blade Characteristics" contained a diagram of a knife. (RR61:57). As to the slide entitled "Stab Wound Depth Analysis," he agreed that it explained "different depths wounds [sic]" that a single knife may create. (RR61:60).

The silhouette of the knife was relevant as it helped the medical examiner to explain the nature and cause of the injuries that resulted in Mildred's death. The silhouette assisted the jury in understanding Dr. McDonough's testimony regarding Mildred's wounds. Contrary to the statements in Appellant's brief, the silhouette was not speculative. The silhouette on Slide 2 depicted a single-edged knife, the same type of knife that Dr. McDonough believed caused Mildred's wounds. (RR61:57-58). The silhouette on Slide 5 showed that a single knife may cause wounds of different depths. (RR61:60).

Importantly, the State did not present the silhouette of the knife as an image of the weapon that was actually used in the instant offense. Indeed, the State clarified with Dr. McDonough the fact that he had never "seen a knife [and had] never been presented a knife to examine" in connection with Mildred's autopsy. (RR61:57). On cross-examination, Dr. McDonough agreed that although he had testified to what the knife may look like, he could not testify to a scientific certainty what the knife looked like or how long it was. (RR61:90-91). *See Simmons*, 622 S.W.2d at 113-14 (finding no abuse of discretion in overruling Simmons' objection to the State's display to the jury of a "similar-type [of] knife" as that used during the commission of the offense).

On appeal, Appellant argues that the silhouette of the knife was also inadmissible under Rule 403. (Appellant's Brief pp.122-23). He did not object on this basis at trial; he only objected on the basis of speculation. (RR61:11). As such, Appellant failed to preserve his Rule 403 objection for this Court's review. *See Guevara*, 97 S.W.3d at 583.

Regardless, the probative value of the silhouette was not substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. As stated, the silhouette was probative of the nature of the

weapon used to inflict Mildred's fatal injuries. The silhouette was used to demonstrate the type of blade that may have inflicted Mildred's wounds and to demonstrate how a single blade could create different wounds of varying depth. The potential for the silhouette to impress the jury in an irrational way was low given Dr. McDonough's acknowledgement that he was never presented with a particular knife to examine or compare with Mildred's wounds and that he could not testify to a scientific certainty what the murder weapon actually looked like. At a minimum, the trial court's decision falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

Even if this Court finds that the trial court erred in allowing the State to use the silhouette as a demonstrative aid, any alleged error is harmless as it did not have a substantial and injurious effect or influence on the jury. The complained-of exhibit was offered during testimony by the medical examiner during the *punishment* phase of trial. The fact that Appellant stabbed Mildred to death was previously determined by another jury. Dr. McDonough simply described for the new jury Mildred's cause of death and the nature and extent of her injuries. The complained-of silhouette was used during his testimony

simply to help the jury understand the type of weapon that caused her wounds. There was no attempt to mislead the jury to believe that the silhouette was an exact replica of the actual murder weapon. And there was no dispute that a sharp, blade-like object was used or the lethal nature of the wounds it inflicted. Accordingly, the silhouette of the knife did not affect Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).

Issue 44 should be overruled.

***STATE'S RESPONSE TO ISSUE 45: THE TRIAL COURT PROPERLY ADMITTED THE AUTOPSY PHOTOGRAPHS. ALTERNATIVELY, ANY ERROR IS HARMLESS.***

Appellant contends that the trial court should have excluded all of the autopsy photographs offered by the State under evidence rule 403. Appellant's contention appears to be that the probative value of the photographs was outweighed by the danger of unfair prejudice. Appellant's contentions lack merit.

### *Pertinent Facts*

In a sub rosa hearing, Appellant objected under Rule 403 to autopsy photographs of Mildred and Fred "being shown to the jury." (RR61:8-9). The color photographs were the exact photographs admitted in the guilt phase of Appellant's prior 1986 trial. The trial

court had rejected a rule 403 objection to their admission back then, finding that the probative value was not outweighed by the danger of any unfair prejudice. (RR61:9). The State re-offered all twenty-four previously admitted autopsy photographs - - fourteen from Mildred's autopsy and ten from Fred's autopsy. (RR61:9-10). The prosecutor stated:

> They are grouped in a manner that is consistent with their grouping of the injuries that show the injuries, the knife wounds, the point of entry, why those points of entry can be seen as being consistent with a single-edge knife. [The medical examiner] will talk about the location of those injuries and how - - especially with Mildred - - those might relate to the fractured ribs that she sustained.
>
>   . . .
>
> There's probably, I think, 25 [sic] pictures. But that's because there were a lot of stab wounds that were inflicted upon these two folks.

(RR61:10). Importantly, the 24 photographs offered were only "a small - - a portion of the total pictures that were taken." (RR61:11).

Appellant's objection was overruled. (RR61:11). The photographs were admitted during Dr. McDonough's testimony. (RR61:48-49).

248

### *Analysis*

The trial court did not err in admitting the 24 autopsy photographs over Appellant's 403 objection. All 24 photographs were highly probative of Mildred and Fred's injuries; they show the external injuries - - stab wounds, cuts, contusions - - that Mildred and Fred suffered as a result of the instant offense. The photographs were used by Dr. McDonough to explain those injuries. (RR61:57, 61-65, 67-74, 78-83). This Court has held that a trial court does not abuse its discretion in admitting autopsy photographs over a Rule 403 objection where they help to explain the medical examiner's testimony describing the victim's various wounds for which appellant is responsible. *See Escamilla*, 143 S.W.3d at 826. Given the nature and extent of Mildred and Fred's injuries – the sheer volume of stab wounds – the photographs were especially important to help the jury understand the brutal nature of the offense.

Furthermore, the 24 complained-of photographs are not unfairly prejudicial under Rule 403. The photographs are not repetitious; each depicts a different area of injury:

- State's Exhibit #76, the autopsy identification photograph, is a close up of Mildred's face. (RR61:63-64; SX76).

- State's Exhibit #79 is a close-up of a large cut to Mildred's scalp. (RR61:64-65; SX79).

- State's Exhibit #80 is a close-up of a three-inch cut on the back of Mildred's head. (RR61:65; SX80).

- State's Exhibit #73 is a close up of defensive wounds on Mildred's left hand. (RR61:72; SX73).

- State's Exhibit #74 is a close-up of a large stab wound to Mildred's lower right arm. (RR61:72-74; SX74).

- State's Exhibit #81 is a close-up of several stab wounds to Mildred's left arm. (RR61:71-72; SX81).

- State's Exhibit #75 shows a large stab wound to Mildred's face and shows multiple defects to her shirt. (RR61:62-63; SX75).

- State's Exhibit #78 is an overhead view of Mildred's upper body and shows the curlers in her hair, her Rolex watch, and the defects to her shirt. (RR61:61-62; SX78).

- State's Exhibit #77 is an overhead view of Mildred's lower body and shows two stab wounds to her belly. (RR61:62; SX77).

- State's Exhibit #63 is a close-up of a stab to Mildred's body. (RR61:57-58; SX63).

- State's Exhibit #65 is a close-up of the right side of Fred's face and shows a large stab wound to the temple area. (RR61:81-81; SX65).

- State's Exhibit #58 is an overhead view of the upper portion of Fred's body from his head to his knees. (RR61:78; SX58). He is wearing a shirt, but nothing below his waist. His genital area is covered by a black box.

- State's Exhibit #64 is a close-up of Fred's left shoulder area and shows multiple stab wounds to his chest, shoulder and arm. (RR61:81-82; SX64).

- State's Exhibit #60 is a close-up of blood droplets on the back of Fred's left upper leg. (RR61:82; SX60).

- State's Exhibit #61 is a close-up of cuts to Fred's buttocks. (RR61:83; SX61).

- State's Exhibit #68 is a close-up of a fracture or tear of a fingernail on Fred's right hand. (RR61:83; SX68).

In some of the photographs, Mildred and Fred are unclothed:

- State's Exhibit #71 shows Mildred's unclothed body from her breasts to her abdomen and shows a series of stab wounds to Mildred's abdomen and her left side. (RR61:71; SX71).

- State's Exhibit #82 is an overhead view of the front of Mildred's unclothed body, from her head to just above her knees and shows multiple stab wounds all over her body. (RR61:67-68; SX82).

251

- State's Exhibit #83 is a closer-in view of the right upper side of Mildred's body and shows groups of stab wounds to her right arm and right side. (RR61:69-71; SX83).

- State's Exhibit #72 is an overhead view of the back of Mildred's body and shows multiple stab wounds to her shoulder, arm, and hip area. (RR61:68-69; SX72).

- State's Exhibit #62 is a closer-in view of Fred's chest and shows multiple stab wounds to that area. (RR61:81; SX62).

- State's Exhibit #59 is a closer-in view of the left side of Fred's body and shows a group of cuts to that area. (RR61:82; SX59).

- State's Exhibit #66 is an overhead view of the upper portion of the front of Fred's body, from his head to his knees and shows seven stab wounds. (RR61:79-80; SX66).

- State's Exhibit #67 is an overhead view of the back of Fred's upper body and shows eleven stab wounds. (RR61:80; SX67).

A photograph, which is used to describe the complainant's injuries, is not inadmissible simply because it depicts an unclothed body. *See Santellan v. State*, 939 S.W.2d 155, 172-73 (Tex. Crim. App. 1997) (finding no error in admitting photographs of victim's naked body during autopsy where the photographs show damage done to victim's

body by Santellan and no damage attributable to the autopsy is apparent).

Appellant complains that the prosecutor and Dr. McDonough commented that the photographs were "gruesome." (RR61:61). The photographs are gruesome, but they depict nothing more than the injuries that Appellant inflicted on Mildred and Fred. *See Ladd*, 3 S.W.3d at 568 (holding that the trial court did not abuse its discretion in admitting photographs of the victim's body, including autopsy photos, because the photographs depicted the manner of death and were no more gruesome than the crime). Notably, Dr. McDonough's testimony regarding the photographs consisted of only twenty pages in an otherwise extremely lengthy record. (RR61:57, 61-65, 67-74, 78-83).

The trial court did not abuse its discretion when it admitted the 24 autopsy photographs. At a minimum, its decision falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

### *Any Alleged Error is Harmless*

Even if the trial court erred in admitting the 24 complained-of photographs, Appellant was not harmed. As previously argued, there was overwhelming evidence supporting the jury's verdict on

punishment regardless of the photographs of Mildred and Fred. Even without the photographs, the jury heard evidence that Mildred was stabbed 90 times. The jury heard evidence of Appellant's history of violence both in and out of prison. Accordingly, taking the entire record into consideration, it is clear that any alleged error in admitting the complained-of photographs clearly did not affect Appellant's substantial rights and should be disregarded. *See* Tex. R. App. P. 44.2(b).

Issues 45 should be overruled.

**STATE'S RESPONSE TO ISSUE *46*: THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S OBJECTION TO THE TESTIMONY OF JAMES BELT, SR.**

Appellant contends that the trial court should have excluded the testimony of Mildred and Fred's son-in-law, James Belt. He claims Belt's testimony was not admissible as victim impact testimony. Furthermore, he claims under Rule 403 that any probative value it had was outweighed by the danger of unfair prejudice. Appellant preserved his complaints at trial, but the court acted within its discretion in overruling them.

### *Pertinent Facts*

During it's case-in-rebuttal, the State called Mildred and Fred's son-in-law, James Belt, to testify. (RR68:212). Appellant objected that Belt was not Mildred and Fred's child. (RR68:218). He objected to the fact that Belt would testify as to the effect of the offense on his wife, Mildred and Fred's daughter, Molly, as well as Mildred and Fred's grandchildren, Melanie and James III. (RR68:212-13, 216). He objected that the defense would not be able to cross-examine Molly. (RR68:212-13, 216). Appellant also objected to the testimony under Rule 403. (RR68:214).

Before the jury, Belt testified that he is married to Mildred and Fred's only child, Molly. (RR68:220-21). Belt and Molly have two children, Melanie and James III. (RR68:226). Fred and Belt, both lawyers, shared an office close to Rose Lane. (RR68:229). Belt testified that Fred was more than just a father-in-law; "he was everything to [Belt]." (RR68:235). Belt had a great deal of respect and admiration for Mildred. (RR68:235).

Belt testified that even though decades have passed since the offense, "It comes back. [He] can't shake it . . . It's got [him] messed

up." (RR68:236). After the offense, Molly had to take a leave of absence from work for a year. (RR68:237). "Initially, she had anxiety attacks. She couldn't really do anything. But, as time passes, she's gotten a lot better . . . But she's not whole." (RR68:237). The offense affected Melanie as well. Melanie "has never been able to stay in a house by herself." (RR68:237). Melanie could not be left alone when she was a child or after she left home to go off to college. (RR68:237).

### *Applicable Law*

Victim-impact evidence is "evidence concerning the effect the victim's death will have on others, particularly the victim's family members." *Mosley v. State*, 983 S.W.2d 249, 261 (Tex. Crim. App. 1998). Victim-character evidence is "evidence concerning good qualities possessed by the victim." *Id.* Both types of evidence are admissible "in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." *Id.* at 262.

Victim-impact evidence "remind[s] the jury that murder has foreseeable consequences to the community and the victim's survivors - - family members and friends who also suffer harm from murderous

256

conduct." *Estrada v. State*, 313 S.W.3d 274, 316 (Tex. Crim. App. 2010) (quoting *Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim. App. 2002)). Evidence about the victim can be an important humanizing factor, making the victim more than just a faceless stranger before the jury, and is essential for just decision making in the penalty phase of a death-penalty trial. *See Mosley,* 983 S.W.2d at 261 (discussing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)).

However, victim-impact evidence is subject to limitations. Victim-impact evidence should be excluded under rule 403 if it predominantly encourages comparisons between the worthiness of the victim and the worthiness of the defendant. *See Mosley*, 983 S.W.3d at 262; Tex. R. Evid. 403. "When the focus of the evidence shifts from humanizing the victim . . . to measuring the worth of the victim compared to other members of society[,] then the State exceeds the bounds of permissible testimony." *Mosley*, 983 S.W.3d at 262.

Trial courts should exercise sound discretion in permitting some victim impact evidence while limiting the amount and scope of such testimony. *See Estrada*, 313 S.W.3d 315-16 (quoting *Salazar*, 90 S.W.3d at 336). Considerations in determining whether testimony

should be excluded under rule 403 include the nature of the testimony, the relationship between the witness and the victim, the amount of testimony to be introduced, and the availability of other testimony relating to victim impact and character. *See Mosley*, 983 S.W.2d at 262.

### *Analysis*

It is the State's position that Appellant has failed to properly brief his complaint regarding the testimony of James Belt. Importantly, he does not provide citations to the portion(s) of the record of Belt's testimony that he claims is inadmissible. *See* Tex. R. App. P. 38.1(i). The State notes that Belt offered more than simply victim-impact testimony. Belt was also a fact witness; he was the person who found Mildred's and Fred's dead bodies. (RR68:228-29).

In any event, the trial court did not err in allowing Belt to provide victim-impact testimony. Belt's testimony was relevant and probative evidence that humanized Mildred and Fred. *Mosley*, 983 S.W.2d at 262. Belt provided a brief description for the jury of who this married couple was and the impact of the murders on their family. There was nothing in Belt's testimony that encouraged a comparison between Mildred and Fred and Appellant. As such, the trial court acted

within its discretion in allowing Belt's testimony during the State's case-in-rebuttal.

That Belt was Mildred and Fred's son-in-law did not render Belt's testimony inadmissible. *See Mosley*, 983 S.W.2d at 262 (stating, "[W]e do not believe that an absolute rule limiting testimony to family members within a certain degree of relationship is viable."). Although Belt was not Mildred and Fred's son by birth, he was their son-in-law and the father of their grandchildren. It is clear from Belt's testimony that he enjoyed an extremely close relationship with Mildred and Fred, both personally and (as to Fred) professionally.

In his brief, Appellant argues that Belt's testimony was improper, extraneous victim testimony because it pertained to a victim not named in the indictment. (Appellant's Brief pp.127-28). Mildred is the only complainant listed in the instant indictment, not Fred. (CR:206). Appellant did not object on this basis at trial, therefore this claim is not preserved for review. *See* Tex. R. App. P. 33.1. Regardless, Appellant is incorrect. Belt's testimony regarding the impact of the offense, that he "can't shake it" and that it "[had him] messed up" pertains to Mildred's murder. Mildred and Fred were killed during the

same transaction. Because his testimony pertains to the victim named in the indictment, it was not improper.

Appellant complained at trial and in his brief on appeal that because Belt was allowed to testify as to the effect of the offense on Molly, he was denied the right to cross-examine her. At trial, the State asked only two questions of Belt regarding the effect of the offense on Molly. (RR68:236-37). And, Appellant made no attempt to cross-examine him. (RR68:239).

Even if this Court finds that the trial court erred in admitting Belt's victim-impact testimony (which the State does not concede), any alleged error is harmless. *See* Tex. R. Evid. 103; Tex. R. App. P. 44.2(b). Belt's testimony about the impact of the offense on him and his family was brief. And, he was the only witness to give this type of testimony. Indeed, the State was judicious and presented only one witness – Belt – to testify regarding the impact of the brutal murder of a highly respected couple in the Dallas community. Belt's testimony did not affect Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).

Issue 46 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. 47-48:** *APPELLANT IS NOT INTELLECTUALLY DISABLED.*

In Issue 47, Appellant contends that the jury's response to the intellectual disability special issue is against the great weight and preponderance of the evidence. In Issue 48, Appellant contends that the evidence was sufficient to show that Appellant is intellectually disabled. Appellant's contentions lack merit.

### *Standard of Review*

This Court has characterized the issue of intellectual disability as an affirmative defense. *Neal v. State*, 256 S.W.3d 264, 273 (Tex. Crim. App. 2008). When a defendant asserts this affirmative defense at trial, he bears the burden to prove by a preponderance of the evidence that he is intellectually disabled. *Id.* In reviewing the sufficiency of the evidence to support the jury's finding that Appellant was not intellectually disabled, the appellate court considers whether the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* The jury's decision is entitled to great deference as it is in the best position to assess the witnesses' credibility and resolve any conflicts in the evidence. *Id.*

*Alternate Standard of Review*

In two issues, Appellant contends that the evidence presented at trial established that he was intellectually disabled. The State understands Issue 47 to be that the jury's response to the intellectual disability special issue is against the great weight and preponderance of the evidence and Issue 48 to be that the evidence was sufficient to show that Appellant is intellectually disabled. It is unclear whether Appellant is suggesting that there are *two* standards of review in connection with the jury's response to the intellectual disability issue. As stated above, the standard of review in connection with the jury's finding on the intellectual disability special issue is whether the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Neal*, 256 S.W.3d at 273. Appellant cites no authority to the contrary.

## *Applicable Law*

A defendant is intellectually disabled and, thus, exempt from the death penalty if he has (1) significant sub-average general intellectual functioning, usually evidenced by an intelligence quotient (IQ) score below 70, that is accompanied by, (2) related limitations in adaptive

functioning, (3) before the age of 18. *Neal*, 256 S.W.3d at 272-73; *Briseno*, 135 S.W.3d at 7-8; *see also* Tex. Health & Safety Code Ann. §591.003(7-a). These criteria are "adequately 'informed by the medical community's diagnostic framework.'" *Moore*, 470 S.W.3d at 487 (citing *Hall*, 134 S. Ct. at 2000).

Factors relevant to evaluating the three prongs include:

- Did those who knew the person best during the developmental stage--his family, friends, teachers, employers, and authorities--think he was mentally retarded at that time, and, if so, act in accordance with that determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

- Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of

263

> that offense require forethought, planning, and complex execution of purpose?

*Neal*, 256 S.W.3d at 273.

## *Analysis*

Appellant failed to meet his burden of proving that he is intellectually disabled. The record supports the jury's decision to answer the first special issue "no."

### *Appellant's IQ*

General intellectual functioning refers to an IQ which is obtained by assessment with a standardized, individually administered intelligence test. *See Moore*, 470 S.W.3d at 487 (citing *Hearn*, 310 S.W.3d at 428 n.7). Sub-average general intellectual functioning refers to an individual's "measured intelligence on standardized psychometric instruments of two or more standard deviations below the age-group mean for the tests used." Tex. Health & Safety Code Ann. §591.003(20) (West Supp. 2015). "[T]he MR or Intellectual Disability category is approximately two standard deviations below the average, about an IQ score of 70." *Cathey*, 451 S.W.3d at 14.

Appellant presented evidence of two IQ scores: 77 and 71. (RR65:118; RR66:23). Dr. Hom administered the Wechsler Adult Intelligence Test (WAIS-II) in 1987. (RR65:110, 115). On this test, Appellant's full-scale IQ was 77. (RR65:118).

In 2012, Dr. McGarrahan administered the WAIS-IV and Appellant scored a 71.[34] (RR66:16, 23, 29; SX248). Appellant's "full-scale IQ was 71, which is in the - - what we used to call 'mildly mentally retarded' range to borderline functioning[.]" (RR66:23). Given that the standard error of measurement is "essentially plus or minus five points," Appellant's score falls in the range of 66-76. (RR66:29-30). Dr. McGarrahan testified that Appellant's IQ score was two standard deviations below the norm. (RR66:9-10).

The State's expert, Dr. Price, testified that Appellant's 71 IQ score places him in "the borderline" range of mildly intellectually disabled. (RR69:78). He testified, "you take into consideration the confidence interval of the IQ score obtained and it includes, in this case, a score that should be considered significantly sub-average." (RR69:79). Dr.

---

[34] At the time of trial, the WAIS-IV was the current edition of this test. (RR69:24).

Price testified that Appellant meets the first prong of the intellectual disability analysis. (RR69:79).

Taking into consideration the SEM associated with Appellant's 2012 71-IQ-score, the State agrees with Appellant that the evidence substantiates a finding that he meets the first prong of the intellectual disability analysis.

*Adaptive Behavior*

Even though Appellant's 2012 IQ score meets the first prong of the AAMR definition for intellectual disability, his IQ score alone does not justify his classification as intellectually disabled. *See Ex parte Tennard*, 960 S.W.2d 57, 60-61 (Tex. Crim. App. 1997) (IQ scores should not be used as a "unitary measure of mental retardation"). The score must be accompanied by deficits in adaptive behavior. *Briseno*, 135 S.W.3d at 7. Adaptive behavior is defined as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." Tex. Health & Safety Code Ann. § 591.003(1) (West Supp. 2015). "Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of

maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales." *Briseno*, 135 S.W.3d at 7 n.25.

Expert Opinion

Dr. McGarrahan testified that Appellant's adaptive deficits "include his academic functioning, his ability to socialize and be in the community and live independently and take care of himself." (RR66:24). According to Dr. McGarrahan, Appellant could not make change; had problems in school; did not learn how to drive; had difficulty using a telephone and a telephone book; was a loner; had no friends; had trouble getting along with people; and, experienced a head injury at the age of 15. (RR66:25-26).

Dr. Price testified that he did not see significant limitations in Appellant's adaptive behaviors. (RR69:38). According to Dr. Price, there was evidence that Appellant "had many different jobs in the time after he was 17, in the free world." (RR69:39). In addition, Appellant was not incapable of graduating from high school. (RR69:39). Indeed, Dr. Price did not believe that Appellant's poor performance in school

was related to his intellectual functioning. (RR69:40). That Appellant was picked on as a child and was a loner was not evidence of significant limitations in adaptive behavior. (RR69:41). Some of the evidence showed that he would not stand up for himself but other evidence showed that he would. (RR69:41-42). Furthermore, Appellant was not a complete loner; he had girlfriends and was close to some family members. (RR69:42). Importantly, when Appellant was younger, he was not treated by everyone as if he was intellectually disabled. (RR69:44).

Dr. Price testified that Appellant has the ability to "formulate a plan to behave in a certain way, to get the effect or to achieve the consequence that he was after." (RR69:44-45). He also has the ability to lie in order to avoid criminal responsibility. (RR69:46). Dr. Price testified that it appeared that the lying started with the Linwood incident. (RR69:46). Appellant "comes up with excuses, self-defense argument, denies that he committed this offense in the way in which the evidence was presented to the jury, telling the investigator one thing and also telling her at the same time to not put that in the record." (RR69:46). Appellant's testimony in connection with the

Linwood offense was significant to Dr. Price and "was very inconsistent with a person with mental retardation[.]" (RR69:58). Dr. Price testified:

> Well, it speaks to the area of communication as adaptive behavior, as well as the social problem-solving area. He testified. He was cross examined. He responded to the questions in a responsive fashion, on point. He understood the questions. He had an answer that was in his own self-interest, whether or not it was accurate or not.
>
> It also showed a denial of responsibility for the act and a memorization of the conduct. But he was able to, if you will, hold his own on the witness stand under cross examination. Something that can be difficult to do.

(RR69:48).

Dr. Price also reviewed 24 of Appellant's 90-day mental status examinations from 2002 to 2010. (RR69:51). "[W]ith very, very few exceptions, his mental status examines [sic] for those eight years . . . were entirely normal." (RR69:52). There was no evidence of psychosis, hearing voices, bipolar disorder, or schizophrenia. (RR69:52). No mental health medications were administered. (RR69:52). There were no complaints of unusual behaviors. (RR69:53).

## Other Evidence

The record reflects that, from a young age, Appellant was an individual fully capable of caring for himself and carrying out everyday activities whether at home, on the streets, or while incarcerated. Appellant, also known by his nickname, "Clean," liked clothes and liked to dress well. (RR62:19-20, 46, 54, 100, 111; RR66:79). Although he did not have a driver's license, he got around by driving Lonnie's car, walking, or having friends pick him up. (RR62:62-63, 117, 131).

Contrary to Dr. McGarrahan's testimony that Appellant was a loner, didn't have any friends, and did not know how to get along with others, multiple witnesses testified that Appellant had relationships with family, friends, and even had a girlfriend. (RR62:65, 131; RR66:25, 131, 71, 96-97). Indeed, from a young age, Appellant maintained close relationships with multiple family members, including his brother Lonnie and sister Shirley as well as his cousins Bobby Charles and Thomas, Anthony, and Cynthia Penagraph. (RR62:53, 100; RR65:49-50, 61; RR66:71). Thomas testified that he and Appellant were "just like two peas in a pot (sic)." (RR62:65). They were "[r]eally close." (RR62:65). Anthony testified that he and Appellant went everywhere

together.  (RR65:51).  More recently, Appellant reconnected with his half-brother Rodney Turner.  (RR66:96).  The men became pen pals, encouraging each other through their letters.  (RR66:97).  Appellant's letters included citations to Scripture.  (RR66:106).

Growing up, Appellant's cousins Anthony and Cynthia believed that Appellant was slow but Lonnie, Thomas, and Delores Easter did not.  (RR62:26, 53, 100; RR65:49; RR66:130).  Indeed, Lonnie thought Appellant was intelligent; Appellant could read and hold a conversation with him and even helped him with his homework.  (RR62:100-01, 118).  Easter described Appellant as "very bright."  (RR62:26).

There is no evidence that Appellant was ever placed in special education classes through DISD.  (RR68:207).  Appellant's school records reflect that although he performed poorly in middle school, he improved by his sophomore year of high school when he started attending Metro North.  (RR68:203-04).  Notably, Appellant's move to Metro North did not occur until after his head injury at Fair Park.  (RR68:210).  Dr. Price testified that based on the records, Appellant's scores on the Iowa and California tests, and his performance at Metro North, Appellant was "not incapable" of graduating.  (RR69:40). *See*

*Cathey*, 451 S.W.3d at 64 (noting that "[t]he best source of retrospective information concerning adaptive behavior during the developmental period is usually school records.").

Appellant presented evidence of the head injury at Fair Park.[35] The evidence reflects, however, that he testified at the trial in connection with the Linwood offense three years after the injury. (RR69:48). Dr. Price testified that Appellant's testimony at that trial was "very inconsistent with a person with mental retardation[.]" (RR69:48). Similarly, when he was interviewed by Cindy Kuykendall after the instant offense, Appellant responded to questions, answered questions in his own interest, and "provided alibis, excuses, rationalizations, [and] denials." (RR69:49).

Appellant grew up in an area where fighting was common. (RR62:55-56, 110). While it is true that Appellant would get picked on, two of his cousins testified that if Appellant had to defend himself, he would. (RR62:55, 107; RR65:47-48, 56; RR66:84). He even defended Lonnie on more than one occasion. (RR62:108). Dr. Price testified that whether one is picked on is not, by itself, evidence of intellectual

---

[35] The State introduced a copy of Appellant's medical records from Parkland Hospital. The records contain no mention of the head injury. (RR69:57; SX249).

disability. (RR69:41). Instead, it is the response to being picked on that should be considered. (RR69:41).

Although Appellant had "very few jobs over his life[,]" there was evidence of some work experience. (RR66:18). Appellant worked as a janitor with his mother at Fair Park. (RR62:114). He worked on trucks with Rice's brother, Anthony. (RR66:126, 136). He worked at the Adel Hunt Furniture Company. (RR66:56). In 1984, however, while he was out of prison on parole, he did not maintain stable employment. (RR63:192-93).

Appellant has a history of lying and manipulative behavior. When interviewed by police in connection with the Linwood incident, he told the detective that he intended to kill Linwood when he stabbed him, but then he told her not to include that detail in the report. (RR66:46-48). When he testified at trial, he claimed that he did not intend to kill Linwood; he just wanted to "scratch" Linwood to get him to leave him alone. (RR66:46-47).

In 1983, while in prison, Appellant was aggressive and tried to extort his then-cellmate Ferguson. (RR63:137-39). He manipulated another inmate, Turner, into doing his laundry and doing "sexual stuff

273

for him[.]" (RR63:167-68). A 2010 inventory of Appellant's cell turned up two razor blades secreted in a book. (RR65:21-22; SX230). He also had a diagram showing how to alter a radio to create a communication device. (RR65:17; SX232).

In prison, Appellant manages his time and health. He spends his time reading. One detention officer testified that Appellant is always reading or sleeping. (RR67:41). He reads "novels off the law library cart." (RR67:45). An inventory of his cell revealed eight books, a dictionary, and a Bible. (RR65:12, 13, 14, 28-29; SX231, 236-42). He also had a capital defense periodical that contained markings on passages concerning confidentiality and strategy. (RR65:24-28; SX233). When he has recreation time at the gym, Appellant walks or plays basketball. (RR67:42). In the event that Appellant needs to see a doctor, he is able to take the steps necessary to do so. (RR69:45).

In 2006, Appellant took an "Adaptive Behavior Screening Test." (RR71:1212-13; SX251). He reported the following: prior to his arrest, he lived with his family (common law wife); he supported himself with a job; he had bills and he paid them; he got to where he needed to go by driving himself; he cooked what he ate; when he needed to go to the

doctor, his family made an appointment; he looked at an analog clock and correctly stated the time within 5 minutes; he washed his clothes himself; and he reported that, to bake cornbread or a cake or biscuits, the oven should be set to 300°-400°. (RR71:1212-13; SX251). He answered one question incorrectly: "If cigarettes cost $4.35 and you gave the clerk a $5.00 bill, how much change should you get back?" (RR71:1213; SX251). Appellant answered "Any other [number]" instead of "$0.65." (RR71:1213; SX251).

The commission of the instant offense demonstrates considerable forethought and planning. Through trial-and-error, Appellant figured out how to get inside the Finch home. Once inside, he overpowered not just one person, but two. After he brutally stabbed and killed Mildred and Fred, he selected and organized the property that he wanted to take and then figured out how to transport it from the Finch home to his own. Once at home, he concocted a story to explain the blood on his clothing and the source of all of the bags and boxes of clothing and assorted property. Later, he disposed of his bloody clothes and the knife he used to kill Mildred and Fred. During an interview with the media after the offense, Appellant told a reporter that he got the blood on his

275

shoes from a dog that he had hit with a stick. (RR66:50). And, he gave an alibi for the day after the murders. (RR66:52-53).

## Conclusion

A significant impairment in adaptive behavior may be thought of as the extent to which an individual requires assistance to carry out age-appropriate activities. *See Cathey*, 451 S.W.3d at 23. Given all of the foregoing, it is clear that before and after he turned 18, Appellant was fully capable of carrying out age-appropriate activities. The jury could have reasonably determined that any deficits Appellant had in adaptive behavior were not within the range of intellectual disability.

### *Onset before 18*

Appellant failed to prove an IQ below 70 and deficiencies in adaptive behavior prior to the age of 18. First of all, both of Appellant's IQ tests were taken after his 18th birthday. When Appellant was tested by Dr. Hom in 1987, he was 26. (DX7). When he was tested by Dr. McGarrahan in 2012, he was 51. (SX248). The only evidence of an IQ test taken during the developmental period was the California Test of Mental Maturity taken when Appellant was in second grade. (RR68:200). On this test, Appellant scored an 82 total IQ. (RR68:198).

Next, the evidence of adaptive deficits was conflicting. Some family members thought Appellant was slow, but others thought he functioned well and was bright. Although Appellant performed poorly during some school years, his performance was better in others. There was evidence that he worked with his mother. There was evidence that he was bullied in the neighborhood, but there was also evidence that he stood up for himself. Appellant failed to prove that he is intellectually disabled, much less that the onset occurred during the developmental period. *See Cathey*, 451 S.W.3d at 28 (stating that "If applicant has failed to prove that he is intellectually disabled, he clearly did not prove that he was intellectually disabled before the age of approximately eighteen.").

### *Conclusion*

Given the foregoing, it is clear that the jury's answer to the intellectual disability special issue was not so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Neal*, 256 S.W.3d at 273.

Issues 47 and 48 should be overruled.

***S*TATE'S RESPONSE TO ISSUE NO. *49*: *THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE JURY'S FINDING THAT APPELLANT IS A FUTURE DANGER.***

In Issue 49, Appellant contends that the evidence is legally insufficient to support the jury's finding that there is a probability that he will commit criminal acts of violence in the future. Appellant's contention lacks merit.

### *Applicable Law*

The State has the burden of proving the future dangerousness issue beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 37.0711, §§ 3(b)(2), 3(c) (West 2006); *Ladd*, 3 S.W.3d at 557. A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society: the circumstances of the offense, the defendant's state of mind, whether he was working alone or with other parties, the calculated nature of his acts, the forethought and deliberation exhibited by the crime's execution, the existence of a prior criminal record, the defendant's age and personal circumstances at the time of the offense, whether the defendant was acting under duress or the domination of another at the time of the offense, psychiatric evidence, and character evidence. *See Martinez v. State,* 327 S.W.3d

727, 730 n.4 (Tex. Crim. App. 2010). In reviewing the sufficiency of the evidence, the appellate court views all of the evidence in the light most favorable to the jury's finding and determines whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was "yes." *Id.* at 730.

### *Analysis*

The State's evidence unquestionably demonstrates Appellant's propensity for violence. Indeed, the facts of the offense, standing alone, are sufficient to support a finding of future dangerousness. Appellant broke into a home and brutally stabbed two people to death. "[A] stabbing death is particularly brutal." *King v. State,* 953 S.W.2d 266, 272 (Tex. Crim. App. 1997). Appellant stabbed Mildred 90 times. And, Mildred was not his only victim. He also stabbed Fred to death. This Court has stated that the circumstances of the offense may be sufficient in some cases to support an affirmative finding on the future danger issue. *Devoe v. State,* 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *see also Martinez v. State,* 924 S.W.2d 693, 696 (Tex. Crim. App. 1996) (commenting on the distinction between murders committed with a gun,

"which can potentially be used from across a room . . . and which often results in death resulting from a single shot" and with a knife "a weapon which, by virtue of its very nature, forces the user to be in such close proximity to his victim that he is often touching him or comes into contact with him on each blow [and] several thrusts are often utilized in order to ensure death").

Regardless, the State did not rely on the facts of the offense alone. The State presented the following additional evidence of Appellant's history of violence which proves that he is a future danger:

- In 1979, Appellant stabbed Linwood in the head with a screwdriver causing permanent brain damage. (RR63:72, 84). Appellant told the detective that he was trying to kill Linwood.

- On the same day as the Linwood incident, Appellant got into a fight with his brother Billy, during which he cut Billy and Billy's friend. (RR63:111-12).

- Later that night, upset when an ex-girlfriend would not let him inside her house, Appellant broke her window. (RR63:102-03).

- In January 1983, Appellant "started coming on" to his cellmate, Ferguson. (RR63:136, 138-39).

- In June 1983, Appellant was seen "raping another inmate." (RR63:151).

- On the day after the rape, Appellant tried to force another inmate, McCarroll, to "suck his dick." (RR63:154). When the inmate refused, Appellant broke the inmate's nose and gave him two black eyes. (RR63:154).

- In August 1983, Appellant manipulated another inmate, Turner, into washing his clothes and "do[ing] sexual stuff for him[.]" (RR63:168). Appellant also made Turner have sex with other inmates. (RR63:169).

- While in jail, Appellant was moved multiple times for a variety of reasons. He had to be placed in administrative custody; he assaulted other inmates; he caused trouble in the tank; he fought; he made sexual threats; and he could not get along with others. (RR63:182; SX228).

- While in prison, Appellant flooded his cell twice; used indecent or vulgar language; threw his tray out of his cell; threatened an officer twice; refused to obey an order multiple times; got into a fistfight with another inmate; threw two glasses of water at an officer, striking him on the face and chest; and was found in possession of contraband multiple times. (RR65:37-40; SX245).

- In 1984, while on parole, Appellant failed to report and even tried to stab his mother. (RR63:188-89).

Appellant argues that his good behavior while incarcerated on death row proves that he is not a future danger. While good behavior in prison is a factor to consider, it does not preclude a finding of future dangerousness. *Devoe*, 354 S.W.3d at 468 (finding evidence sufficient to

support jury's finding of future dangerousness despite Devoe's "pristine" behavioral record while incarcerated).

Viewed in the light most favorable to the verdict, the evidence is more than sufficient to support the jury's finding beyond a reasonable doubt that Appellant would constitute a continuing threat to society. The evidence is sufficient to support the jury's answer to the future dangerousness special issue.

Issue 49 should be overruled.

**STATE'S RESPONSE TO ISSUE 50: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUESTED JURY INSTRUCTION.**

Appellant contends that the trial court erred in denying his request to amend the jury instruction defining "significantly sub-average general intellectual functioning." Appellant's contention lacks merit.

## *Pertinent Facts*

The trial court's charge to the jury defines "significantly sub-average general intellectual functioning" as follows:

> . . . refers to measured intelligence on standardized psychometric instruments of approximately two or more standard deviations below the group mean for the tests used. Significantly subaverage intellectual functioning is

evidenced by an IQ score of approximately 70 or below. An IQ score is not considered to be a fixed number. Instead a score represents a range or an approximation of a person's IQ.

(CR3:17). Appellant requested that the following two sentences be added to that definition:

- IQ tests has [sic] a standard error of measurement which is a reflection of the inherent imprecision of the test itself.
- An IQ score of 70 is considered to represent a band or zone of a score of 65 to 75.

(RR69:120). He argued that his additions would "fully develop and give an accurate definition of [the] terminology[.]" (RR69:120). In support of his argument, Appellant called Dr. McGarrahan who testified that the proposed instruction was important as it informs the jury that there is inherent error in the tests and that the "IQ itself is not a hard and fast number." (RR69:122). The State then questioned Dr. McGarrahan as follows:

[State]: . . . Dr. McGarrahan, is the standard error of measurement five points, plus or minus, for every IQ test?

[Dr. McGarrahan]: It is not. And that might not be exactly accurate. The last part, to say a band zone or a score 65 to 75, it's really not. It's statistically based on each IQ score

and each IQ test. So we say approximately, plus or minus, five points. But it's not exact.

[State]: So some tests may have a standard error of measurement of two-point something or three-point something. It depends on the test that's given, correct?

[Dr. McGarrahan]: It does. And it depends on - - like, we have our verbal IQ or verbal comprehension versus our performance reasoning, and those are different. Their standard errors of measurement are different for each of those.

(RR69:123). The State opposed Appellant's proffered additions as they would constitute a comment on the weight of the evidence. (RR69:125). The trial court denied Appellant's request. (RR69:125).

### *Applicable Law*

The trial court has a duty to provide the jury with a written charge, distinctly setting forth the law applicable to the case without expressing any opinion as to the weight of the evidence, summing up the testimony, discussing the facts, or using any argument that is calculated to arouse the sympathy or excite the passions of the jury. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2006).

### *Analysis*

The trial court did not err in refusing Appellant's request to include his two proffered sentences in the punishment charge. Contrary to the statements in Appellant's brief, the first sentence, which references the "standard error of measurement which is a reflection of the inherent imprecision of the test itself[,]" does not define sub-average general intellectual functioning. Instead, it is a comment on the weight of the evidence; it recites that IQ tests are inherently imprecise. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (stating that the court's charge shall not express any opinion as to the weight of the evidence). The trial court did not err in denying Appellant's request to include this sentence in the charge.

The second sentence, which references the "band or zone of a score of 65 to 75" is inaccurate. Dr. McGarrahan testified that that sentence "might not be exactly accurate." (RR69:123). She stated, "to say a band zone or a score 65 to 75, it's really not. It's statistically based on each IQ score and each IQ test. So we say approximately, plus or minus, five points. But it's not exact." (RR69:123). Given Dr.

McGarrahan's testimony, the trial did not err in denying Appellant's request to include this sentence in the charge.

The trial court did not abuse its discretion in denying Appellant's requested instructions. At a minimum, the ruling falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

Even if this Court finds that the trial court erred in denying Appellant's requested instructions, which the State does not concede, Appellant has failed to show some harm. If there is error in the court's charge and that error was the subject of a timely objection in the trial court, reversal is required if the error is calculated to injure the rights of the defendant, which means only that there must be some harm as a result of the error. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). Whether the defendant suffered actual harm is evaluated in light of the entire jury charge, the state of the evidence, counsel's arguments, and any other relevant information in the record. *See id.*

With regard to the first sentence, as previously argued, it was a comment on weight of the evidence. Regardless, that IQ scores are not

fixed numbers was already before the jury. Dr. McGarrahan testified regarding the standard error of measurement, as did Dr. Price. (RR66:29-30; RR69:33-34). Indeed, the fact that IQ scores do not represent fixed numbers was undisputed. As to the second sentence, Appellant cannot show harm since Dr. McGarrahan herself testified that it may not be an accurate statement. (RR69:123).

Issue 50 should be overruled.

***STATE'S RESPONSE TO ISSUE 51: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST THAT THE JURY BE ALLOWED TO ENTER A NON-UNANIMOUS VERDICT REGARDING THE INTELLECTUAL DISABILITY SPECIAL ISSUE.***

Appellant contends that the trial court erred in denying his request that the jury not be required to unanimously find the intellectual disability special issue in his favor. Appellant's contention lacks merit.

### *Pertinent Facts*

During the charge conference, Appellant requested the following:

> . . . where the Court is submitting and that the jury, to find mental retardation, must agree unanimously, we are requesting a civil burden be placed here. In the state of

Texas, a civil burden is a jury verdict of ten members of the jury, as opposed to the twelve.

In other words, none is not unanimously to be found, and we would ask that the Court adopt or adapt one of the - - like, on page three, where it says in the middle of the page "you may not answer either issue" we would request ". . . this Special Issue yes, unless ten or more Members of the Jury agree". That that be applied, instead of a unanimously [sic] burden.

(RR69:125-26). Appellant's request was denied. (RR69:126).

The jury was instructed regarding the intellectual disability special issue as follows:

You may not answer Special Issue No. 1 "yes" or "no" unless the jury agrees unanimously. Members of the jury need not agree on what particular evidence supports a "yes" answer to Special Issue No. 1.

(CR3:19).

## *Analysis*

On appeal, Appellant has failed to properly brief this issue. He lists three cases and a statute, but he includes no argument showing that he was entitled to the complained-of instruction. Tex. R. App. P. 38.1(i).

Regardless, Appellant's argument lacks merit. Unlike the future danger and mitigation special issues, the Texas Legislature has not established a statutory scheme for the presentation and determination of an issue of intellectual disability in a capital murder trial. *See Hunter v. State*, 243 S.W.3d 664, 672 (Tex. Crim. App. 2007). In *Hunter*, this Court overruled Hunter's complaint that he was entitled to a pre-trial determination of intellectual disability. *Id.* This Court stated that, "In the absence of legislation or a constitutional requirement directing when the determination of mental retardation is to be made or by whom, the trial court committed no error in denying [Hunter] a pretrial determination of mental retardation by a judge or jury separate from that determining guilt." *Id.* The same logic applies here. Since there is no statutory scheme dictating the jury verdict regarding intellectual disability, the trial court committed no error in requiring that it be unanimous.

In his brief, Appellant cites three cases and a civil rule; however, none provide authority in support of his argument that the jury should have been allowed to answer the intellectual disability special issue "yes" if only ten of the twelve jurors agreed. (Appellant's

Brief p.144). Neither *Briseno* nor *Gallo* mandate Appellant's proposed instruction. *Briseno*, 135 S.W.3d 1; *Gallo v. State*, 239 S.W.3d 757 (Tex. Crim. App. 2007). The opinion in *Williams v. State* contains a footnote, which recites that jurors were instructed to answer the intellectual disability special issue "yes" if at least ten jurors found that he proved by a preponderance of the evidence that he was intellectually disabled. 270 S.W.3d 112, 134 fn.30 (Tex. Crim. App. 2008). The opinion does not address whether that instruction was required or whether it was even proper. *Id*. Rule 292 of the Texas Rules of Civil Procedure provides that a jury may render a verdict "by the concurrence . . . of the same ten or more members of an original jury of twelve[.]" Tex. R. Civ. Proc. Ann. 292. Appellant points to no authority showing that Rule 292 applies to a jury determination of intellectual disability in a capital murder case.

In any event, even if this Court concludes that the trial court erred in denying Appellant's proposed instruction, which the State does not concede, any alleged error was harmless. In this case, the jury was unanimous; the jury unanimously found that Appellant failed to prove by a preponderance of the evidence that he was intellectually disabled.

Issue 51 should be overruled.

**STATE'S RESPONSE TO ISSUE *52*: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST FOR AN ACCOMPLICE WITNESS INSTRUCTION.**

Appellant contends that the trial court erred in failing to include an accomplice witness instruction in the instant punishment charge. Appellant's contention lacks merit.

### *Pertinent Facts*

During the charge conference, Appellant requested "that the jury be instructed that Lonnie Thomas was an accomplice witness[.]" (RR69:126-27; DX25). Appellant offered the following instruction:

> You are instructed that Lonnie Thomas was an accomplice and you cannot consider his testimony unless you first believe that his testimony is true and shows the guilt of the defendant as charged by the indictment, and then you cannot consider his testimony unless the accomplice witness' testimony is corroborated by other evidence tending to connect the defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the defendant with its commission.

(DX25). In response, the State argued that an accomplice instruction would be appropriate for a guilt-or-innocence charge, but not a punishment charge. (RR69:127). The State pointed out that the

291

existing charge already instructed the jury to determine the credibility of each witness, which would necessarily include Lonnie. (RR69:127). Anything further would be a comment on the weight of the evidence. (RR69:127). Appellant's request for an instruction was denied. (RR69:127).

## *Applicable Law*

Article 38.14 of the Texas Code of Criminal Procedure provides as follows:

> A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005).

## *Analysis*

Appellant has failed to properly brief this issue. Indeed, his briefing regarding this issue consists of only two sentences. (Appellant's Brief pp.144-45). This Court is not required to make Appellant's case for him. *Garcia*, 887 S.W.2d at 882.

Moreover, Appellant points to no authority in support of his contention that he was entitled to an accomplice-witness-instruction

during the punishment phase of trial.  Appellant cites one case, *Zamora v. State*, 411 S.W.3d 504 (Tex. Crim. App. 2013).[36]  This case concerns the use of an accomplice-witness-instruction during the guilt/innocence phase of trial.  *Id.* at 507-08.  Appellant does not cite – and the State cannot locate – any authority requiring such an instruction in the *punishment* charge.

Issue 52 should be overruled.

**STATE'S RESPONSE TO ISSUE 53:  THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST FOR AN ANTI-PARTIES INSTRUCTION IN THE CHARGE.**

Appellant contends that the trial court erred in denying his request for an anti-parties instruction in the jury charge.  Appellant's contention lacks merit.

### *Pertinent Facts*

Appellant requested that the trial court include the following instruction in the charge:

> You are further instructed that at this phase of the trial only the conduct of the Defendant can be considered in determining the answers to the special issues submitted to you.

---

[36] In fact, Applicant cites to *Zamosa v. State*, 41 S.W.3d 504 (Tex. Crim. App. 2013). There is no case by that name at that cite.  The State believes this is a clerical error.

(RR69:128).

## *Applicable Law*

Where a law of parties charge is given during the guilt/innocence phase of a capital case, a prophylactic instruction should be given, if requested, which would instruct the jury to limit its consideration of punishment evidence to conduct shown to have been committed by the defendant. *Belyeu v. State*, 791 S.W.2d 66, 72-73 (Tex. Crim. App. 1989). This is referred to as an "anti-parties" charge. *See Martinez v. State*, 899 S.W.2d 655, 657 (Tex. Crim. App. 1994). However, a blanket rule that each time a charge on the law of parties is given at the guilt/innocence stage of a capital murder case an "anti-parties" charge must be given on request at the punishment stage (or charge error results) is inappropriate. *See id.* at 73.

## *Analysis*

Appellant has failed to properly brief this issue. Although he cites three cases, he fails to set forth any specific argument or discussion of the authority in support of his contention. (Appellant's Brief p.144). This Court is not required to make Appellant's case for him. *Garcia*, 887 S.W.2d at 882.

Regardless, Appellant's argument fails. The trial court did not err in denying Appellant's request for an anti-parties charge. Contrary to the statements in Appellant's brief, a parties instruction was not included in the original guilt/innocence charge. The jury was instructed that Lonnie Thomas was an accomplice, however, there was no instruction regarding Appellant's criminal responsibility as a party. Because there was no parties instruction in the guilt/innocence charge, Appellant was not entitled to one in the instant punishment charge.

Issue 53 should be overruled.

**STATE'S RESPONSE TO ISSUE 54: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S REQUEST FOR A SECOND COMPETENCY HEARING.**

Appellant contends that the trial court erred in denying his request for a second competency hearing. Appellant's contention lacks merit.

### *Pertinent Facts*

On July 9, 2014, the jury found Appellant competent to stand trial. (RR59:7).

Trial on the merits began on July 10, 2014. (RR60). At the conclusion of testimony on July 15, defense counsel requested the opportunity for he and Appellant to put some things on the record, ex

parte. (RR63:204-05). During that ex parte hearing, Appellant appeared to offer to "accept signing any document, endorsing any paperwork needed," so that he could go home, having already served 27 years for this offense. (RR63:209-10). The trial court informed Appellant that even if counsel filed a Motion for Time Served, he "would have to deny it. Because the State has the . . . right to make the election how they wish to proceed in this type of case. And if they wish to proceed and pursue the death penalty, then the Court cannot, on its own, prevent them from doing so." (RR63:211).

The following morning, before Appellant was brought into the courtroom, he completely undressed himself then smeared feces on his face and upper chest. (RR64:4; DX4-5). In a hearing in chambers, defense counsel stated:

> . . . We were in court getting ready to proceed in trial when the bailiffs alerted us that Mr. Thomas was back in his cell and undressed and covered in feces.
>
> They allowed me to go back to the holding cell to speak to him. I asked him if he would get dressed and clean himself up, and he said he was fine the way he was. I asked him was he refusing to come into court, and he said, no; that he was ready to come into the courtroom, but that's the way he was going to enter.

(RR64:3). Counsel took photographs of Appellant with his phone and showed them to the trial court "to support our position again that there has been a material change in his competency, and we would ask the Court to consider that at this time when deciding whether to make an inquiry." (RR64:5-6; DX4-5). Counsel advised of her intent to file an Amended Motion for Competency Evaluation and Hearing. (RR64:5). The trial court stated that the defense could file their motion and he would take it under advisement. (RR64:6). The judge stated, however, that he believed that Appellant was "just playing games and trying to delay this proceeding." (RR64:6).

Appellant agreed to take a shower and clean himself and then return to court. (RR64:10-11). He requested to see his "psych doctor at the jail." (RR64:11). Testimony resumed that afternoon. (RR65:8). Appellant elected to remain in the holdover during testimony. (RR65:8).

On July 23, 2014, defense counsel filed "Under Seal Defendant's Second Notice of Incompetence to Stand Trial." (CR-S:24). In the motion, counsel alleged that "[s]ubsequent to the jury determination on July 9, 2014 that the Defendant was competent to stand trial there has

297

been a marked and material decline in the Defendant's competency[.]" (CR-S:24). Counsel requested that the trial court again inquire into Appellant's competency to stand trial. In support of the motion, counsel attached an affidavit wherein she averred that Appellant's condition had worsened; he has persistent delusions; he did not understand that his innocence is not at issue in the trial proceedings; on July 16, 2014, Appellant "had a breakdown, removing all his clothes in the holdover and smearing excrement on his face and chest." (CR-S:24).

After closing arguments but before the verdict, defense counsel "ask[ed] the court consider our Motion and make its ruling." (RR70:81). The motion was denied. (RR70:81). Counsel re-urged the motion after the verdict, but prior to sentencing. (RR70:84). The motion was denied. (RR70:84).

### *Applicable Law*

A defendant is presumed competent to stand trial. Tex. Code Crim. Proc. Ann. art. 46B.003(b). A defendant is incompetent to stand trial if he lacks: (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against him. *See* Tex.

Code Crim. Proc. Ann. art. 46B.003(a). Should a formal competency trial result in a finding of competency, the trial court is not obliged to revisit the issue later absent a material change of circumstances suggesting that the defendant's mental status has deteriorated. *Turner v. State*, 422 S.W.3d 676, 693 (Tex. Crim. App. 2013).

## *Analysis*

The trial court did not err in denying Appellant's request for a second competency determination because Appellant failed to prove a material change of circumstances since the previous determination of competency. Appellant's competence was determined by a jury on July 9th. A week later, on July 16th, when trial on the merits was well underway, Appellant undressed and smeared feces on his face and chest. In a hearing in chambers, the judge stated:

> For the record, the Court engaged in a conversation with the Defendant after the end of testimony yesterday and, based on that conversation, the Court is going to proceed with the trial.
>
> The Court is of the opinion that the Defendant is just playing games and trying to delay this proceeding.

(RR64:6). This exchange was the informal inquiry into Appellant's competency. It is clear from the judge's comment, however, that he did

not believe that evidence existed to support a finding of incompetency. A trial court's first-hand factual assessment of a defendant's competency is entitled to great deference on appeal. *Ross v. State*, 133 S.W.3d 618, 627 (Tex. Crim. App. 2004).

In any event, the trial court invited the defense to file a motion, which the judge would take under advisement. (RR64:4). Defense counsel did not file the instant motion until seven days later, on July 23rd, when the parties delivered their closing arguments. (CR-S:24). Although the motion alleges that Appellant has suffered "a marked and material decline in Defendant's competency[,]" no evidence was presented to prove that there had been a material change in circumstances in connection with Appellant's mental status. In the affidavit attached to the motion, counsel described that Appellant suffers from delusions. But, this evidence was presented and rejected at the July 7th competency trial. (RR57:177-80, 182, 185). Counsel also alleged that Appellant "persists in demanding that we put on a defense to his guilt." (CR-S:24). Evidence on this subject was also presented at the competency trial. Dr. McGarrahan testified at length regarding Appellant's belief that he cannot be convicted if the State fails to

introduce the murder weapon. (RR57:175-77). She testified that Appellant believes that State's witnesses are working behind the scenes to ensure his conviction. (RR57:177). She testified that Appellant's "perceptions and his beliefs are not based in reality." (RR57:179). "He believes that if only his attorneys . . . could file the right motion, he could walk out the door." (RR57:181). The competency jury heard this information and rejected it. (RR59:7).

The affidavit also described the July 16th feces incident. However, beyond the mere fact of the incident itself, no evidence was presented to suggest that in the days between the jury's determination of competency, the feces incident and informal inquiry, and the filing of the motion, that Appellant had suffered a material change of circumstances suggesting that his mental status has deteriorated. Beyond the mere fact of the incident itself, no evidence was presented to suggest that Appellant lacked sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding or that he lacked a rational as well as a factual understanding of the proceedings. *See* Tex. Code Crim. Proc. Ann. art. 46B.003(a). Indeed, the affidavit merely recites that after the incident, Appellant "seemed

dazed [and] largely non-responsive to [counsel's] questions and explanations." (CR-S:24). The next day, Appellant "was cheerful and had returned to his delusive state." (CR-S:24). There is no mention of any additional information suggesting a deterioration in Appellant's mental status.

While it is true that Appellant's decision to smear feces on his face and upper chest was shocking and repellant, it was not necessarily an act demonstrating incompetency. *Johnson v. State*, 429 S.W.3d 13, 18 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (stating that "[b]izarre, obscene, or disruptive comments by a defendant during court proceedings do not necessarily constitute evidence supporting a finding of incompetency"). Instead, it was an act intended to cause disruption. From the very beginning of the trial proceedings, Appellant engaged in behavior calculated to disrupt those proceedings. At the beginning of voir dire, Appellant sought to voluntarily absent himself. (RR12:10-11). He told counsel that if he was brought into the courtroom that he would fight the guards. (RR11:6). On July 12th, Appellant told one of his lawyers that "The three of us need to work together to stop the trial[.]" (CR-S:24). Three days later (the day before the feces incident), during

testimony by State's witness Turner, Appellant stood up and tried to walk out of the courtroom into the holdover. (RR63:163). At the end of that day, during the ex parte hearing described above, Appellant told the judge that he had "asked Mr. Carlos [sic] to stop the jury several times." (RR63:210). The following morning, Appellant smeared feces on himself.

The feces incident was not the act of a man suffering a material deterioration in his mental status; it was the well-devised strategy of a man trying to derail his capital murder trial. It is worth noting the bailiff's description of the incident:

> When we did roll call, [Appellant] was in his cell and he was dressed out at that time. When we had went to get him for court, he was totally nude and he had feces wiped across his entire face and also his chest. His clothes were folded up and put to the side. There was no feces on the walls or floor or anywhere inside the cell. It was just on hisself [sic].

(RR64:9). Indeed, the photographs reflect that Appellant smeared the feces on his face very carefully, deliberately avoiding his eyes, nose, and mouth. (RR72:15, 17; DX4-5). Afterward, he took the time to wash his hands as there appears to be no feces on his hands. (RR72:15, 17; DX4-5). That Appellant was able to talk to his attorney and agree to clean

303

himself and return to court shows that he was able to communicate with counsel. Given the foregoing, it is clear that the trial court did not abuse its discretion in denying Appellant's motion for a third inquiry into his competency. At a minimum, it falls within the zone of reasonable disagreement.

Issue 54 should be overruled.

**STATE'S RESPONSE TO ISSUE NO. 55: APPELLANT'S CLAIM THAT THE EVIDENCE IS INSUFFICIENT TO SUPPORT HIS CONVICTION FOR CAPITAL MURDER PRESENTS NOTHING FOR THIS COURT'S REVIEW.**

Appellant contends that the evidence is insufficient to support his conviction for capital murder. In particular, he points to the fact that the murder weapon was never found and entered into evidence.

### *Applicable Law*

On an appeal of a retrial on punishment only, an appellant may not allege any error that transpired during the guilt-innocence phase of trial. *See Easton v. State*, 920 S.W.2d 747, 749 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd). The appeal is entirely limited to issues pertaining to the retrial on punishment. *See Sanders v. State*, 832 S.W.2d 719, 723-24 (Tex. App.—Austin 1992, no pet.).

*Analysis*

On August 25, 2010, this Court vacated Appellant's sentence and remanded the case to the trial court for a new punishment hearing. *See Ex parte Thomas*, No. AP-76,405, 2010 Tex. Crim. App. Unpub. LEXIS 452, at *6 (Tex. Crim. App. Aug. 25, 2010) (not designated for publication). Because he was retried as to punishment only, Appellant's appeal is limited to issues pertaining to that punishment retrial. *See Sanders*, 832 S.W.2d at 723-24. Appellant's current complaint regarding the sufficiency of the evidence to support his conviction for capital murder, however, relates to the guilt/innocence phase of trial. Appellant has failed to present an issue appropriate for this Court's review.

Issue 55 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. 56-67: THE TRIAL COURT PROPERLY DENIED APPELLANT'S CHALLENGES TO THE DEATH PENALTY STATUTE.**

In Issues 56 through 67, Appellant challenges the constitutionality of the Texas death penalty statute. He acknowledges that these issues have been previously submitted to this Court and overruled, citing *Saldano,* 232 S.W.3d 77, but invites the Court to review its prior stance on these issues. He claims that he asserts these

issues not to cause unnecessary litigation but to preserve the issues for federal court review. (Appellant's Brief p.151).

In Issue 56, Appellant contends the statute under which he was sentenced to death violates the Eighth Amendment by allowing the jury too much discretion in determining who should live and who should die and results in the arbitrary and capricious imposition of the death penalty. (Appellant's Brief p.152).

In Issue 57, Appellant contends that the Texas death penalty statute violates the due process mandates of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on him rather than placing the burden on the State to prove beyond a reasonable doubt that no circumstances warrant a life sentence rather than a death sentence. (Appellant's Brief p.152).

In Issue 58, Appellant contends the trial court erred in denying his motion to hold that Article 37.0711, §§ 2(e) and (f) violates Article I, §§ 10 and 13 of the Texas Constitution.[37] (Appellant's Brief p.153).

---

[37] The State presumes that Appellant's citation to Tex. Code Crim. Proc. Ann. art. 37.071 is actually a citation to Tex. Code Crim. Proc. Ann. art. 37.0711, §§ 3(e) and (f) (West Supp. 2015).

In Issue 59, Appellant contends that the Texas death penalty scheme violates the due process protections of the U.S. Constitution because it does not require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny. (Appellant's Brief p.154).

In Issue 60, Appellant contends that the Texas death penalty scheme violates his rights against cruel and unusual punishment and to due process of law under the Eighth and Fourteenth Amendments by requiring at least ten "no" votes for the jury to return a negative answer to a punishment special issue. (Appellant's Brief p.154).

In Issue 61, Appellant contends that the Texas death penalty scheme violates his rights against cruel and unusual punishment, to an impartial jury, and to due process of law under the Sixth, Eighth, and Fourteenth Amendments because vague, undefined terms in the punishment jury instructions effectively determine the difference between a life or death sentence. (Appellant's Brief p.155).

In Issue 62, Appellant contends that the trial court erred in overruling his motion to hold Art. 37.071, §§ 2(e) and (f)

unconstitutional because it fails to require the jury to give meaningful consideration to mitigating evidence. [38]  (Appellant's Brief p.156).

In Issue 63, Appellant contends that the mitigation special issue is unconstitutional because it fails to place the burden of proof on the State to prove that aggravating evidence exists.  (Appellant's Brief p.156).

In Issue 64, Appellant claims that the mitigation special issue is unconstitutional under the Eighth and Fourteenth Amendments to the U.S. Constitution because it permits an open-ended discretion which was condemned by *Furman v. Georgia*, 408 U.S. 238 (1972). (Appellant's Brief p.157).

In Issue 65, Appellant contends that Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it lacks meaningful appellate review. (Appellant's Brief pp.157-58).

In Issue 66, Appellant contends that the trial court erred in overruling his pre-trial motions which raised various constitutional

---

[38] The State presumes that Appellant's citation to Tex. Code Crim. Proc. Ann. art. 37.071 is actually a citation to Tex. Code Crim. Proc. Ann. art. 37.0711, §§ 3(e) and (f).

challenges to the Texas capital murder punishment scheme. (Appellant's Brief pp.158-59).

In Issue 67, Appellant contends that the cumulative effect of these alleged constitutional violations denied him due process of law in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution. (Appellant's Brief pp.159-60).

Appellant invites the Court to revisit its prior decisions on these issues, which he agrees have all been previously overruled. *See* Appellant's Brief at 151, 158; *Saldano*, 232 S.W.3d at 107-09 (overruling multiple challenges to death penalty statute); *Escamilla*, 143 S.W.3d at 828-829 (overruling similar challenges). Appellant presents no new arguments for the State to address. Accordingly, the State asks this Court to decline his invitation to revisit these legal claims and to overrule issues 56 through 67.

# PRAYER

The State prays that this Honorable Court will affirm the judgment of the trial court.

Respectfully submitted,

_[signature]_

**Susan Hawk**
*Criminal District Attorney*
**Messina Madson**
*First Assistant*
*Criminal District Attorney*
Dallas County, Texas

**Christine Womble**
*Assistant District Attorney*
State Bar No. 24035991
Frank Crowley Courts Bldg
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*
CWomble@dallascounty.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that there are 57,838 words in this document, excluding the caption, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, certificate of service, and certificate of compliance. This number exceeds the maximum allowable number of words provided in Tex. R. App. P. 9.4(i)(2)(A). The State is filing a Motion to Exceed the Word Count contemporaneously with this brief.

_____
Christine Womble


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on John Tatum, attorney for Appellant, 990 South Sherman Street, Richardson, Texas, 75081, by email and by United States mail, on September 16, 2016.

_____
Christine Womble